Rory J. Radding (RR 4042)
David I. Greenbaum (DG 6232)
Jennifer L. Dereka (JD 1577)
EDWARDS WILDMAN PALMER LLP
750 Lexington Avenue
New York, New York 10022
212.308.4411

*Attorneys for Plaintiff Ritani, LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------- X

RITANI, LLC,

               Plaintiff,

     -against-

HAROUT AGHJAYAN; HAROUT R, LLC; H.
RITANI, INC.; H. RITANI, LLC; H. RITANI,
CORP.; and AMAZING SETTINGS, LLP

          Defendants.

-------------------------------------- X

Index No. 11-CV-8928 (RWS)(GWG)

## <u>DECLARATION OF ALEXAN KHATCHADORIAN</u>

I, Alexan Khatchadorian, being duly sworn, depose and say that:

1.   I am the Director of Alexan Jewelry & Gems Co. Ltd. based in Hong Kong and the business partner of Harout Aghjayan ("Harout") in the company Harout and Alexan Jewelry & Gems LLC based in Shenzhen, China.  I have worked in the jewelry business for the past 25 years.

2.   I first met Harout at the Hong Kong fair in September of 2006.

3.   I saw Harout again the following year at the September 2007 Hong Kong show where Harout approached me to discuss a potential business partnership between him and me involving the manufacture of custom bridal engagement rings and wedding bands in China for sale in the United States.  We did not discuss the specifics of our business arrangement at this show.

4.   My next encounter with Harout was at the September 2008 Armenian Jewelers Association meeting at the Hong Kong fair.  Harout attended this show, and the two previous shows, as the President of Ritani.  At the 2008 show, Harout told me that he was ready to go forward with the business plan we discussed back in 2007 in that we would become partners.  He also told me that we needed to start our business preparations as soon as possible, because it will take a long time to organize.  I agreed to meet Harout for breakfast the following morning to discuss our business plan in more detail.

5.   The September 2008 breakfast meeting with Harout lasted approximately two hours.  At the beginning of the meeting, Harout handed me his Ritani business card, which included his name "Harout Aghjayan," his current employer "Ritani" and the Ritani three leaf logo.  (Exh. 1). Harout crossed out his Ritani e-mail address on the front of the card and handwrote "AGHJAYAN@GMAIL.com."  *Id.*  When Harout gave me his card, he instructed me not to use his Ritani email address.  Instead, I was to send all emails to his personal account, so no one

from Ritani could find out what we were planning.  Later in a phone call, he told me not to use

his real name in any of our written communications.  Rather, I should simply write "H" or the

nickname "Parev."  Harout and I used the word "Parev," which means "Hello" in Armenian, as

our code word for Harout in order to hide Harout's identity.

6.    Harout also wrote his cell phone and home phone numbers and his wife Shawndria's cell

phone number on the back of his Ritani business card, so I could contact him to discuss our

business.  (Exh. 2).  Since Harout was still working for Ritani at the time, Harout instructed me

not to call him directly during the day, but to wait until the evening hours to phone him about

business matters.  Harout repeatedly told me how important it was to keep our arrangement a

secret, because he was still employed as Ritani's President and chief designer.  Therefore, he

specifically instructed me not to discuss our business dealings with anyone except my wife.

7.    At the September 2008 breakfast meeting, Harout and I agreed to immediately start

working together to manufacture custom bridal engagement rings and wedding bands in China

for sale to customers in the United States.  Our initial plan was for Harout and me to begin

making sales in the United States within six months of our September 2008 start date.  To do so,

we agreed that we eventually would need to create a Chinese company and factory to

manufacture our jewelry designs and several U.S. companies to promote and sell our products in

the United States.

8.    Harout also informed me that during those first six months we would have to work under

Shawndria's name, so we could hide from Ritani the fact that Harout was forming a jewelry

business to compete with Ritani.  While Harout told me that his employment agreement with

Ritani included a non-compete clause, he explained that he could not wait until he was free from

the Ritani contract to start our business, because it would take too long to get our company up and running.  Instead, we had to prepare everything quietly and secretly beforehand.

9.   When I expressed my concern about entering into this arrangement without first getting Ritani's permission, Harout assured me that everything was alright.  Harout told me that he remained friendly with Ritani and would offer them a discount for sale to other shareholders of his shares of Ritani, so Ritani would allow Harout to work with me in six months time.  It is my current understanding that Harout never made such payment to Ritani or made such a discount, nor received Ritani's permission to work with me.

10. During the September 2008 breakfast, Harout and I also discussed the details of our business arrangement.  Harout and I agreed to create a full service bridal jewelry company that would sketch jewelry designs, produce jewelry pieces as well as offer to sell and sell finished jewelry products to customers in the United States.  We agreed to begin working out of my home and to hire a few CAD CAM workers to help us create jewelry designs.  Once business picked up, we would then consider moving to a larger facility in China, so we could begin the manufacturing process.

11. Within days of our September 2008 meeting, I began receiving emails about my new business venture with Harout from the email account of Harout's wife, Shawndria Aghjayan ("Shawndria").  (Exh.  3).  At first, Shawndria sent me all the business emails.  Shawndria simply worked as Harout's assistant or secretary and would email Harout's instructions in an effort to protect Harout from liability from Ritani.  In fact, I have never spoken directly with Shawndria over the telephone about my business dealings with Harout.  I only spoke with Harout.

12. In the beginning, Harout was very careful not to put anything in writing himself, so no one could uncover the fact that he was directly involved in establishing a competing jewelry business prior to leaving Ritani.  Even though the early emails seemed to come from Shawndria's email account, Harout was always my sole partner and made all of the business decisions throughout our relationship, including the types of designs we created and the employees we hired.  I believe that Harout was sending me emails under Shawndria's name to avoid detection by Ritani.  From the very first day of our venture together in 2008 until around August of 2010, Harout and I spoke over the phone every evening to discuss our company and its jewelry designs.  My daily phone calls with Harout sometimes lasted two or three hours.

13. During the first two months that I worked with Harout, I continued to receive emails under Shawndria's name with Harout's instructions and jewelry designs.  In those emails, Shawndria's email sometimes referred to Harout as her "second pair of eyes," "other set of eyes" or "my someone," because Harout was making all of the design decisions.  (See Exhs. 4, 5, 6).  On occasion, Shawndria's email mistakenly used Harout's real name in providing me with Harout's design comments and corrections.  (Exh. 7).

14. In October of 2008, Shawndria sent me an email discussing a "swoop" design, which permits the engagement ring to fit flush up against the wedding band without any gaps in between.  (Exh. 8).  During our phone discussions, Harout told me that he developed this concept and know-how for Ritani, which he called "Perfect Match."  To Harout, "Perfect Match" was a very important feature in the United States market.  Harout taught me and our China workers how to create ring designs with the "Perfect Match" technique and instructed us that all designs, without exception, had to use "Perfect Match," regardless of the shape of the stone.  (Exhs. 8, 9).

15. Shawndria's emails, however, contained a large number of mistakes and showed her lack of knowledge of the jewelry industry and the simple design styles and techniques necessary to effectively develop a business.  Consequently, by the end of November 2008, I informed Harout that I no longer wanted Shawndria to send me emails about our company.  I did not see this as a big deal, because all of the instructions, descriptions, designs and decisions were being made by Harout, not Shawndria.  Therefore, from November 20, 2008 on, all of the important emails came from Harout under the code word "Parev" and some were even addressed to "Parev Harout aghpar" or "Parev, AG."  (Exh. 10 and Exh. 11).  After this date, Harout and Shawndria frequently changed their email address to be extra careful not to be detected.  Harout and I also continued to elaborate upon our emails through nightly conversations, which allowed us to quickly make decisions on the shapes and sizes of the center stones of our jewelry designs.

16. Between September and December of 2008, Harout and I hired three employees with experience in CAD/CAM designs to work out of my home office in China.  At this time, Harout was doing the large majority of the design work from the United States and emailing me the designs, because we had a limited number of employees in China to assist him.

17. Specifically, beginning in late October or early November of 2008, Harout and I began to follow a series of steps to design and manufacture our jewelry pieces.  Harout started the process by emailing me the first jewelry design "concepts" in the form of CAD CAM drawings using the Jewel CAD software (".jcd").  (Exh. 12).  Upon receipt, our designers in China would work on the files by changing the size and shape of the center stones.  Upon completion, I emailed the finished drawings back to Harout in the United States.  Harout would then print a wax model of the jewelry pieces using a 3-Dimensional printing machine that Harout purchased for our company and stored in the basement of his New Jersey home.  (Exh. 13).  After Harout analyzed

the wax model rings, and compared them to his original specifications, he would inform me via email whether any additional design changes or improvements were needed.  Once any required changes were complete, I sent the file back to Harout in the United States so he could re-print the wax model.  This back and forth process would continue until Harout approved the final design. *Id.*

18. In addition to the CAD CAM drawings, Harout also sent me some emails with spreadsheets attached.  (Exh. 14).  These spreadsheets would sometimes include a column entitled "mm size," which listed Ritani's standard size measurement for each stone.  *Id.*  In the industry, the size of the stone is not a set standard and can vary from one company to another. Whenever I challenged Harout as to the size of the stone, he would respond stating that he had provided me with Ritani's standard measurements, which Ritani has successfully used for the past 10 years.

19. During 2008 and 2009, Harout and I worked together to prepare a large collection of designs for sale to the United States market.  Our plan for the first six months was to prepare a catalog of our bridal designs and circulate it in the United States so we could sell our products to U.S. consumers through a U.S. company to be set up by Harout called "Amazing Settings." Harout told me that he was hoping to be able to get Ritani's permission to circulate these catalogs and start selling his designs in time for the Las Vegas trade show in 2009.

20. Because he was unable to get Ritani's authorization to do so, Harout separately sought to get others, including myself, Shawndria, an Armenian man named Siroun and Carlos, formerly of Tiffany, to agree to sell Harout's jewelry designs in the United States, under their name, so that outsiders could not detect that Harout was really the one behind the sales.  As an example, around March of 2009, Harout approached Siroun seeking to get his consent to an arrangement

where Siroun would sign the company papers and sell Harout's products in the United States, on Harout's behalf, in exchange for a small shareholder percentage.  Harout's proposals were rejected, however, because everyone kept telling him that it was not right to sell products through others during his non-compete period.

21. Based upon my dealings with Harout, it has always been my understanding that Harout was the creative force behind all of the CAD CAM drawings that were emailed to me, though he did not share the specifics as to exactly where his "concept" designs originated.  From approximately October of 2008 until the middle of 2009, Harout, either personally or through Shawndria's name, emailed me CAD/CAM files for 84 designs.  Two examples include the March 3, 2009 email entitled "I Changed the Top Head of 135 that I spoke to you"  (Exh. 15) and the November 21, 2008 email "New Ring."  (Exh. 16).  These first 84 designs were assigned Style Nos. 100 through 200, with 16 empty designs.  Upon receiving the .jcd files for these 84 styles, our China workers changed the heads of each piece by changing the size and/or shape of the center stone.  These changes were made directly on the CAD/CAM files we received from Harout.  The remaining portions of these designs were maintained without modification.  During Harout's employment with Ritani, as well as during his non-compete period, the China factory also designed hundreds of other jewelry designs indicated as Style Nos. 201-400, based upon pictures of "concepts" that Harout emailed to me and sketches made by my employees in China. Moreover, it was our common practice to swap designs or to change head settings with other shanks in order to create "new" designs.  It was my understanding from Harout that this allows us to protect our copyrights.  I do not know copyright law so I believed Harout.  In fact, this practice has allowed us to create more than 200 styles, just by swapping styles indicated as Style Nos. 401.

22. While Harout told me we were unable to get permission from Ritani to sell during that six month time frame, ultimately these designs were showcased in our jewelry catalogs and displayed on either the Amazing Settings or Harout R websites, after these companies were formed in November 2009 and May 2010 respectively.

23. In addition, by January of 2009, Harout and I decided we needed more room and it was time to move from my home office to a bigger office within the same building.  At that time, we started an office with approximately 10 employees under our Hong Kong Company name.  Over the next six or seven months, these employees prepared designs by sketching models on paper and making models using the Jewel CAM software.  The original Hong Kong company was registered under my name and Shawndria and I were joint shareholders.  Harout was unable to officially use his name in association with the Hong Kong company due to his contract with Ritani, though it was Harout, not Shawndria, who was my true partner.

24. Harout and I continued our daily business discussions in the first half of 2009, even though Harout was attending trade shows on behalf of Ritani, as its President.  For example, in February of 2009, Harout asked me to contact him to discuss business while he was at the Centurian show as the President of Ritani.  (Exh. 17).  Similarly, on May 30, 2009, while attending the Las Vegas trade show as Ritani's President, Harout sent me an email message providing me with his hotel room and phone number to call him.  (Exh. 18).  After receiving the email, I called him and Harout told me that he was going to take advantage of his presence in Las Vegas on behalf of Ritani to try to renew some of his old relationships for our business.  While representing Ritani at the 2009 Vegas show, Harout also secretly made efforts to organize our business.  *Id.*  For example, Harout secretly met with at least one software company to discuss setting up a software program for our business venture.  *Id.*  Harout explained that this meeting

was necessary, because he needed at least a year head start to organize our jewelry business to be ready to compete.

25. Shortly after the Chinese New Year in February of 2009, Harout and I began preparations for the start of our Chinese company, which we would name Harout and Alexan Jewelry and Gems. At that time, we moved to a factory in China, so we could begin the process of manufacturing a silver sample line of jewelry for sale in the United States. (Exh. 19). A silver sample line is a ring cast in silver with a synthetic stone for use as a representative sample to sell a product line. The design is final except for the type of metal and stone used. It is cheaper to make silver samples than final gold rings with a diamond. Over the next six months on a rolling basis we completely set up our China factory and became an operational business, including the creation of departments for designing, casting, polishing and setting our bridal jewelry pieces.

26. While we began to prepare the registration papers for Harout and Alexan Jewelry and Gems in July of 2009 and although our business activity was high, as a formality, Harout did not want to sign the final papers until his contract with Ritani expired in November of 2009. (Exh. 20). Unlike our Hong Kong company, it was our plan to use Harout's actual name on the registration papers of our China company. *Id.* By the end of 2009, Harout and I obtained a license for Harout and Alexan Jewelry and Gems.

27. In the meantime, by at least August of 2009 some silver samples were made, but after February 2010 we were making weekly shipments of our silver sample line from either our Hong Kong or China facility to Harout at his personal residence in New Jersey. Specifically, Harout would ship the wax models that he had approved from the United States to me in China with instructions to wax and cast the pieces in silver. Upon receipt of the models, our workers would

make a silver master and then a silver sample line production for me to ship back to Harout in the United States for use in his sales efforts.

28. We produced a large number of silver samples in the 2009-2010 time period to showcase so we could offer to sell to retail shops in the United States in the hopes of obtaining orders. From the very beginning, Harout wanted to sell jewelry in the United States, rather than internationally, because he believed he could benefit from the fact that he was a famous designer in the United States.  As a result, our China company was created solely to sell finished bridal jewelry products to customers in the United States.

29. From our start date in September of 2008 through October of 2009, Harout continued to conduct business and create designs for our company, while still working for Ritani.  We also continued to speak daily about our China company even during Harout's business trips as President of Ritani.

30. At one time, Harout emailed me design drawings that he told me had previously been created for Ritani.  For example, in June 21, 2009, Harout sent me an email entitled "I made this design for R."  (Exh. 21).  The "R" in this email refers to Ritani, because "R" was the password we always used whenever we discussed Ritani.  In this email, Harout told me that he would call me that evening to discuss the design head setting he created for Ritani as a "concept" and whether we could come up with a similar design.  *Id.*

31. In addition, in September and October of 2009, Harout emailed me several internal Ritani design drawings and asked that I help him make these designs for Ritani.  Specifically, between September 4 and September 26, 2009, Harout sent me five separate emails with the subjects "R," (Exh. 22) "R Styles," (Exh. 23) "R Rings," (Exh. 24) "For R No 6 Rit" (Exh. 25) and "RIT 12." (Exh. 26).  Similarly, Harout sent me emails entitled "RIT" (Exh. 27) and "95D-H" (Exh. 28) on

October 20 and 22, 2009 respectively.  The "R" in each of these subject lines stands for Ritani, while "H" was our abbreviation for Harout.  Each of these emails contained .jcd drawings of Ritani designs, including designs incorporating the Ritani logo.  *Id.*  Harout requested my assistance, because he did not have enough time to prepare these designs himself, since he was very busy using his wax machine to build designs for our company.  Harout was unable to complete his work for Ritani, even though he had recently informed them that there was no need for him to come into work, because he could finish his jobs at home.

32. As Harout requested, I took the Ritani concept designs that he had emailed me, completed them and emailed them back to Harout so he could print them out using his wax model machine located in his basement in New Jersey.  It was my understanding that Harout provided these wax models to Ritani.

33. Around October of 2009, towards the end of Harout's employment with Ritani, Harout told me that he informed Ritani that he was working from home, while he really was working with me in China on our business venture.

34. By November 9, 2009, Harout formed Amazing Settings in the United States to sell our jewelry designs to the United States market.  A few days later, Harout sent me the first beginning pages for the Amazing Settings website, including pictures of our designs, which had taken between four to six months to prepare.  (Exh.  29).  Thereafter, on approximately May 20, 2011, the Amazing Settings website first went up on the internet.  From start to finish, it took approximately one year to complete.  The Amazing Settings website contains a number of the 84 designs from the CAD/CAM drawings that Harout created and emailed to me between October of 2008 and the middle of 2009, and some designs from Style Nos. 201-400, which were based on pictures and "concepts" that Harout sent me either during his employment with Ritani or

within the first year following his departure and that my Chinese employees used to create

sketches, at that time, from which the final designs were made.

35. On December 1, 2009, shortly after Harout left Ritani, Harout again changed his email

address, this time to include his real name. (Exh. 30). However, while Harout's new email was

Aghjayanh@yahoo.com, he continued to sign his emails with the name "Parev."  *Id.*

36. On December 23, 2009, Harout sent me an email telling me not to add Shawndria as a

friend on Facebook so we could keep our relationship a secret from Ritani.  (Exh.  31).  Harout

did not want Ritani to know that he was working with me in China, that we had a China

company or that we had created bridal jewelry designs to sell in the United States.

37. The purpose of our China company was to manufacture jewelry products only for

Harout's United States companies.  In the beginning, this meant Amazing Settings.  We had

planned to start distributing our designs through Amazing Settings so we could make some

money to use in advertising our brand name, which became "Harout R."  The "R" in "Harout R"

stands for Ritani.  Harout told me that he chose this name, because everyone knows him as

Harout Ritani and that no one would recognize the name Harout alone.

38. In early 2010, Harout told me he was working heavily on developing his customer

connections in the United States and hoped to "meet important clients" for us when he attended

the Las Vegas trade show that year. (Exh.  32).  Since our China factory had been producing

silvers since February of 2010, we had hundreds of silver sample line selections at this time,

totaling around 20,000 pieces.  Harout's business strategy was to focus on big customers in order

to get large orders.  He specifically solicited Helzberg, QVC, Blue Nile, Tiffany, Robbins Bros.

and Michael Hill for business in 2010.  In fact, Harout told me that he was going to go after all

Ritani customers, because Ritani's customers knew him as Harout Ritani.

39. For example, Harout contacted Helzberg Diamonds ("Helzberg") prior to February of 2010 to set up an appointment to discuss our bridal line with the hopes of getting our first order. Harout told me that Helzberg was a prospective client of Ritani.  Harout had numerous communications with Helzberg and made his first visit around February 3, 2010.  (Exh.  33). During the next several months, Harout traveled to Helzberg on multiple occasions to show them catalogs, pictures and silver samples to try to get Helzberg to place an order under Harout's U.S. Company, Amazing Settings.  Following Harout's visit, Helzberg selected approximately 65 styles that they were interested in.  By March of 2010, Harout was shipping me wax jewelry models for Helzberg and I was sending silver pieces back to Harout in the United States.  (Exh. 34).

40. Harout told me that he informed Helzberg that he no longer was designing for Ritani and was working to design a catalog for his new business.  Harout also stated that he told Helzberg that Ritani would go out of business if Harout did not design for Ritani.  In addition, Harout informed me that due to his visits, Helzberg cancelled their appointment with Ritani, because they could not work with both Ritani and Harout.

41. On February 11, 2010, Harout received an email from Helzberg attaching a 2010 Supplier Purchasing Information Form.  (Exh. 35).  It is the normal course in the jewelry industry that customers will not do business with you unless and until you provide them with a fully executed vendor agreement.  Harout forwarded this email to me with a request for the registration number of our Chinese company, because Harout was thinking of selling Helzberg designs directly from China, rather than Amazing Settings.  *Id.*  This form was never filled out for our China company, because we did not sell anything or invoice customers from China. Rather, all merchandize is shipped from China to either Amazing Settings or Harout R and all

customer invoices were sent out from these U.S. companies.  Harout explained that following receipt of this purchasing form, a fight began between the lawyers from Helzberg and Harout's lawyer, Jerry, as to why Harout was trying to sell them products in the United States if he was not allowed to do so.  As a result, Harout tried to get Helzberg to sign a paper that they never in fact had a meeting.  (Exh. 36).

42. In April of 2010, Harout emailed me stating that Helzberg's attorneys had become nervous about the idea of Helzberg doing business with Harout, because they cannot work with someone that has a non-compete contract with another company.  *Id.*  Over the next couple of months, Harout continued to communicate with Helzberg and tried to convince them that it was not a problem to enter into a business agreement with us.

43. By May 11, 2010, Harout told me that he was hoping to close the deal with Helzberg by the Las Vegas trade show at the end of the month.  (Exh. 37).  However, this did not happen. Harout then became extremely happy in July of 2010 when his close friend, Tom, started to work for Helzberg and promised to give us a big order.  (Exh. 38).

44. In a November 2010 email, Harout informed me that he succeeded in opening accounts with 25 Helzberg stores.  (Exh. 39).  Ultimately, we entered into our first contract with Helzberg for $2.8 million in late 2010 or early 2011.  The gold pieces purchased by Helzberg were shipped from our China facility to Harout R, one of Harout's United States companies, for distribution to Helzberg in the beginning of 2011.

45. In addition, by at least April of 2010, Harout initiated contact with Ritani's customer, QVC, and scheduled several meetings in an effort to negotiate a business arrangement with them. (Exhs. 40, 41).  Harout had a connection at QVC and mentioned to me that he did some work for Internet QVC.  Harout made several trips to QVC to show them our sample silver production

lines.  *Id.*  For example, on April 14, 2010, Harout sent me an email telling me that he had just

come back from a trip to QVC.  *Id.*  Harout knew that QVC was a Ritani customer and that they

were very nervous about doing business with him after he left Ritani.  (Exh.  41).  In fact, Harout

admitted to me that it may have been too soon for him to go to QVC, while Ritani is still doing

business with them.  (Exh.  42).

46. QVC was not interested in the first production samples that Harout brought to them in

April of 2010.  *Id.*  Instead, they wanted Harout to take some of the pendants he showed them

and convert them into rings. *Id.*   Following Harout's initial meeting with QVC, Harout asked

our designers to start designing CAD/CAM drawings of rings for QVC based upon "sketches

named Rita," which were designed in June of 2009 while Harout was still working for Ritani.

(Exh.  43).  Harout referred to this QVC fashion collection as "RITA," which he named after his

daughter.  In May of 2010, Harout told us to stop rendering pieces for QVC, because he could

not reach an agreement with the designers there. (Exh.  44).   Based upon my discussions with

Harout, QVC was very concerned that Harout would not be able to sell designs to them in the

United States in 2010.

47. Harout was especially interested in dealing with Ritani customers, because they knew

him from his previous work as Ritani's President and chief designer.  As a result, Harout also

solicited Blue Nile for business in 2010.  Ritani had already had business dealings with Blue Nile

for some time, which were secret and covered by a non-disclosure agreement ("NDA").  Due to

his employment at Ritani, Harout had special knowledge of this information and of its secrecy,

but nonetheless violated the NDA by disclosing the fact that Ritani and Julius Klein Diamonds

worked with Blue Nile at the same time, using this information to his business advantage.

48. Harout also approached Tiffany in 2010 to try to sell them our jewelry designs.  Tiffany, however, turned Harout away because they considered him to be a "black mark," due to an earlier incident where Harout paid off someone at Tiffany in an effort to secure a $10 million a year order.

49. On September 13, 2010, Harout R was officially formed as our brand name jewelry company in the United States.  Harout R shares the same factory, the same employees and the same designs as Amazing Settings in China and the United States.  In addition, as with Amazing Settings, the Harout R website has a number of the original 84 designs that Harout created and sent to me between late 2008 and mid-2009, as well as Style Nos. 201-400, which were based on pictures and "concepts" that Harout sent me either during his employment with Ritani or within the first year following his departure and that resulted from my Chinese employees' sketches.

50. .  Harout R was likewise established as a brand name company to sell bridal designs manufactured by our China company to customers in the United States.

51. In November of 2010, Harout sent me an email that he was continuing to focus on selling our jewelry products in the United States by traveling everywhere to try to open accounts, including Seattle, California, Virginia and Washington.  (Exh.  39).

52. By late 2010 or early 2011, we began to make our jewelry designs in gold and platinum.  Specifically, the silver masters we created were covered in rubber to make a mold, injected with a second kind of wax and a gold cast was made.  After casting was complete, the diamond was placed on the ring in China and the jewelry pieces were shipped from our Chinese company, Harout and Alexan Jewelry and Gems, to Harout in the United States at either Amazing Settings or Harout R.

53. Prior to the 2011 Las Vegas trade show, Harout sent out 7,000 catalogs to customers to try to solicit business.  (Exh. 45).  In the meantime, we continued to stock up on our inventory in anticipation of the accounts that we would open at the trade show.  Harout set up two booths at the 2011 Las Vegas show and took orders from 52 different accounts.

54. Throughout our relationship, Harout was always trying to prove to me that he had good relations with Ritani, in order to eliminate my concerns and because I was constantly pushing him to get Ritani's permission so we could start selling our bridal jewelry.  When we began our business, we planned to prepare catalogs and to have our collection ready prior to the 2009 Las Vegas show, so we could start selling our designs at that show.  (Exh. 46).  While Harout promised that our sales could begin within six months of the formation of our partnership in September of 2008, this did not happen.  During the 2008-2011 time period, we spent a great deal of time and hundreds of thousands of dollars in organizing our businesses, designing our styles and manufacturing jewelry pieces for sale into the United States.

55. By August of 2010, Harout and I no longer exchanged telephone calls with each other and our relationship had deteriorated.  In the few emails that we did exchange, Harout would constantly tell me that everything was black and that business was bad.  While I remain a shareholder in Harout and Alexan Jewelry & Gems LLC, I am no longer permitted access to the factory.

56. The following are true and correct copies of the exhibits referenced herein and attached hereto:

1.  Exhibit 1 is a true and correct copy of the front of Harout Aghjayan's Ritani business card received from Harout Aghjayan in September of 2008.

2.  Exhibit 2 is a true and correct copy of the back of Harout Aghjayan's Ritani business card received from Harout Aghjayan in September of 2008.

3.  Exhibit 3 is a true and correct copy of a September 22, 2008 email from shawndriaritani@yahoo.com to director@alexanjewelryandgems.com with the subject "[?? Probable Spam] Harouts wife Shawndria Aghjayan."

4.  Exhibit 4 is a true and correct copy of a November 6, 2008 email with attachment from shawndria007@gmail.com to Alexan's with the subject "Re: 107 excel."

5.  Exhibit 5 is a true and correct copy of a November 12, 2008 email from shawndria007@gmail.com to Alexan with the subject "Cushion stone is okay."

6.  Exhibit 6 is a true and correct copy of a November 19, 2008 email from shawndria007@gmail.com to Alexan with the subject "117 and 103."

7.  Exhibit 7 is a true and correct copy of a November 3, 2008 email from shawndria007@gmail.com to Alexan's with the subject "Re: In answer to your questions."

8.  Exhibit 8 is a true and correct copy of an October 16, 2008 email with attachment from shawndria007@gmail.com to Alexan's with the subject "Please open them."

9.  Exhibit 9 is a true and correct copy of a March 21, 2009 email with attachment from platinum1010@gmail.com to ALEXAN'S with the subject "174 NEW VERSION WITH BETTER FIT TO A BAND."

10. Exhibit 10 is a true and correct copy of a November 20, 2008 email from platinum1010@gmail.com to ALEXAN'S with the subject "Re: style 118 & same question about 118 & 119."

11. Exhibit 11 is a true and correct copy of a November 24, 2008 email from platinum1010@gmail.com to ALEXAN'S with the subject "Re: A new captain, No. 4."

12. Exhibit 12 is a true and correct copy of an October 16, 2008 email from shawndria007@gmail.com to Alexan with the subject "101."

13. Exhibit 13 is a true and correct copy of a September 15, 2009 email from platinum1010@gmail.com to ALEXAN'S with the subject "hi alex."

14. Exhibit 14 is a true and correct copy of an December 1, 2008 email with attached spreadsheet from shawndria007@gmail.com to Alexan with the subject "STYLE 103 EXCEL REVISED."

15. Exhibit 15 is a true and correct copy of a March 3, 2009 email with attachment from platinum1010@gmail.com to ALEXAN'S with the subject "I CHANGED THE TOP HEAD OF 135 THAT I SPOKE TO YOU."

16. Exhibit 16 is a true and correct copy of a November 21, 2008 email with attachment from platinum1010@gmail.com to ALEXAN'S with the subject "NEW RING."

17. Exhibit 17 is a true and correct copy of a February 3, 2009 email from platinum1010@gmail.com to ALEXAN'S with the subject "Please call harout at the hotel number right now."

18. Exhibit 18 is a true and correct copy of a May 30, 2009 email from platinum1010@gmail.com to ALEXAN'S with the subject "hi alex."

19. Exhibit 19 is a true and correct copy of a February 9, 2009 email from platinum1010@gmail.com to ALEXAN'S with the subject "Re: Is this your current mailing address?"

20. Exhibit 20 is a true and correct copy of a July 27, 2009 email from platinum1010@gmail.com to ALEXAN'S with the subject "paperwork."

21. Exhibit 21 is a true and correct copy of a June 21, 2009 email with attachment from platinum1010@gmail.com to ALEXAN'S with the subject "Re: I made this design for r."

22. Exhibit 22 is a true and correct copy of a September 4, 2009 email with attachments from platinum1010@gmail.com to ALEXAN'S with the subject "R."

23. Exhibit 23 is a true and correct copy of a September 13, 2009 email with attachment from platinum1010@gmail.com to ALEXAN'S with the subject "R STYLES."

24. Exhibit 24 is a true and correct copy of a September 24, 2009 email with attachment from platinum1010@gmail.com to ALEXAN'S with the subject "R RINGS."

25. Exhibit 25 is a true and correct copy of a September 25, 2009 email with attachments from platinum1010@gmail.com to ALEXAN'S with the subject "FOR R NO 6 RIT."

26. Exhibit 26 is a true and correct copy of a September 26, 2009 email with attachments from platinum1010@gmail.com to ALEXAN'S with the subject "RIT 12."

27.  Exhibit 27 is a true and correct copy of a October 20, 2009 email with attachments from platinum1010@gmail.com to ALEXAN'S with the subject "RIT."

28.  Exhibit 28 is a true and correct copy of a October 22, 2009 email with attachments from platinum1010@gmail.com to ALEXAN'S with the subject "95D-H."

29.  Exhibit 29 is a true and correct copy of a November 13, 2009 email with attachments from platinum1010@gmail.com to ALEXAN'S with the subject "website first begining pages."

30.  Exhibit 30 is a true and correct copy of a December 1, 2009 email from aghjayanh@yahoo.com to alex with the subject "new email address."

31.  Exhibit 31 is a true and correct copy of a December 23, 2009 email from platinum1010@gmail.com to ALEXAN'S with the subject "hi alex."

32.  Exhibit 32 is a true and correct copy of a April 22, 2010 email from platinum1010@gmail.com to ALEXAN'S with the subject "new improved models."

33.  Exhibit 33 is a true and correct copy of a February 3, 2010 email from platinum1010@gmail.com to ALEXAN'S with the subject "have a safe flight."

34.  Exhibit 34 is a true and correct copy of a March 8, 2010 email from shawndria007@gmail.com to Alexan and Harout Aghjayan with the subject "Hi Guys! Here's your tracking number for HZ."

35. Exhibit 35 is a true and correct copy of a February 11, 2010 email and attachment from platinum1010@gmail.com to ALEXAN'S with the subject "here is the attachment from helzberg."

36. Exhibit 36 is a true and correct copy of a April 23, 2010 email from platinum1010@gmail.com to ALEXAN'S with the subject "helzberg."

37. Exhibit 37 is a true and correct copy of a May 11, 2010 email from platinum1010@gmail.com to ALEXAN'S with the subject "We've got the green waxes this afternoon & started as you said."

38. Exhibit 38 is a true and correct copy of a July 6, 2010 email from platinum1010@gmail.com to ALEXAN'S with the subject "helz."

39. Exhibit 39 is a true and correct copy of a November 16, 2010 email from aghjayan@gmail.com to ALEXAN'S with the subject "Our little angle's photos."

40. Exhibit 40 is a true and correct copy of a April 14, 2010 email with attachment from platinum1010@gmail.com to ALEXAN'S with the subject "here are new orders with.

41. Exhibit 41 is a true and correct copy of a April 14, 2010 email with attachment from platinum1010@gmail.com to ALEXAN'S with the subject "MORE ORDERS.

42. Exhibit 42 is a true and correct copy of a April 16, 2010 email from platinum1010@gmail.com to ALEXAN'S with the subject "follow up on models."

43. Exhibit 43 is a true and correct copy of a April 20, 2010 email from

   platinum1010@gmail.com to ALEXAN'S with the subject "Re: Some sketches named

   RITA."

44. Exhibit 44 is a true and correct copy of a May 8, 2010 email from

   platinum1010@gmail.com to ALEXAN'S with the subject "Re: Some sketches named

   RITA."

45. Exhibit 45 is a true and correct copy of a July 12, 2011 email from aghjayan@gmail.com

   to ALEXAN'S with the subject "Re: FW: PAREV HAROUT AGHPAR."

46. Exhibit 46 is a true and correct copy of a October 9, 2008 email from

   shawndriaritani@yahoo.com to ALEXAN'S with the subject "RE: Good Morning

   Shawndria."

I DECLARE UPON PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA, THAT THE FOREGOING INFORMATION IS TRUE AND CORRECT.

Executed on <u>May 24, 2012</u>

By: Alexan Khatchadorian

NYC 420876