UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------X

RITANI, LLC,

                       Plaintiff,                11 CIV. 8928

   -against-                            OPINION

HAROUT AGHJAYAN; HAROUT R, LLC;
H. RITANI, INC.; H. RITANI, LLC;
H. RITANI, CORP.; and AMAZING
SETTINGS, LLP,

                    Defendants.

-----------------------------------------X



A P P E A R A N C E S:

        Attorneys for Plaintiff

        LEASON ELLIS LLP
        One Barker Avenue, Fifth Floor
        White Plains, NY 10601
        By:  Peter S. Sloane, Esq.
             Cameron S. Reuber, Esq.
             Jonathan W. Thomas Esq.


        Attorneys for Defendants

        MEYER, SUOZZI, ENGLISH & KLEIN, P.C.
        990 Stewart Avenue, Suite 300
        P.O. Box 9194
        Garden City, NY  11530-9194
        By:  Erica B. Garay, Esq.
             Lynn M. Brown, Esq.

**Sweet, D. J.**


There are several motions currently pending in this action between plaintiff Ritani, LLC ("Ritani" or the "Plaintiff") and defendants Harout Aghjayan ("Aghjayan" or the "Defendant"), Shawndria Aghjayan ("Mrs. Aghjayan"), Harout R, LLC ("Harout R"), H. Ritani, Inc. ("HR Inc."), H. Ritani, LLC ("HR LLC"), H. Ritani, Corp. ("HR Corp.") and Amazing Settings, LLP ("Amazing Settings") (collectively, the "Defendants").


Ritani and counter-claim defendants Julius Klein Diamonds, LLC ("JKD"), Joseph Manber ("Manber"), and Abraham D. Klein ("Klein") (collectively, the "Counter-Defendants") have moved to dismiss certain counter-claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, including: (1) defendant and counter-claim plaintiff HR Corp.'s counterclaims for fraud, negligent misrepresentation, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty; (2) defendant and counter-claim plaintiff Mrs. Aghjayan counterclaim for aiding and abetting a breach of fiduciary duty; (3) defendants and counter-claim plaintiffs Amazing Settings and Harout R's counterclaim for conversion.

1

Individual defendants then moved to dismiss certain counts from Plaintiff's first amended complaint (the "First Amended Complaint" or "FAC") including:  (1) Aghjayan's motion to dismiss Plaintiff's claims for tortious interference with prospective advantage (Count IX) and misappropriation of trade secrets (Count VII) pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure; (2) Mrs. Aghjayan's motion to dismiss the aiding and abetting claims (Counts VII and XI) pursuant to Rule 9(b) and 12(c) of the Federal Rules of Civil Procedure; (3) Amazing Settings and Harout R's motion to dismiss the misappropriation of trade secrets claim (Count VIII) pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

While those motions to dismiss were sub judice, Defendants Aghjayan, Harout R and Amazing Settings filed a motion for attorney's fees as the prevailing party on the copyright infringement claim.

Upon the facts and conclusions set forth below, (1) the Counter-Defendants' motions to dismiss are granted; (2) Defendants' motions to dismiss are denied in part and granted in part; and (3) Defendants' motion for attorney's fees is denied.

## I. <u>Prior Proceedings</u>

The Plaintiff filed its initial complaint on December 7, 2011 against the Defendant and his companies (the "Defendants Companies"), alleging (1) federal copyright infringement pursuant to 17 U.S.C. §§ 101 and 501 <u>et seq.</u>; (2) federal trademark infringement under the Lanham Act, 15 U.S.C. § 1114(1)(a); (3) unfair competition, false designation of origin and false and misleading representations in commerce under the Lanham Act, 15 U.S.C. § 1125(a); (4) false advertising under the Lanham Act, 15 U.S.C. § 1125(a); (5) state false advertising under N.Y.G.B.L. § 350; (6) common law trademark infringement under state law; (7) state unfair competition; (8) state trademark dilution under N.Y.G.B.L. § 360-1; (9) deceptive practices under N.Y.G.B.L § 349; (10) common law misappropriation of trade secrets; (11) tortious interference with business relationships under state law; (12) breach of implied covenant not to solicit business and reduce goodwill under state law; (13) breach of contract and common law non-competition; (14) unjust enrichment; (15) common law breach of the duty of loyalty and breach of fiduciary duty; (16) breach of the implied duty of good faith and fair dealing; and (17) imposition of a constructive trust (the "Initial Complaint" or "IC").

3

Invoking Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, the Defendants moved to dismiss the entirety of the Initial Complaint on February 6, 2012.  That motion was heard and marked fully submitted on March 15, 2012.

On May 30, 2012, Plaintiff filed a motion seeking preliminary injunctive relief due to the alleged irreparable harm caused by the culmination of the Defendants' conduct.  On June 11, 2012, the Court issued an opinion from the bench, denying the Plaintiff's motion for a preliminary injunction for failure to establish a prima facie case.

On May 30, 2012, Plaintiff concurrently made a motion to amend the Initial Complaint and for leave to file the proposed amended complaint (the "PAC" or "Proposed Amended Complaint").  The PAC sought to add certain factual details, to add a new Defendant, Aghjayan's wife, Mrs. Aghjayan", and to remove certain state causes of action.  The PAC alleged the following causes of action against all Defendants, unless otherwise specified:  (1) federal copyright infringement pursuant to 17 U.S.C. §§ 101 and 501 et seq., against Aghjayan, Amazing Settings and Harout R (Count I); (2) federal trademark infringement under the Lanham Act, 15 U.S.C. § 1114(1)(a) (Count

4

II); (3) unfair competition, false designation of origin and
false and misleading representations in commerce under the
Lanham Act, 15 U.S.C. § 1125(a) (Count III); (4) false
advertising under the Lanham Act, 15 U.S.C. § 1125(a) (Count
IV); (5) state false advertising under N.Y.G.B.L. § 350 (Count
V); (6) common law trademark infringement under state law (Count
VI); (7) state unfair competition (Count VII); (8) state
trademark dilution under N.Y.G.B.L. § 360-1 (Count VIII); (9)
common law misappropriation of trade secrets (Count IX); (10)
tortious interference with business relationships under state
law against Aghjayan and his companies (Count X); (11) breach of
implied covenant not to solicit business and reduce goodwill
under state law against Aghjayan and HR Corp. (Count XI); (12)
breach of contract and common law non-competition against
Aghjayan, Mrs. Aghjayan and HR Corp. (Count XII); and (13)
common law breach of the duty of loyalty and breach of fiduciary
duty against Aghjayan and Mrs. Aghjayan (Count XIII).

        Defendants' counsel requested an extension of time to
respond to Plaintiff's motion to amend, which was granted.
(Dkt. No. 33).  On June 27, 2012, Defendants submitted a
response to Defendants' motion to amend referring the Court to
"Defendants' motion to dismiss the original complaint (Docket
Nos. 10-12 and 15) and the transcripts of the hearing on

Plaintiff's motion for a preliminary injunction (Docket Nos. 40, 42, and 44) and the Court's decision of June 11, 2012." (Dkt. No. 47).

By opinion, dated July 18, 2012, this Court granted the Defendant's motion to dismiss the claims in Counts I, V, X and XI, denied Counts II-IV, VI-VII and VIII as to Aghjayan, HR LLC, HR Corp. and Harout R; denied Counts IX and XIII as to Aghjayan and Mrs. Aghjayan; and denied Count XII as to Aghjayan. See Ritani v. Aghjayan, 880 F. Supp. 2d 425, 455 (S.D.N.Y. 2012) (the "July 18 Opinion"). The Plaintiff's motion to amend was granted. Id. However, due to the unusual procedural posture of the case and because Defendants referred the Court to their previous arguments, the motion to amend was granted subject to the causes of action dismissed in the July 18 Opinion. Plaintiff was also granted leave to replead with 20 days.

On August 9, 2012, Plaintiff filed its first amended complaint (the "FAC" or "First Amended Complaint") (Dkt. No. 54). On August 27, 2012, individual defendants Harout R, Amazing Settings, HR Corp., and HR LLC submitted their answers to the First Amended Complaint and asserted certain counterclaims. (See Dkt. Nos. 59, 60, 61, 62).

6

On October 1, 2012, Plaintiff and Counter-Defendants filed three motions to dismiss, including (1) a motion to dismiss the counterclaims of HR Corp.; (2) a motion to dismiss the counterclaims of Mrs. Aghjayan; and (3) a motion to dismiss the counterclaims of Amazing Settings and Harout R (the "Plaintiff's Motions to Dismiss") (Dkt. Nos. 77, 79, 81). The Plaintiff's Motions to Dismiss were heard and marked fully submitted on November 28, 2012.

On November 7, 2012, certain individual defendants moved to dismiss claims from the First Amended Complaint, including: (1) Aghjayan's motion to dismiss Plaintiff's claims for tortious interference with prospective advantage (Count IX) and misappropriation of trade secrets (Count VII); (2) Mrs. Aghjayan's motion to dismiss the aiding and abetting claims (Counts VII and XI); (3) Amazing Settings and Harout R's motion to dismiss the misappropriation of trade secrets claim (Count VIII) (the "Defendants' Motions to Dismiss") (Dkt. Nos. 96, 98, 100). The Defendants' Motions to Dismiss were originally scheduled to be heard on January 16, 2013.

The parties, however, stipulated to adjourn the adjudication of Plaintiffs' Motions to Dismiss and Defendants' Motions to Dismiss pending the outcome of settlement conferences

held before Magistrate Judge Gabriel Gorenstein.  After settlement talks failed, the Defendants' Motions to Dismiss were heard and marked fully submitted on March 27, 2013.

On March 19, 2013, Plaintiff Ritani and Counter-Defendants JKD, Manber, and Klein substituted their counsel from the law firm of Edwards Wildman Palmer LLP to their current counsel, Leason Ellis LLP.

On April 1, 2013, Defendants made a motion for attorneys' fees as the prevailing party on the copyright infringement claim (the "Defendants' Motion for Fees") (Dkt. No. 136).  The Defendants' Motion for Fees was fully submitted and heard on May 1, 2013.

## II.  **Facts**

The facts underlying this action were previously set forth in this Court's July 18 Opinion.  See Ritani, 880 F. Supp. 2d 425.  Accordingly, the general background of this case and prior litigation between the parties is assumed, and any additional facts related to the counterclaims may be found in the relevant "Discussion" sections below.

Ritani is corporation of the State of New York and a successful designer, manufacturer and distributor of high-end designer jewelry.  (FAC ¶ 2).

Aghjayan and Mrs. Aghjayan are individuals residing in the State of New Jersey.  (Id. ¶¶ 3, 4).  The Amended Complaint alleges that the following companies are wholly owned by Aghjayan:  (1) Harout R is a corporation of the State of New Jersey with offices in that state and is a designer, manufacturer and distributor of jewelry; (2) HR LLC is a corporation of the State of Delaware and is now listed as inactive by the Secretary of the State of Delaware.  HR LLC is presently listed by Hoovers as incorporated in the State of New York and has a principal place of business in the State of New Jersey; (3) HR Corp. is a corporation of the State of New York which has offices in New Jersey; and (4) Amazing Settings is a corporations of the State of New Jersey with offices in that state and is a designer, manufacturer and distributor of jewelry.  (Id. ¶¶ 5-8).  The Amended Complaint alleges that Aghjayan had an "intimate personal involvement and domination over each of the Defendant Companies, and played an active and conscious role, on behalf of these Defendants."  (Id. ¶ 12).

9

In 1996, Aghjayan founded and wholly owned HR Corp., which manufactured and distributed high-end jewelry under the trademark Ritani. (Id. ¶ 11). By March 2002, Aghjayan, needing an infusion of cash and managerial support, entered into negotiations with JKD and For Krunch, LLC ("Krunch") for the sale of all of HR Corp.'s assets. (Id. ¶ 14).

On March 26, 2002, Aghjayan, HR Corp., JKD and Krunch executed a series of five agreements. (Id. ¶ 15). By these agreements, Aghjayan and HR Corp. agreed to sell the business consisting of all of the rights, titles and interests in and the assets of HR Corp., including all of its copyrights, trademark rights, and all other intellectual property rights, as well as good will, to the newly formed entity, Ritani. (Id.). Ritani was to be owned jointly by Aghjayan, HR Corp, JKD and Krunch. (Id.).

The first agreement entered into by the parties was a "Membership Interest Purchase Agreement" dated March 26, 2002. (Id. ¶ 16). Under this contract, Aghjayan sold his 44% membership interest in Ritani, as well as all rights, titles and interests in and to the intellectual property of HR Corp., the trademark Ritani and other trademarks, copyrighted Ritani jewelry designs, the "[d]esign, concept and content of the

10

Ritani website" and "all of the good will associated with the business of [HR Corp]" to Ritani for the aggregate purchase price of $2,628,000.  (Id.).

The second agreement was a "Contribution Agreement" whereby HR Corp. and Aghjayan confirmed their sale of the "Contributed Assets" to Ritani in exchange for HR Corp.'s receipt of a membership interest in the newly formed company. As with the Membership Agreement, the Contribution Agreement similarly recited the Defendants' assignment of intellectual property to Ritani. (Id. ¶ 17).

The third agreement was an "Assignment and Assumption Agreement" confirming HR Corp.'s sale, transfer and assignment of all of its right, title and interest in and to the properties listed in the Contribution Agreement to Ritani for Ritani's "own use and benefit forever from the date hereof."  (Id. ¶ 18).

JKD, Krunch, HR Corp., and Aghjayan also entered into an Operating Agreement (the "2002 Operating Agreement") which recited the profit/ loss percentages for each of the members of the newly formed company, as follows: JKD 10%; Krunch 5%; Aghjayan 44%; and HR Corp. 41%.  (Id. ¶ 19).  In addition, JKD and HR Corp. each possessed 50% voting rights.  (Id.).

11

The terms of the 2002 Operating Agreement required Aghjayan to concurrently execute an employment agreement (the "2002 Employment Agreement") appointing him Chief Executive Officer ("CEO") and President of Ritani. (Id. ¶ 20).  Aghjayan entered into the 2002 Employment Agreement, which states that he had a duty to render "exclusive services as Chief Executive Officer" for Ritani and to perform such services "to further the business and affairs of Employer." (Id.).  The 2002 Employment Agreement also precluded Aghjayan from disclosing any confidential information, including but not limited to, trade secret information, even if it was "conceived, originated, discovered or developed" by Aghjayan. (Id. ¶ 21).  It also stated that Aghjayan could not "use, license, sell, convey or otherwise exploit any Confidential Information, or any portion thereof, during the Employment Term hereof and at all times thereafter for any purpose other than solely for the benefit of Employer." (Id.).  As part of the 2002 Employment Agreement, Aghjayan was also prevented from competing with Ritani during his employment term for one year thereafter. (Id.).

On December 16, 2002, the 2002 Operating Agreement was amended to reflect a change in voting power. (Id. ¶ 22).  In addition, a Second Amendment was entered into on May 30, 2003 to

12

show a change in the profit/ loss percentages, as follows: HR
Corp. 41%; JKD 40%; and Krunch 19%.  (Id.).

On November 1, 2004, JKD, Krunch and HR Corp., by
Aghjayan, entered into an "Amended and Restated Operating
Agreement (the "2004 Operating Agreement"), which reflected,
among other things, a change in the profit/ loss percentages of
JKD and HR Corp., changes in the management of Ritani, and
changes to the business agreement of the members since the 2002
Operating Agreement.  (Id. ¶ 23).

That day, Aghjayan also entered into a new employment
agreement ("2004 Employment Agreement") and a consulting
agreement (the "Consulting Agreement") with Ritani.  (Id. ¶ 24).
By the terms of the 2004 Employment Agreement, Aghjayan agreed
to continue to render "exclusive business services" to Ritani as
its CEO and President, to take on additional responsibilities as
Ritani's Chief Operating Officer ("COO") and to supervise and
assist Ritani in product design and marketing until October 31,
2009.  (Id.).  Aghjayan was also obligated to "actively and
aggressively pursue overseas manufacturing opportunities" on
behalf of Ritani, "in order to reduce its costs and increase its
capacity."  In addition, the 2004 Employment Agreement included
a non-compete clause which prevented Aghjayan from "tak[ing] a

13

position where such Confidential Information may be used
adversely" to Ritani's best interests and from "seek[ing] to
divert the Company's business or opportunity to a third party."
(Id. ¶ 26).

With respect to the Consulting Agreement, HR Corp.,
through Aghjayan, agreed to act as a consultant for Ritani, and
to provide such services including designs for Ritani's jewelry
line. (Id. ¶ 25). The Consulting Agreement was to remain in
effect through August 31, 2009 with an automatic one year
renewal provision that would continue until Aghjayan was no
longer with Ritani or until the agreement was terminated with
written notice. (Id.).

On August 29, 2007, HR Corp., by its owner Aghjayan,
assigned via an assignment agreement (the "Assignment
Agreement"), its entire remaining membership interest in Ritani
to JKD, including all of its right, title, and interest in the
capital and profits of Ritani. (Id. ¶ 27). The same day, the
2002 Membership Interest Purchase Agreement was also amended to
confirm JKD's purchase of all of HR Corp.'s membership interest
in Ritani. (Id. ¶ 28). The 2007 amendment to the agreement
included a section entitled "Rights to the 'Ritani' Name," which
stated that Ritani "shall maintain all right, title and interest

in the name 'Ritani,' or any other similar name, together with the goodwill of the business connected with and symbolized by such name." (Id.).

In addition, on October 15, 2007, Aghjayan signed a letter addendum to his 2004 Employment Agreement agreeing to keep confidential Ritani's business relationship with a company named "Blue Nile." (Id. ¶ 24).

Upon formation of the partnership, Ritani transitioned from HR Corp.'s prior use of the H. Ritani brand to the Ritani brand alone which is alleged to be synonymous with luxury and high-quality craftsmanship and to which consumers and the trade identify as the source of all jewelry bearing the Ritani name and marks. (Id. ¶ 36). Ritani has a number of Registered Copyrights, including but not limited to, Registration Nos. VA 1-774-361, VA 1-774,363, VA 1-774-364, VA 1-774-362 and VAu 1-074-079 (the representative copyrighted designs attached to the Initial and Amended Complaints), as well as a number of trademarks, including the trademark Ritani and a distinctive three-leaf design (the "Three-Leaf Trademark) (collectively the "Ritani Trademarks"). (Id. ¶¶ 39-44).

15

According to Ritani, the Ritani Trademarks are
intimately associated with its goods and services and its
exclusive designs are essential to Ritani.  (Id. ¶ 40).  Thus,
the company has instituted procedures to maintain the secrecy of
all of its confidential, proprietary and trade secret designs,
drawings and product development files.  For example, Ritani
uses computer-aided design ("CAD") and computer-aided
manufacturing ("CAM") files containing confidential,
proprietary, and trade secret information to design, create,
modify and produce wax models of new jewelry designs.  (Id. ¶
46).  These CAD/CAM drawings contain numerous confidential
designs, including, but not limited to, "Perfect Match," a
design element used by Ritani to create and enable the
engagement ring and wedding band to fit or flush up against each
other without a gap.  (Id.).  Ritani compels all employees and
contractors to sign confidentiality agreements, instills log off
measures on employees' computers, keeps its hard copies under
lock and key and stores all electronic design files on a secure
server designated for design only, which is accessible with its
own key only.  (Id. ¶ 47).


On November 1, 2009, after several months of
unsuccessful contract negotiations, Aghjayan resigned from his
employment at Ritani.  Pursuant to the 2004 Employment

16

Agreement, Aghjayan was obligated not to compete with Ritani in the jewelry industry until October 31, 2010.  (Id. ¶ 31).

Aghjayan allegedly began a scheme to compete with Ritani within a few years after the transfer of all interest and goodwill to Ritani and while he was working as an officer of Ritani.  (Id. ¶ 49).  Specifically, Aghjayan allegedly improperly transferred Ritani's files outside the company by copying them and transferring them onto a flash drive and ultimately to his home computer.  (Id.).  Aghjayan also was allegedly privy to Ritani's confidential financial and customer files, including information about specific customer accounts, costs associated with Plaintiff's products, pricing information and Ritani's profit margins.  (Id.).

According to the Plaintiff, during the last two months of Aghjayan's employment with Ritani, he disclosed trade secrets and sent confidential design files to his new business partner Alex Khatchadorian ("Khatchadorian") in order to create ring designs and produce them as wax models for Ritani, without the knowledge or consent of Ritani.  Aghjayan allegedly used Mrs. Aghjayan as an alter ego to send Ritani's confidential and trade secret CAD/CAM drawings to Khatchadorian and set up his new company.  (Id. ¶ 60).  More specifically, until his resignation,

17

Aghjayan allegedly improperly transferred Ritani files outside
the company by making copies to a flash drive or by emailing the
files to his home computer, to Mrs. Aghjayan's computer or to
other third parties.  (Id. ¶ 49).  These removed files included
confidential and trade secret design files belonging to Ritani,
which Plaintiff contends Aghjayan "tweaked" to save time and
money, rather than undertake the slow process of building
jewelry designs from scratch.  (Id. ¶¶ 56, 72, 193, 196).

        In addition, according to Ritani, in late 2008,
Aghjayan purchased a 3-Dimensional ("3D") printing machine which
Aghjayan claimed to use to go into the business of making
doorknobs but was actually used to make jewelry.  (Id. ¶ 62).
In February 2009, Aghjayan and Khatchadorian purchased a factory
in China (the "Chinese Factory") to produce jewelry products.
Ritani contends that the scheme involved Aghjayan first emailing
Khatchadorian designs in the form of CAD/CAM drawings that
Aghjayan created while he was employed at Ritani.  (Id. ¶ 63).
Next, the Chinese Factory designers would change the size and
shape of the center stones and email the finished drawings back
to Aghjayan in the U.S.  (Id.).  Aghjayan would then use the 3D
printing machine to print a wax model of the jewelry pieces and
email Khatchadorian with any additional design changes.  (Id.).
Finally, once all the required changes were made, the file was

18

returned to Aghjayan in the U.S. so that he could re-print the wax model for final design.  (Id.).

More specifically, the FAC alleges that Aghjayan, either personally or under Mrs. Aghjayan's name, emailed Khatchadorian CAD/CAM files for 84 designs and that swapping the design features allowed Aghjayan to create more than 200 styles. (Id. ¶ 64).  Between September 4, 2009 and September 26, 2009, Aghjayan, while employed at Ritani, allegedly sent Khatchadorian five separate emails with the subject names "R," "R Styles," "R Rings," "For R No 6 Rit" and "RIT 12," and emails entitled "RIT" and "95D-H For Ritani" on October 20 and 22, 2009.  (Id. ¶¶ 68-69, 72).  These emails contained .jcd drawings of Ritani LLC designs, including designs incorporating the Ritani Three-Leaf Trademark.[1]  (Id. ¶ 72).

---

[1] As examples, paragraph 73 of the FAC states that:

"On September 24, 2009, Defendant Aghjayan sent Mr. Khatchadorian an email with subject matter – "R Rings" – with 7 CAD CAM files that copy Ritani's logo rings. (Exhibit 41).  After Alex completed his work on these designs, he sent them back to Defendant Aghjayan, who printed them out with his 3-D wax printing machine. Defendant Aghjayan then provided Ritani with the wax models for all 7 jewelry designs attached to the September 24, 2009 email, including without limitation, Ritani Style EM-2.  The Wax Model Design of EM-2 that Harout provided to Ritani, LLC is identical to the EM-2 Ritani Drawing sent to China, which is nearly identical to Harout Style Nos. 1r452 and 1r496. (Exhibit 46).  As another example, the CAD CAM file attached to Defendant Aghjayan's September 13, 2009 email entitled "R Styles," which includes an attachment entitled "4" is identical to a wax model that Defendant Aghjayan provided to Ritani, LLC, which matches Style 1r294 in Defendant Aghjayan's current jewelry line, while a slight "tweak" was made to Harout Style No. 1r188. (Exhibit 47). In addition, Defendant Aghjayan's current style numbers 1r478 and 1r333 are derived from Ritani's "12 Rit Solitaire" Drawing (and identical wax model) that Defendant Aghjayan emailed to Mr. Khatchadorian on

In addition, Aghjayan sent Khatchadorian a file of Ritani's "Perfect Match" design and had verbal exchanges about the precise measurements and details necessary to create the design feature. (Id. ¶ 68). According to Ritani, the concept behind "Perfect Match," a registered trademark of Ritani, was unique at the time of Aghjayan's disclosure, as were the measurements and techniques needed to be used in order to enable the two rings to match up perfectly, which Ritani considered proprietary and confidential. (Id.). Ritani also contends that the Chinese Factory manufactured a silver samples jewelry line, which was to be used as a representative sample for sale in the U.S. (Id. ¶ 84). After February 2010, the Chinese Factory allegedly made weekly shipments of the silver sample line to Aghjayan's New Jersey residence. (Id. ¶ 66).

---

September 26, 2009 with the subject "RIT 12." (Exhibit 48). Moreover, Harout's Style Nos. 1r406 and 1r444G are identical to the "Rit Flower 1" design, a design which was part of Ritani LLC's copyrighted sketch book, and was attached to the October 20, 2009 email that Defendant Aghjayan sent to Mr. Khatchadorian with the subject "RIT." (See Exhibits 28 and 49). Further, on October 22, 2009, Defendant Aghjayan sent Mr. Khatchadorian an email entitled "95D-H" attaching an image of a ring drawing titled "R95D-A-h," which can be found in Harout's style number 1r515. (Exhibit 50). Similarly, Ritani Style 1R98D-A-H is derived from Harout's style number 1r310. (Exhibit 51). Defendant Aghjayan disclosed these confidential and trade secret CAD CAM drawings to Mr. Khatchadorian, without Ritani LLC's consent, and Ritani LLC has never commercialized these rings. Thus, they remained trade secrets until they were improperly disclosed by Defendant Aghjayan and used by Defendants Amazing Settings and Harout R to make rings that were offered for sale in the United States."

Prior to the expiration of his non-compete term, Aghjayan approached Ritani seeking an amendment to the provision of his 2004 Employment Agreement.  According to Ritani, Aghjayan was anxious to end his competitive restriction so that he could deliver finished jewelry products, which he allegedly already manufactured and offered for sale or sold to a number of U.S. companies during the non-compete period, including Helzberg Diamonds ("Helzberg").  (Id. ¶¶ 82-86).  In addition, Aghjayan began negotiations with Tiffany & Co. ("Tiffany"), a former customer of HR Corp., in July of 2008.  (Id. ¶ 87).  According to Aghjayan, the negotiations were for his wife, Mrs. Aghjayan, who hoped to leave Ritani's graphics department to form her own company designing and manufacturing bridal jewelry.  (Id. ¶ 54). Ritani contends, however, that Mrs. Aghjayan acted as a cover and alter ego for Aghjayan during the negotiations with Tiffany, so that he and Khatchadorian could compete with Ritani, while Aghjayan was still employed in a position of trust at Ritani. (Id. ¶ 54).

Aghjayan established two companies, Amazing Settings on November 9, 2009 and Harout R on September 13, 2010 for the purposes of selling jewelry.  (Id. ¶ 75).  According to the FAC, on May 20, 2010, the Amazing Settings website went up, which contained a number of the 84 designs from the CAD/CAM drawings

21

emailed between Aghjayan and Khatchadorian.  (Id.).  Harout R
was formed to be the public face of the newly formed company
because the trade knew Aghjayan as Harout Ritani.  (Id. ¶ 80).
According to Ritani, Harout R shares the same factory,
employees, and designs as Amazing Settings in China and the U.S.
(Id.).

     Harout R and Amazing Settings' websites similarly have
a number of the 84 designs emailed between Aghjayan and
Khatchadorian.  (Id. ¶¶ 199-200).  The Amended Complaint also
alleges that, prior to his departure from Ritani, Aghjayan
provided Ritani with a box of the wax models that he created,
which Ritani never commercialized.  (Id. ¶ 72).  Aghjayan
improperly took these Ritani confidential and trade secret
design files, and created either identical or slightly "tweaked"
rings for sale to U.S. customers through Defendants Amazing
Settings and Harout R.  (Id.).

     On October 20, 2010, Aghjayan entered in a letter
agreement ("Letter Agreement") with Ritani amending the blanket
non-compete provision to end two weeks earlier, on October 14,
2010.  (Id. ¶ 34).  Ritani agreed to the modification of the
non-compete portion of the agreement to end the partnership with
Aghjayan on good terms and in return for Aghjayan's agreement

not to sell jewelry to any current Ritani customer through
December 31, 2010 and to refrain from attending a
January/February 2011 trade show, the Centurion Show.  (Id.).
While Ritani understood that Aghjayan had engaged in casual
conversation with a few potential non-Ritani customers, Ritani
understood from Aghjayan that these discussions pertained to
non-competing products, such as castings and findings.  (Id.).

    Plaintiff alleges, however, that Amazing Settings and
Harout R further violated Aghjayan's non-compete provision by
engaging in business negotiations and targeting companies such
as Helzberg, Tiffany, QVC, Blue Nile, Robbins Bros. and Michael
Hill for business.  (Id. ¶ 82).  For example, Aghjayan met with
Helzberg on multiple occasions to show them catalogs, pictures,
and his silver samples to try to get Helzberg to place an order,
during Aghjayan's non-compete period.  (Id. ¶ 88).  Ritani had
accounts with Blue Nile and Robbins Bros. in several states,
which Aghjayan solicited.  (Id. ¶ 90).  Plaintiff also alleges
Aghjayan's improper solicitation caused Ritani significant
financial harm.  (Id. ¶ 91).  For example, according to Ritani,
Aghjayan knew that Blue Nile and Robbins Bros. were two of
Ritani's biggest customers when Aghjayan sold the remainder of
his membership interest in Ritani to JKD.  (Id.).  Thereafter,
he solicited them, and as a result of Aghjayan's targeted

23

solicitation of Blue Nile, Ritani's 2011 sales to Blue Nile were down $1.1 million from 2010 and the six month sales projections for 2012 show a drop in sales of $1.9 million from 2011 Similarly, with respect to Robbins Brothers, Ritani's 2011 sales were down $447,197 or $76.0% from 2010.  (Id.).  In total, Ritani's sales to retail customers that Defendant Aghjayan now sells to, declined 37.17% between 2010 and 2011 and an additional 30.63% when you take into account January through April of 2012 sales figures.  (Id.).

Plaintiff alleges that the Defendants were involved in further acts of solicitation in 2011.  (Id. ¶ 92).  Aghjayan allegedly mailed out around 7,000 competitive flyers and catalogs directly to all of Ritani's customers announcing the formation of Harout R.  (Id.).  Ritani contends that the Harout R flyers and catalogs also contained information that is likely to cause confusion as to Aghjayan and Harout R's association with the Ritani brand.  (Id. ¶ 95).  For example, the Harout R brochures associate Aghjayan with Ritani, by emphasizing that the "R" in Harout R stands for Ritani, as well as the inclusion of a statement whereby Aghjayan claims that he was "previously known as Harout Ritani."  (Id.).  Ritani alleges that specific statements were also made to customers and potential customers that Aghjayan is the real "Harout Ritani."  (Id. ¶ 96).  The

24

Amended Complaint also states that, in February 2011, Mrs. Aghjayan referred to herself as Shawndria Ritani, and posted on her Flickr page, a picture of Aghjayan selling jewelry, along with a question asking "Where is Harout Ritani now?" (Id. ¶ 98).

In addition, Ritani alleges that, in 2011, Aghjayan, through the Defendant Companies, began to use a reproduction, copy, and colorable imitation of the Three-Leaf Trademark in his Harout R jewelry line in a manner likely to cause confusion to consumers as to the origin of the goods. (Id. ¶ 99). In April of 2011, Harout R's jewelry line began selling on an online store of Helzberg's. (Id. ¶ 100). Ritani contends that current Harout R Style Nos. 1r109 and 1pc109 were virtual copies of Ritani's styles and designs. (Id.). In May 2011, Harout R's online catalogs also allegedly included pieces of jewelry that were virtual copies of and substantially similar to Ritani's copyrighted jewelry designs as well as other designs created by Aghjayan through the use of Ritani's confidential and trade secret CAD files. (Id. ¶¶ 101-03). Lastly, Ritani contends that after using its' copyrighted designs, the Defendants sought copyright registrations on several of the allegedly copied works. (Id. ¶ 103).

III. **The Relevant Standards**

**Rule 12(b)(6)**

In considering a motion to dismiss pursuant to Rule
12(b)(6), the Court construes the complaint liberally, accepting
all factual allegations as true and drawing all reasonable
inferences in the plaintiff's favor.  Mills v. Polar Molecular
Corp., 12 F.3d 1170, 1174 (2d Cir. 1993).  The issue "is not
whether a plaintiff will ultimately prevail but whether the
claimant is entitled to offer evidence to support the claims."
Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir.
1995) (quoting Scheuer v. Rhodes, 416 U.S. 232, 235-36, 94 S.
Ct. 1683, 40 L. Ed. 2d 90 (1974)).

To survive dismissal, "a complaint must contain
sufficient factual matter, accepted as true, to 'state a claim
to relief that is plausible on its face.'"  Ashcroft v. Iqbal,
556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)
(quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.
Ct. 1955, 167 L. Ed. 2d 929 (2007)).  Plaintiffs must allege
sufficient facts to "nudge[ ] their claims across the line from
conceivable to plausible."  Twombly, 550 U.S. at 570.  "The
plausibility standard is not akin to a 'probability
requirement,' but it asks for more than a sheer possibility that

26

a defendant has acted unlawfully." <u>Cohen v. Stevanovich</u>, 772 F.
Supp. 2d 416, 423 (S.D.N.Y. 2010).  Though the court must accept
the factual allegations of a complaint as true, it is "not bound
to accept as true a legal conclusion couched as a factual
allegation." <u>Iqbal</u>, 556 U.S. at 678. (quoting <u>Twombly</u>, 550 U.S.
at 555).

Furthermore, allegations in a complaint must be
complete enough to enable a reader to understand how each
defendant was personally involved in the wrongdoing plaintiff is
alleging.  <u>Onwuka v. NYC Taxi Limousine Comm'n</u>, No. 10 Civ.
5399(SLT)(LB); 2012 WL 34090, at *4-5 (E.D.N.Y. Jan. 6, 2012).
"It is well-settled that 'where the complaint names a defendant
in the caption but contains no allegations indicating how the
defendant violated the law or injured the plaintiff, a motion to
dismiss the complaint in regard to that defendant should be
granted.'" <u>Dove v. Fordham Univ.</u>, 56 F. Supp. 2d 330, 335
(S.D.N.Y. 1999) (quoting <u>Morabito v. Blum</u>, 528 F. Supp. 252, 262
(S.D.N.Y. 1981)).

## Rule 9(b)

Rule 9(b) requires that the plaintiff "state with
particularity the circumstances constituting the fraud."  Fed.

27

R. Civ. P. 9(b).  "Allegations that are conclusory or unsupported by factual assertions are insufficient" to satisfy Rule 9(b).  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007).  Thus, to satisfy this requirement, the complaint must:  "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Romach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004) (internal quotation marks and citation omitted). While "intent, knowledge, and other conditions of mind may be averred generally," a plaintiff must allege sufficient facts to create a "strong inference" of scienter.  Kalnit v. Eichler, 264 F.3d 131, 137-38 (2d Cir. 2001).

**Rule 12(c)**

        Rule 12(c) provides that "[a]fter the pleadings are closed — but early enough not to delay trial — a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  The legal standard used to decide a motion for judgment on the pleadings made pursuant to Rule 12(c) is identical those governing a Rule 12(b)(6) motion to dismiss.  See e.g. Patel v. Contemporary Classics of Beverly Hills, 259 F.3d 123, 126 (2d Cir. 2001) (collecting cases).

28

**IV.**  **Discussion**

**A) The Plaintiff's Motions to Dismiss HR Corp.'s Counterclaims**
**is Granted**

In its Answer, HR Corp. has filed several
counterclaims against JKD, Manber and Klein for fraud, negligent
misrepresentation, breach of fiduciary duty, and aiding and
abetting a breach of fiduciary duty.  (See Dkt. No. 61).

Relevant Facts

According to the Defendants, as of August 2007, HR
Corp. and JKD were both members of Ritani.  (Dkt. No. 61 ¶ 137).
At that time, Klein was an owner and in control of JKD as well
as the Chairman of Ritani.  (Id. ¶ 106).  Manber, a Certified
Public Accountant ("CPA"), was the Chief Financial Officer
("CFO") of Ritani, and also Ritani's manager (Id. ¶ 109-110).
Defendants contend that once JKD became the majority member of
Ritani, it was no longer privy to financial information
regarding Ritani, and relied exclusively on Manber to provide
that information. (Id. ¶¶ 134-35, 181, 241-42).  Thus,
Defendants maintain that Manber, as the CFO and Manager of
Ritani, and Klein, as Ritani's Chairman of the Board, both owed

a fiduciary duty to HR Corp., the minority member. (Id. ¶¶ 107, 110-11, 142, 161).  In addition, by August 2007, Klein's son, Joel Klein ("Joel"), who had been employed by JKD, left JKD and was installed by his father at Ritani to give JKD more day-to-day control. (Id. ¶¶ 143-44).  According to the Defendants, once Joel was employed by Ritani and effectively took over its management, he also owed a fiduciary duty to HR Corp. (Id. ¶ 145).

According to the Defendants, as of August 2007, Blue Nile had been a customer of JKD for approximately seven years, but had never done business with Ritani. (Id. at ¶¶ 149-50). While still employed at JKD, Joel allegedly began soliciting Blue Nile to become a Ritani customer. (Id. ¶ 151).  At a Las Vegas jewelry show in May or June 2007, Joel allegedly met with Sue Bell, Senior Vice President of Blue Nile, and while still working at JKD, Joel continued to actively solicit Blue Nile's business for Ritani. (Id. ¶ 152).  Defendants contend that these solicitation activities were known to JKD, Klein, Joel, and Manber, but actively kept secret from Aghajayan and HR Corp. during the spring and summer of 2007.  (Id. ¶¶ 153-54, 182).

Defendants maintain that when Blue Nile became a customer of Ritani's in the fall of 2007, that fact was kept

secret from Aghjayan, even though he was asked to sign a Non-Disclosure Agreement ("NDA") on October 15, 2007.  (Id. ¶ 196-99; FAC ¶ 24, Ex. 9) (stating that Aghjayan was instructed "to keep in strict trust and confidence any and all information relating to the Company's business relationship with Blue Nile.").

According to Aghjayan, to hide the business arrangement between Ritani and Blue Nile from him, and thus HR Corp., Ritani and JKD, created phony order forms and invoices that did not bear the Blue Nile name. (Dkt. No. 61 ¶¶ 183, 198). Simultaneously with Ritani's discussions with Blue Nile, Ritani was negotiating with HR Corp. to acquire its remaining minority membership interest in Ritani. (Id. ¶ 155).  Aghjayan allegedly, on behalf of HR Corp., decided that, instead of selling HR Corp.'s remaining interest to JKD, it would make a bid for Ritani and obtained financing to buy back the company.  Manber was allegedly present at the meeting between Aghjayan and HSBC Bank ("HSBC") at which HSBC promised financing to HR Corp.  (Id. ¶¶ 157-58).

According to the Defendants, in July 2007, Aghjayan announced to Manber and certain Ritani employees that he intended to buy back Ritani.  (Id. ¶ 159).  When he made this

31

announcement, Aghjayan, and thus HR Corp., allegedly did not know that Ritani was soliciting Blue Nile and that it was going to become a Ritani customer. (Id. ¶¶ 154, 160).  In addition, Defendants allege that JKD, Klein and Joel directed Manber not to disclose to Aghjayan anything about the business opportunity with Blue Nile, and the potential positive effects it might have on Ritani, and also directed Manber to use his status as CFO and Manager of Ritani, to dissuade HR Corp. from buying Ritani. (Id. ¶¶ 167-69).  Thus, Manber allegedly, at the direction of the other Counterclaim Defendants, took Harout aside, and told him that, instead of buying Ritani, Corp. should sell its remaining interest in Ritani to JKD.  (Id. ¶¶ 156, 159, 170). Specifically, Manber allegedly said, "Harout, why would you want to buy out JKD and become the sole owner of Ritani?  Don't you know that Ritani is going to have declining revenue in 2008, and lose money in 2008?  You shouldn't buy the company, you should sell the stake," or words to that effect. (Id. ¶ 171).

According to the Defendants, to induce HR Corp. to sell rather than buy, Manber showed Aghjayan sales projections for Ritani that Manber had prepared in his capacity as Ritani's CFO and Manager in July 2007, and, upon information and belief, in concert with JKD, Klein, and Joel, which represented Ritani's 2007 revenues and other financial information and projections

for 2008, specifically, that Ritani would suffer a decline in
revenue in 2008 as compared to 2007.  (Id. ¶¶ 172-73, 239).
This sales projection allegedly failed to disclose and concealed
material facts concerning the prospects of Ritani and the
material fact that Ritani was gaining Blue Nile as a customer.
(Id. ¶¶ 176, 239-40).


HR Corp. Has Failed to Plead Sufficient Facts to Establish Fraud

         In its second counterclaim, HR Corp. has alleged
common law fraud against the Counter-Defendants. (See Dkt. No.
61, ¶¶ 238-45).  HR Corp. contends that "in over 150 paragraphs
. . . the very nature of the alleged fraud, including the time,
place, speaker, and the allegedly false misrepresentation" is
adequately described and contains "the requisite, plausible
factual allegations."  (HR Corp. Opp. at 12).  Specifically,
that the "time and place is in July 2007 outside Ritani's
conference room after Harout [Aghjayan] announced his intention
to have [HR] Corp. buy back Ritani, the speaker is Manber (at
the behest and direction of JKD and A.D. Klein) and the
allegedly false misrepresentation is that [HR] Corp. should not
buy back the company, but rather sell its interest because it
was projected that Ritani's revenue would decrease in 2008

(supported by false projections that did not take the Blue Nile business into account.)". (Id. at 12-13).

To state claim for common law fraud under New York law, a plaintiff must demonstrate "(1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which plaintiff reasonably relied; and (5) which caused injury to plaintiff." In re Optimal U.S. Litigation, 813 F. Supp. 2d 351, 381 (S.D.N.Y. 2011). "The elements of fraud under New York law are essentially the same as those for a claim of securities fraud under Section 10(b) and Rule 10b-5." Serova v. Teplen, No. 05 Civ. 6748(HB), 2006 WL 349624, at *8 (S.D.N.Y. Feb. 16, 2006).

Thus, in addition to the pleading requirements laid out in Twombly and Iqbal, HR Corp.'s claims must also satisfy the heightened pleading requirements of Fed. R. Civ. P. 9(b).[2] As discussed above, in this Circuit, "allegations of fraud [must] adequately specify the statements made that were false or misleading, give particulars as to the respect in which it is contended that the statements were fraudulent, and state the

---

[2] Defendant HR Corp. cites to the Rule 12(b)(6) standard in its brief to submit that dismissal would be improper under that standard and that they have pled a plausible claim.

time and place the statements were made and the identity of the

person who made them." Red Ball Interior Demolition Corp. v.

Palmadessa, 874 F. Supp. 576, 584 (S.D.N.Y. 1995).  This

heightened pleading standard also applies to "claims that do

rely upon averments of fraud [and sound in fraud]." Rombach,

355 F.3d at 171-72.


          The facts cited by HR Corp. fail to satisfy the

heighted pleading standard of Rule 9(b).  HR Corp. alleges that:


        239. By the acts described herein, Manber, at the
        direction of A.D. Klein, Joel Klein and JKD, knowingly
        provided Corp.[3] with false, incomplete, and misleading
        material financial information regarding Blue Nile,
        sales projections and the financial condition of LLC,
        and the value of Corp.'s interest therein, as well as
        its future worth and viability, in the 2007 Financial
        Projection, and made false statements to induce Corp.
        to sell its interest in LLC rather than buyout JKD.

        240. JKD, A.D. Klein, Joel Klein and Manber knew that
        the 2007 Financial Projection and Manber's statements
        provided to Corp. was false, and provided such to
        Corp., intending that Corp. rely on it and be
        convinced by such to decide to sell its stake in LLC,
        rather than buy-out JKD.

        241. It was reasonable for Corp. to rely upon the 2007
        Financial Projection and Manber's statements.  Corp.
        reasonably relied upon CFO Manber's projections as he
        was CFO of LLC, its Manager and a CPA (not knowing
        that Manber was, in fact, on JKD's payroll, which
        fact, Manber, A.D. Klein, Joel Klein and JKD

---

[3] Defendant HR Corp. is referred to as "Corp."; Defendant Aghjayan is referred
to as "Harout"; and Plaintiff Ritani is referred to as "LLC" in HR Corp.'s
Answer.

intentionally failed to disclose to Harout so that
Harout, on behalf of Corp., would trust Manber).

242. Corp. had no independent means to find out about
LLC's relationship with Blue Nile given the
affirmative steps taken (as set forth above) to hide
the relationship, including by having LLC use phony
names on invoices and bags and production, and failing
to disclose the existence of the relationship until
October 15, 2007, after Corp. sold its stake in LLC.

(Dkt. No. 61 ¶¶ 239-42).[4]

To begin with, Rule 9(b) is not satisfied by a
complaint in which "defendants are clumped together in vague
allegations." Three Crown Ltd. Partnership v. Caxton Corp., 817
F. Supp. 1033, 1044 (S.D.N.Y. 1993) (stating that "[s]uch wide-
scale clumping is unacceptable."). "To this end, the complaint
may not rely upon blanket references to acts or omissions by all
of the defendants, for each defendant named in the complaint is
entitled to be appraised of the circumstances surrounding the

---

[4] See also Dkt. No. 61 ¶¶ 167-169, citing the allegations that:

167. Upon information and belief, JKD, A.D. Klein, and Joel
Klein, on behalf of LLC, directed Manber not to disclose to
Harout and Corp. anything about the Blue Nile business
opportunity, and the positive effect such was likely to have upon
LLC.

168. Upon information and belief, Joel Klein, A.D. Klein, and JKD
gave Manber these instructions in order to dissuade Corp. from
buying LLC, and to permit JKD to obtain complete control over LLC
and not have to share LLC's increased profits with Corp.

169. Upon information and belief, Manber was then directed by
Joel Klein, A.D. Klein, and JKD to use his status as CFO and
Manager of LLC, to convince Harout not to buy LLC back from JKD,
but, instead, to sell Corp.'s interest in LLC, thereby favoring
JKD over Corp., the other member of LLC.

fraudulent conduct with which he individually stands charged."
Red Ball Interior Demolition Corp., 874 F. Supp. at 584.  HR
Corp. contends that unlike in cases like Three Crown, where the
respective pleadings identified the alleged fraudulent actors as
"defendants," its pleadings identify the name and title of those
"who acted on behalf of the Corporate Defendants."  (HR Corp.
Opp. at 17).  However, "even if [plaintiff's] language is
somewhat more exact than in Three Crown, Plaintiffs do not
distinguish the allegedly illegal acts of the [defendants] from
one another.  See e.g., In re Blech Secs. Litig., 928 F. Supp.
1279, 1294 (S.D.N.Y. 1996).


        Here, HR Corp. conflates the acts of JKD, Klein, and
Ritani, such that that particular acts with which they are
charged cannot be determined.  Such pleadings fail because each
allegedly illegal act of each Counter-Defendant must "specify
their respective roles in the manipulation."  Three Crown, 817
F. Supp. at 1040 (holding that when "defendants are charged with
fraud, the complaint must be specific as to the nature of each
defendant's alleged participation in the fraud.") (emphasis
added); see also Ellison v. American Image Motor Co., 36 F.
Supp. 2d 628, 641 (S.D.N.Y. 1999) ("Because the complaint fails
to separate these defendants with specific allegations of

37

wrongdoing as to each one of them, the complaint does not pass muster under Rule 9(b).").

Manber is the only remaining counter-defendant to whom allegations, of any specificity, are alleged.  HR Corp. alleges that Manber attempted to convince Aghjayan not to buy Ritani back from JKD, but to sell HR Corp.'s interest in Ritani instead.  (Dkt. No. ¶ 169).  Specifically, in July 2007, Manber allegedly told Aghjayan that "Ritani is going to have declining revenue in 2008, and lose money in 2008..." and that Aghjayan should therefore "sell the stake."  (Id. ¶ 171).  According to the Plaintiff and Counter-Defendants, "[t]hese are statements of opinion and speculation of uncertain, future events, not representations of material fact."  (Pl. Memo. at 10).

Accepting all of HR Corp.'s allegations as true, there is no actionable fraud or misrepresentation because HR Corp. fails to show not only that Aghjayan reasonably believed Manber's description of Ritani's financial status, including any omissions of Ritani's relationship with Blue Nile, but also that Aghjayan was justified in taking acting in reliance thereon. See Red Ball Interior, 874 F. Supp. at 588.  HR Corp.'s Answer merely states that "[i]t was reasonable for Corp. to rely upon the 2007 Financial Projection and Manber's statements.  Corp.

reasonably relied upon CFO Manber's projections as he was CFO of
LLC, its Manager and a CPA . . . ." (Dkt. No. 61 ¶ 241; see
also id. ¶¶ 178-79). There are no allegations that HR Corp.,
through Aghjayan, knew about or even read the 2007 Financial
Projection when it chose to sell its shares rather than buy out
JKD. See Am. Fin. Int'l Group – Asia, LLC v. Bennett, No. 05
Civ. 8988, 2007 WL 1732427, at *9 (S.D.N.Y. June 14, 2007)
(finding no reliance where "plaintiffs have not alleged that
they read any of the financial statements at issue, much less
that they actually relied on them.").

      Even assuming HR Corp. had pled actual reliance, such
an allegation would be insufficient because the reliance must
also be reasonable and justifiable. See Crigger v. Fahnestock &
Co., Inc., 443 F.3d 230, 234 (2d Cir. 2006). HR Corp. could not
have reasonably relied on the 2007 Financial Projection because,
on its face, the document is incomplete, in that the 2006
figures are represented by "########" for the majority of the
months, and does not show the alleged basis of HR Corp.'s
decision to sell its shares, the decline in Ritani's revenue in
2008 as compared to 2007.

      Moreover, even assuming HR Corp. has sufficient pled
common law fraud as to each Counter-Defendant, it has not

alleged damages that are actionable under fraud.  HR Corp.
alleges that it is entitled to damages resulting from: (1) gains
it hypothetically would have realized had it not sold its
interest in Ritani in August 2007, measured by future Ritani
profits or the amount that may have been paid by Cantor
Fitzgerald in 2012 for shares of Ritani (Dkt. No. 61 ¶¶ 207,
243, 244); and (2) the difference between the price HR Corp.
received for the sale of its Ritani shares and the price that it
would have received but for the alleged fraud.  (Id. ¶¶ 205,
243).

     In essence, HR Corp. seeks to recover the benefit of
what it claims would have been two alternative contracts. (See
id. ¶¶ 207, 243, 244).  However, in New York, "the loss of an
alternative contractual bargain . . . cannot serve as a basis
for fraud or misrepresentation damages because the loss of the
bargain was undeterminable and speculative." Lama Holding Co.
v. Smith Barney Inc., 88 N.Y.2d 413, 422 (N.Y. 1996) (internal
quotation marks omitted); see also Rather v. CBS Corp., 886
N.Y.S.2d 121, 127-28 (1st Dept. 2009) (dismissing as speculative
fraud claim seeking to recover damages for lost opportunity and
future earnings); Alpert v. Shea Gould Climenko & Casey, 559
N.Y.S.2d 312, 315 (1st Dept. 1990) (stating that "[i]t is also
well settled that the victim of fraud may not recover the

40

benefit of an alternative agreement overlooked in favor of the
fraudulent one.") (citation omitted).  HR Corp. seeks to recover
undeterminable and speculative damages resulting from such
alternative contractual arrangements, which are not actionable
under New York law.

In addition, HR Corp. maintains that the statements
concerning expected losses and reduced revenue allowed JKD to
purchase Corp.'s interest at a lower price.  (Dkt. No. 61 ¶
187).  However, HR Corp.'s sale of Ritani's shares in August
2007 was made in accordance with the 2004 Operating Agreement,
which defined the formula that determined the price of the
selling member's interest.  The 2007 Purchase Agreement,
executed by Aghjayan for HR Corp. on August 29, 2007, states
that "pursuant to Section 6.7.1 of the [2004] Operating
Agreement, upon a declaration of a deadlock, JKD has the option
to purchase the membership interest held by [Corp.] in
[Ritani]." (Dkt. 54, Ex. 11 at 1).  Section 6.7.1 of the 2004
Operating Agreement provides the right to purchase Corp.'s
interest at a purchase price equal to its "Fair Value."[5]  (Id.,

---

[5] "Fair Value" is the product of "the percentage Interest being sold of the
value of [Ritani's] good will at December 31 of the immediately preceding
calendar year", and the "Book Value of the Member's Interest as of December
31 of that year." (Dkt. No. 54, Ex. 8 at 4).  For all sales occurring in
2007, Corp.'s proportional share in Ritani's "good will" was calculated as
$65,000 on December 31, 2006. (Id., Ex. 11 at 2).  "'Book Value' means the
amount that [Corp.] would receive if [Ritani] (i) sold all of its assets at

Ex. 8. "Fair Value" equals HR Corp.'s proportional interest in (i) Ritani's "good will" plus (ii) Ritani's "Book Value," both as measured on December 31 of the prior year, i.e., December 21, 2006.

Under the 2007 Purchase Agreement, HR Corp. was paid the following "Fair Value" for Ritani shares:

> (i) $1,625,951 (representing the value of [ ] Corp.'s Capital Account and amounts remaining in the capital account of former member [Harout], each as of December 31, 2006 [i.e., Book Value], plus

> (iii) [sic] $65,000 (representing [ ] Corp.'s proportionate share of the value of [Ritani's] good will as of December 31, 2006 [i.e., Good will].

(Id., Ex. 11 at 2).

Thus, the possibility that Blue Nile might become a customer in 2008 was immaterial to the valuation of HR Corp.'s shares. Even if the speculative future business with Blue Nile were somehow included in the 2007 Financial Statement, the price that HR Corp. received upon the sale of its Ritani shares would have remained the same.

---

their values . . . net of any depreciation and/or amortization . . . and (ii) paid all of its liabilities and distributed the resulting cash to its Members in complete liquidation in accordance with each Member's Capital Account." (Id., Ex. 8 at 3).

42

Taken together, HR Corp. has failed to establish a claim for fraud against the Counter-Defendants.  The Plaintiff and Counter-Defendants' motion to dismiss the claim is therefore granted.

HR Corp. Has Failed to Plead Sufficient Facts to Establish A Claim for Negligent Misrepresentation

To assert a claim of negligent misrepresentation, a plaintiff must allege that (1) the defendant had a duty as a result of a special relationship to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the defendant knew that the plaintiff desired the information for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment. Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000).  In this Circuit, negligent misrepresentation claims that "sound in fraud" are subject to the heightened pleading requirements under Rule 9(b).  See BNP Paribas Mortg. Corp. v. Bank of Am., N.A., --- F. Supp. ---, 2013 WL 2452169, at *14 (S.D.N.Y. June 6, 2013) (citing cases).

Here, HR Corp.'s negligent misrepresentation claim fails for the same reason as the fraud claim, namely, HR Corp.

43

has alleged no reliance and no injury suffered as a result of any reasonable reliance on anything Counter-Defendants said or did.  In addition, as discussed above, in New York, "the loss of an alternative contractual bargain . . . cannot serve as a basis for fraud or misrepresentation damages because the loss of the bargain was undeterminable and speculative."  Lama Holding, 88 N.Y.2d at 422 (emphasis added).  Accordingly, Plaintiff and Counter-Defendants' motion to dismiss HR Corp.'s negligent misrepresentation claim is granted.


HR Corp. Has Failed to Plead Sufficient Facts to Establish A Claim for Breach of Fiduciary Duty and Aiding and Abetting a Breach of Fiduciary Duty

        To state a claim for breach of fiduciary duty under New York law, a plaintiff must plead "breach by a fiduciary of a duty owed to plaintiff; defendant's knowing participation in that breach; and damages."  SCS Commc'ns, Inc., v. Herrick Co., 360 F.3d 329, 342 (2d Cir. 2004).  While lost profits are available on breach of fiduciary duty claims, see Am. Federal Group, Ltd. v. Rothenberg, 136 F.3d 897, 907 (2d Cir. 1998), a plaintiff must prove that those losses are not merely speculative but prove the losses with reasonable certainty.  Id. (noting that "to recover damages for lost earnings or profits one must prove with certainty that the loss was caused by a

breach. . . .").  In New York, to recover damages for lost
revenue or profits, "it must be shown that: (1) the damages were
caused by the breach; (2) the alleged loss must be capable of
proof with reasonable certainty, and (3) the particular damages
were within the contemplation of the parties to the contract at
the time it was made."  Ashland Mgmt, Inc. v. Janien, 82 N.Y.2d
395, 404 (N.Y. 1993).

    As discussed above, HR Corp.'s sale of Ritani's shares
in August 2007 was made in accordance with the 2004 Operating
Agreement, which defined the formula that determined the price
of the selling member's interest.  Thus, considering that the
price that HR Corp. received upon the sale of its Ritani shares
would have remained the same regardless of its relationship with
Blue Nile, even assuming HR Corp. has properly pled the first
two elements of a breach of fiduciary duty, the damages
requirement has not been met.  See e.g., Stoeckel v. Block, 170
A.D.2d 417, 417 (1st Dept. 1991).

    Accordingly, for the reasons stated above, Plaintiff
and Counter-Defendants' motion to dismiss HR Corp.'s
counterclaims is granted.

## B) **The Plaintiff's Motion to Dismiss Mrs. Aghjayan's Counterclaims is Granted**

In her Answer, Mrs. Aghjayan has filed a counterclaim for aiding and abetting a breach of fiduciary duty against Ritani and JKD. (See Dkt. No. 68).

Relevant Facts

Mrs. Aghjayan was formerly employed by Ritani as a CAD-CAM designer. (Id. ¶ 133). According to Mrs. Aghjayan, she left Ritani's employ in August 2008 to pursue designing on her own, which led to the creation of the 84 bridal jewelry designs that are the subject of Ritani's claims. (Id. ¶ 137). In connection with those designs, Mrs. Aghjayan allegedly emailed designs and CAD-CAM files to Khatchadorian in China. (Id. ¶ 138).

According to Mrs. Aghjayan, Khatchadorian was her partner, not Aghjayan's, in the Chinese company, and therefore owed her a fiduciary duty. (Id. ¶¶ 150, 171). Among the duties allegedly owed by Khatchadorian was to maintain the confidentiality of proprietary information, including design files. (Id. ¶ 171). She alleges that the Counter-Defendants approached Khatchadorian in April 2012, who informed them that

46

he was partners with Aghjayan and/or Mrs. Aghjayan in one or
more companies outside the United States.  (Id. ¶¶ 150, 151,
171, 172).  Notwithstanding knowing that Khatchadorian owed a
fiduciary duty to Mrs. Aghjayan, the Answer alleges that the
Counter-Defendants accepted and knowingly took possession of
Mrs. Aghjayan's property that did not belong to them, without
disclosing to Mrs. Aghjayan that they were doing so or that
Khatchadorian had approached them.  (Id. ¶ 173).

        According to Plaintiff and Counter-Defendants, in the
Spring of 2012, Khatchadorian contacted them and provided new
evidence of Aghjayan's alleged misconduct.  Khatchadorian
allegedly informed Ritani that he was a former partner of
Aghjayan in the Chinese company.  Specifically, Khatchadorian
allegedly informed Ritani that Aghjayan, while he was still
employed by Ritani and during his non compete period, had (a)
partnered with Khatchadorian to manufacture custom bridal
engagement rings and wedding bands in China for the sole purpose
of maintaining a competing business to sell such jewelry in the
United States; (b) diverted Ritani's business opportunities to a
third party by providing Khatchadorian with jewelry designs
prepared by Aghjayan while working for Ritani for the use and
benefit of the competing business; (c) pursued overseas
manufacturing opportunities in China to further the

47

business affairs of another; (d) disclosed Ritani's confidential
and/or trade secret CAD-CAM drawings and design files to third
parties, including Khatchadorian; and (e) used Ritani's
confidential and/or trade secret designs to form a business and
create jewelry styles to compete directly with Ritani in the
United States market.

According to Ritani, Khatchadorian, of his own
volition, provided Counter-Defendants with numerous emails
showing that Aghjayan, while President, CEO, and chief designer
at Ritani and continuing thereafter, took advantage of his
position of trust and confidence at Ritani to allegedly create
his own business to directly compete with Ritani through the use
of Ritani's trade secrets and confidential design files.

Mrs. Aghjayan's Aiding and Abetting Breach of Fiduciary Duty
Claim is Dismissed For Failure of Proof

The Answer contends that, upon information and belief,
the Counter-Defendants and their employees, attorneys, and
agents have been examining Mrs. Aghjayan's property which is
allegedly proprietary, including files which are for designs
that have not yet been sold or marketed, and have given unlawful
access to same to the jewelry designers, agents and employees of
the Counter-Defendants, who have been copying and studying these

48

designs.  (Dkt. No. 68 ¶¶ 159, 161, 174).  By reason of the
Counter-Defendants' alleged aiding and abetting Khatchadorian
breach of fiduciary duty, Mrs. Aghjayan seeks both compensatory
and punitive damages from the Counter-Defendants. (Id. ¶ 176).

To state a claim for aiding and abetting breach of
fiduciary duty under New York law, a plaintiff must prove "(1)
the existence of a violation committed by the primary (as
opposed to the aiding and abetting) party; (2) "knowledge" of
this violation on the part of the aider and abettor; and (3)
"substantial assistance" by the aider and abettor in achievement
of the violation.  Briarpatch Ltd., L.P. v. Geisler Roberdeau,
Inc., No. 99 Civ. 9623(RWS), 2007 WL 1040809, at *21 (S.D.N.Y.
Apr. 4, 2007) (citing Moll v. U.S. Life Title Ins. Co., 654 F.
Supp. 1012, 1030 (S.D.N.Y. 1987)).  In addition, under New York
law, courts have also sometimes discussed the tort of
"participating" in or "inducing" a breach of fiduciary duty.
The elements of this tort are similar to the tort of aiding and
abetting a breach of fiduciary duty.  See S&K Sales v. Nike,
Inc., 816 F.2d 843, 847-48 (2d Cir. 1987) (stating that "[t]he
claimant must prove (1) a breach by a fiduciary of obligations to
another, (2) that the defendant knowingly induced or
participated in the breach, and (3) that the plaintiff suffered
damages as a result of the breach.").

49

     With regard to the knowledge requirement, the Second
Circuit has iterated that "actual knowledge" is a necessary
element.  See In re Sharp Int'l Corp., 403 F.3d 43, 49 (2d Cir.
2005); see also Kaufman v. Cohen, 307 A.D.2d 113, 125, 760
N.Y.S.2d 157, 169 (1st Dep't 2003) ("Although a plaintiff is not
required to allege that the aider and abettor had an intent to
harm, there must be an allegation that such defendant had actual
knowledge of the breach of duty.").  Thus, "[c]onstructive
knowledge of the breach of fiduciary duty by another is legally
insufficient to impose aiding and abetting liability."  Id.
(citation omitted).  In addition, "[s]ubstantial assistance may
only be found where the alleged aider and abettor affirmatively
assists, helps conceal or fails to act when required to do so,
thereby enabling the breach to occur").  In re Sharp Int'n
Corp., 403 F.3d 43, 50 (2d Cr. 2005) (internal quotations and
citations omitted).

     Mrs. Aghjayan falls far short of pleading the
existence of a fiduciary duty owed to her by Khatchadorian.  "A
fiduciary relationship exists . . . 'when one [person] is under
a duty to act for or to give advice for the benefit of another
upon matters within the scope of the relation.'"  Flickinger v.
Harold C. Brown & Co., 947 F.2d 595, 599 (2d Cir. 1991) (quoting

Mandelblatt v. Devon Stores, Inc., 132 A.D.2d 162, 521 N.Y.S.2d
672, 676 (1st Dep't 1987)) (alteration in original).  However,
"when parties deal at arms length in a commercial transaction,
no relation of confidence or trust sufficient to find the
existence of a fiduciary relationship will arise absent
extraordinary circumstances."  Pan Am. Corp. v. Delta Air Lines,
Inc., 175 B.R. 438, 511 (S.D.N.Y. 1994) (internal quotation
omitted).

     Paragraph 150 of the counterclaims alleges that
"Shawndria was a 'partner' with Alexan in a company in China."
(Dkt. No. 67 ¶ 150).[6]  Mrs. Aghjayan offers no reasons as to why
the common law of New York would be applicable to her Chinese
venture nor does she allege that Chinese law creates a fiduciary
duty between partners in a Chinese company.  In fact, Mrs.
Aghjayan provides no details regarding her partnership or why
the word "partner" is placed in quotation marks.  Mrs. Aghjayan
fails to allege the name of the partnership, the nature of
partnership, the relationship between or among the partners, or
the dates of commencement and termination of the partnership.
This lack of specificity is fatal to her counterclaim.

---

[6] Defendant Mrs. Aghjayan is referred to as "Shawndria"; and Khatchadorian is
referred to as "Alexan" in Mrs. Aghjayan's Answer.

Moreover, even assuming that a duty exists, Mrs. Aghjayan has failed to demonstrate that Counter-Defendants' had actual knowledge of the alleged breach or that they provided substantial assistance to enable any breach.  The only allegation as to Counter-Defendants' knowledge reads that: "Once Alexan identified himself as Shawndria's partner, [Ritani] and JKD knew or should have known that he owed a fiduciary duty to Shawndria that would be violated if Alexan gave Counterclaimant's Property to LLC and JKD." (Dkt. 67 ¶ 172). While this paragraph alleges Counter-Defendants' actual knowledge of Alexan's "partnership" with Shawndria, it is devoid of allegations that Counter-Defendants had actual knowledge that Counterclaimant's Property was confidential or proprietary to Amazing Settings.  Whether Counter-Defendants "should have known" that Counterclaimant's Property was confidential or proprietary is irrelevant, as actual knowledge is required to support aiding and abetting liability.  See Kaufman, 307 A.D.2d at 125.

In her opposition, Mrs. Aghjayan's quotes testimony given by Klein to support her allegations that Counter-Defendants had actual knowledge of her partnership with Khatchadorian.  (Dkt. No. 87 at 9-10).  However, the testimony demonstrates that Counter-Defendants had actual knowledge of a

52

Khatchadorian's business venture with Aghjayan, not Mrs. Aghjayan, and that Khatchadorian provided certain documents to Counter-Defendants.  Neither the quoted testimony nor the allegations in the Answer, however, render plausible the notion that Counterclaim Defendants had actual knowledge that the documents disclosed contain Mrs. Aghjayan's confidential information.

        In addition, Mrs. Aghjayan also fails to allege any acts of the Counter-Defendants that affirmatively assisted or helped to conceal Khatchadorian's alleged breach.  According to Mrs. Aghjayan, Counter-Defendants allegedly provided substantial assistance to Khatchadorian by "'de-briefing' him for hours, and encouraging Khatchadorian to give them Counterclaimant's Property." (Dkt. 67 ¶ 175).  A bare pleading of "encouragement," however, is wholly insufficient to render substantial assistance plausible.  See Morin v. Trupin, 711 F. Supp. 97, 112 (S.D.N.Y. 1989).

        Khatchadorian's alleged breach occurred, and was completed, at the moment he turned over to Counterclaim Defendants the documents allegedly belonging to Amazing Settings.  In her opposition, Mrs. Aghjayan describes

Counterclaim Defendants' examination of the disclosed documents
and their alleged internal dissemination of the same as
"active and knowing participation in the breach."  (Dkt. No. 87
at 11 (emphasis in original)).  These actions, however, occurred
after the completion of the alleged breach, and therefore may
not be conflated to bolster a claim of substantial assistance.

For the reasons stated above, Plaintiff's motion to
dismiss Mrs. Aghjayan's counterclaim for aiding and abetting a
breach of fiduciary duty is granted.

## C) Plaintiff and Counter-Defendants' Motion to Dismiss Amazing Settings and Harout R's Counterclaims is Granted

In its Answer, Amazing Settings and Harout R have
filed a counterclaim for conversion against Ritani and JKD. (See
Dkt. Nos. 59 and 60).  However, in its opposition, Amazing
Settings and Harout R sought to recast its claims for conversion
to claims for New York common law unfair competition.  (Dkt. No.
88, at 6) (stating that "[w]hile admittedly the counterclaims at
issue are labeled "conversion," the gist of the claim is that
the Counter[-]Defendants have wrongfully obtained and used the
Defendant Companies' Property, alleged to be both a trade secret
and confidential, for the Counterclaim Defendants' own purposes.
The Defendant Companies concede that the claim as pled should

not have been labeled 'conversion,' but rather 'unfair
competition.'"

Relevant Facts

        According to Amazing Settings and Harout R, in April
2012, Ritani and JKD were approached by Khatchadorian, who had
been entrusted with CAD-CAM files, designs, sketches and
renderings that are allegedly owned by the Defendant Companies.
(the "Counterclaimant's Property").   These files were annexed to
emails sent to Khatchadorian for the purposes of creating
designs and product lines for the Defendant Companies to use
commercially.

        Upon information and belief, Khatchadorian offered to
give Ritani and its counsel a copy of some 1500 emails, many of
which included attachments of CAD-CAM designs that are allegedly
confidential, non-public and proprietary information belonging
to Amazing Settings and Harout R.   (Dkt. No. 60 ¶ 92; Dkt. No.
59 ¶ 126).   Ritani and JKD allegedly "debriefed" Alexan and
through counsel for hours, and encouraged Alexan to give them
the Defendant Companies' Property. (Dkt. No. 60 ¶ 93; Dkt. No.
59 ¶ 127).   Upon information and belief, JKD and/or Ritani
allegedly promised to give Khatchadorian consideration in

55

exchange for the Defendant Companies' Property. (Dkt. No. 60 ¶ 97; Dkt. No. 59 ¶ 131). In April 2012, Khatchadorian allegedly gave to Ritani and JKD Counterclaimant's Property, and they failed to advise the Defendant Companies that they came into such possession. (Dkt. No. 60 ¶ 94; Dkt. No. 59 ¶ 128).

According to Defendants, the Defendant Companies' Property is valuable, some are not publicly known and proprietary, and some are copyrighted. (Dkt. No. 60 ¶¶ 95-96; Dkt. No. 59 ¶¶ 129-30). Ritani and JKD's possession of the Defendant Companies' Property was allegedly not authorized by the Defendant Companies nor disclosed to the Defendant Companies until after a thorough review. (Dkt. No. 60 ¶¶ 99-100; Dkt. No. 59 ¶¶ 133-34).

On May 30, 2012, Defendant Companies became aware of Ritani's possession on or about May 30, 2012, and sought the return of the Defendant Companies' Property. (Dkt. No. 60 ¶ 101; Dkt. No. 59 ¶ 135). Ritani and JKD, however, allegedly retained unlawful possession of the property, despite demand for the return of same. Upon information and belief, Ritani and JKD have made and retain copies of the Defendant Companies' Property, and have given unlawful access to same to the jewelry designers, agents and employees of Ritani and JKD, who have been

copying and studying these designs.  (Dkt. No. 60 ¶ 102; Dkt. No. 59 ¶ 136).

Defendants contend that Ritani and JKD have paid no consideration to the Defendant Companies' for their Property, or for the use or exploitation of same, although the Defendants Companies' Property has great value to JKD and Ritani.  (Dkt. No. 60 ¶ 104-05; Dkt. No. 59 ¶¶ 138-39).  They also maintain that they have a superior possessory right in Defendant Companies' Property and seek damages and injunctive relief enjoining Ritani and JKD from using the Defendant Companies' Property for their own purposes.

According to the Plaintiff and Counter-Defendants, Khatchadorian informed Ritani that Aghjayan, while still employed by Ritani and during his non-compete period had (a) partnered with Khatchadorian to manufacture custom bridal engagement rings and wedding bands in China for the sole purpose of maintaining a competing business to sell such jewelry in the United States; (b) diverted Ritani's business opportunities to a third party by providing Khatchadorian with jewelry designs prepared by Khatchadorian while working for Ritani for the use and benefit of the competing business; (c) pursued overseas manufacturing opportunities in China to further the business

57

affairs of another; (d) disclosed Ritani's confidential and/or trade secret CAD-CAM drawings and design files to third parties, including Khatchadorian; and (e) used Ritani's confidential and/or trade secret designs to form a business and create jewelry styles to compete directly with Ritani in the United States market.

According to the Plaintiff, Khatchadorian, of his own volition, provided Counter-Defendants with numerous emails showing that Aghjayan, while President, CEO, and chief designer at Ritani and continuing thereafter, allegedly deliberately took advantage of his position of trust and confidence at Ritani to unlawfully create his own business to directly compete with Ritani through the use of Ritani's trade secrets and confidential design files.

"An unfair competition claim involving misappropriation usually concerns the taking and use of the plaintiff's property to compete against the plaintiff's own use of the same property." Roy Export Co. Establishment v. Columbia Broad. Sys., Inc., 675 F.2d 1095, 1105 (2d Cir. 1982). Thus, "New York common law allows a plaintiff to sue for unfair competition where a property right or a commercial advantage has

58

been misappropriated.  ITC Ltd. v. Punchgini, Inc., 482 F.3d

135, 165 (2d Cir. 2007) (internal citation omitted).

          "The tort is adaptable and capacious."  Roy Export,

675 F.2d at 1105.  As the Second Circuit explained,

> New York courts have noted the 'incalculable variety'
> of illegal practices falling within the unfair
> competition rubric, calling it a 'broad and flexible
> doctrine' ... [unfair competition] is taking 'the
> skill, expenditures, and labors of a competitor,' and
> 'misappropriati[ng] for the commercial advantage of
> one person ... a benefit or 'property' right belonging
> to another.'

Id. at 1044.  "It has been broadly described as encompassing any

form of commercial immorality, or simply as endeavoring to reap

where one has not sown; it is taking the skill, expenditures and

labors of a competitor, and misappropriati(ng) for the

commercial advantage of one person . . . a benefit or property

right belonging to another." Id. at 1105 (internal citations and

quotation marks omitted).  "The essence of an unfair competition

claim under New York law is that the defendant misappropriated

the labors and expenditures of another." Saratoga Vichy Spring

Co., Inc. v. Lehman, 625 F.2d 1037, 1044 (2d Cir. 1980).  An

unfair competition claim must also involve some degree of bad

faith.  Id.

Here, the Defendant Companies allege, based on the
testimony at the preliminary injunction hearing in this matter,
that the Counterclaim Defendants were approached by
Khatchadorian, Ritani and JKD, took designs offered to them by
Alexan, and debriefed him for days.  (citing Tr. at 25,202, 224-
25).  Defendant Companies contend that their allegations that
the Counterclaims possess confidential information and trade
secrets, including designs created for the Defendant Companies,
that they improperly obtained from Khatchadorian, and which they
reviewed and copied and are using to compete against them,
combine to state a plausible claim for an unfair competition
claim.  (Dkt. No. 60 ¶¶ 92-95, 98-100, 102-03, 105-107; Dkt. No.
59 ¶¶ 126-29, 132-34, 136-37, 139-41).

However, Defendant Companies fail to allege facts to
demonstrate that the Counterclaim Defendants have appropriated
the Defendant Companies' Property for any commercial advantage.
Defendant Companies allege that "[u]pon information and belief,
LLC and JKD have made and retain copies of the Counterclaimant's
Property, and have given unlawful access to same to the jewelry
designers, agents and employees of LLC and JKD, who have been
copying and studying these designs.  (Dkt. 59 ¶ 136; Dkt 60 ¶
102).  Such internal use does not constitute an external
competitive act that is beyond mere internal dissemination and

review.  Absent such allegations of an external competitive act,
Defendant Companies have not stated a claim for unfair
competition.

In addition, Defendant Companies have not established
bad faith.  In order to establish bad faith, Defendant Companies
must show that Counter-Defendants "acted out of dishonest
purpose."  See Barbagallo v. Marcum LLP, No. 11 Civ. 1358, 2012
WL 1664238, at *8 (E.D.N.Y. May 11, 2012).  Defendant Companies,
in fact, do not allege any purpose whatsoever on the part of
Counter-Defendants.  See Berman v. Sugo LLC, 580 F. Supp. 2d
191, 209 (S.D.N.Y. 2008) (counterclaim for unfair competition
dismissed when Counter-Plaintiff fail to adequately allege the
bad faith acts by which Counterclaim Defendants misappropriated
its labor or resources for their own commercial advantage).

Taken together, Defendant Companies have not alleged
any commercial appropriation or a dishonest purpose on the part
of Counter-Defendants.  Accordingly, Plaintiff's motion to
dismiss Amazing Settings and Harout R's counterclaim is granted.

## D) Aghjayan's Motion to Dismiss Counts VII and IX is Denied in Part and Granted in Part

Defendant Aghjayan has moved to dismiss Ritani's claims for misappropriation of trade secrets ("Count VII") and tortious interference with business relations ("Count IX") of the First Amended Complaint.  Defendants contend that the tortious interference claim is barred by the law of the case, which precludes re-litigation of legal issues resolved by a court.  Plaintiffs, in turn, maintain that the law of the case does not bar its claims and that its FAC now pleads each of the required elements of Counts VII and IX.

Considering the parties' conflicting interpretations of the July 18 Opinion, for clarification purposes, a brief discussion of the disputed section follows.

The July 18 Opinion and Subsequent Procedural History

After considering the allegations contained in the Initial Complaint and the Proposed Amended Complaint, the July 18 Opinion granted in part and denied in part Defendants' motion to dismiss certain claims.  Ritani, 88 F. Supp. 2d at 456.  Among the dismissed claims was the tortious interference claim as set forth in the PAC against all Defendants because:  (1)

62

Ritani had not alleged that, as a result of Aghjayan's actions, any of these customers did not buy from Ritani, or that any order was canceled or that Ritani had an actual, legitimate expectation as to their further patronage; (2) the allegations that Aghjayan met with potential customers or that some jewelers are now selling Harout R rings are not in and of themselves actionable; (3) Ritani had not pled sufficient facts to show that Aghjayan acted with a wrongful purpose motivated solely by malice or to inflict injury to Ritani; and (4) Ritani has not pled any specific facts as to business relationships with a specific jeweler that was interfered with and successfully harmed by Aghjayan's actions so that orders or business was lost due to those actions. Id. at 452-53.

The July 18 Opinion also granted Plaintiff's motion to amend "subject to the causes of action dismissed in this Opinion, because they are considered futile." Id. at 456. This was based on the unusual procedural posture of the case and because Defendants had referred the Court to the arguments made in their previous Motion to Dismiss the Initial Complaint, the preliminary injunction hearing transcripts, and the Court's preliminary injunction order. (See Dkt. No. 47). The July 18 Opinion, however, also allowed Plaintiff "leave to replead within 20 days." Id. at 456. Thus, Plaintiff had the option of

63

filing its PAC, subject to the July 18 Opinion, or repleading additional factual allegations to further support the sufficiency of its amended claims.

Plaintiff then timely filed its First Amended Complaint expanding upon certain factual bases for its claims. Following Plaintiff's service of the FAC, the parties faxed several letters to the Court with conflicting interpretations as to whether the July 18 Order allowed Plaintiff to amend its tortious interference claim against Aghjayan.  The letters were treated as a motion, to be heard on submission, returnable on September 11, 2012.  (Dkt. No. 58).  On September 26, 2012, an order was issued denying Defendants' letter motion to strike the tortious interference claim on the basis of the July 18 Order, but granting leave to dismiss on any other applicable grounds. (Dkt. No. 76).  Following that decision, Aghjayan filed the instant motion to dismiss Counts VII and IX.

## The Motion to Dismiss the Tortious Interference Claim is Granted

To begin with, as discussed above, the law of the case is inapplicable to the instant motion.  Contrary to Defendants' argument, the July 18 Order did not "expressly limit[] leave to replead 'subject to the causes of action dismissed in' the July

Order" or "den[y] Ritani the right to replead the dismissed claims." (Def. Memo at 8).  Instead, because Defendants did not oppose Ritani's motion, but instead referred the Court to arguments made in their motion to dismiss the Initial Complaint as well as the preliminary hearing transcripts, (see Dkt. No. 47), the Court first considered whether the AC, as pled, was sufficient to survive the Defendant's motion to dismiss, and then allowed amendment of the complaint as proposed in the PAC or leave to replead.  The law of the case does not apply where none of the dismissed claims in the July 18 Order were dismissed with prejudice, and express permission was granted to replead. See Kregler v. City of New York, 821 F. Supp. 2d 651, 658 (S.D.N.Y. 2011) (finding that the law of the case does not control because the second amended complaint "alleges materially different and more detailed claims than the Amended Complaint, which was the subject of the Summary Order"); Steinfeld v. Marks, No. 96 Civ. 0552(PKL), 1997 WL 563340, at *3 (S.D.N.Y. Sept. 8, 1997) (holding that the law of the case "only forecloses consideration of issues that have already been decided" and that a Court may address new factual allegations after a motion to dismiss was granted.).  Accordingly, whether a plausible tortious inference claim is pled in the FAC is discussed below.

65

To state a claim for tortious interference with
business relationships under New York law a plaintiff must
allege:  "(1) the plaintiff had business relations with a third
party; (2) the defendant interfered with those business
relations; (3) the defendant acted for a wrongful purpose or
used dishonest, unfair, or improper means; and (4) the
defendant's acts injured the relationship." Catskill Dev.,
L.L.C. v. Park Place Entm't Corp., 547 F.3d 115, 132 (2d Cir.
2008).  "The defendant's interference must be direct:  the
defendant must direct some activities towards the third party
and convince the third party not to enter into a business
relationship with the plaintiff." B&M Linen, Corp. v.
Kannegeisser, USA, Corp., 679 F. Supp. 2d 474, 485 (S.D.N.Y.
2010).  Thus, the Plaintiff must plead the basis on which it
claims the "relationship" and the expectation it would yield
future business. See DeSantis v. City of Troy, 83 Misc. 2d 195,
201 (N.Y. Sup. 1975) (stating that the pleading must show that
"but for" interference, it would have received contract).

Ritani has failed to adequately establish the
necessary elements for a tortious interference claim against
Aghjayan.  In the July Order, this Court held that no plausible
tortious interference claim was stated because "Ritani has not
alleged that, as a result of [Aghjayan's wrongful] actions, that

66

any of these customers did not buy from Ritani, or that any

order was canceled or that it had an actual, legitimate

expectation as to their future patronage." 2012 WL 2979058 at

*22. Ritani's new allegations as to Helzberg and Blue Nile in

the FAC do not cure these deficiencies.

With respect to Helzberg, Ritani fails to allege an actual

"business relationship" with Helzberg at the time of Aghjayan's

actions. Ritani alleges that it had a "very positive meeting"

with Helzberg in January and February of 2010, but admittedly to

"discuss *entering* into a business arrangement [with Ritani] for

the purchase of engagement rings and wedding bands," not that

such a relationship already existed. (See. Dkt. No. 54 ¶ 85

(emphasis added).) Even if Helzberg's buyer informed Ritani

that he potentially wanted to do business in the future (id. ¶

213), Ritani does not allege that any orders were actually

placed or subsequently cancelled, or that the relationship with

Helzberg had progressed beyond the talking stage. Nor does the

fact that "Helzberg's top executives were former executives of

Ritani customers dating back prior to Plaintiff's 2002

acquisition of H. Ritani, Corp. and lasting up until a few years

ago" establish a "business relationship" for the purposes of

tortious interference. (Id. ¶ 100.) Moreover, Ritani fails

to establish that Aghjayan actually knew of or interfered with

67

whatever relationship Ritani may have had with Helzberg, aside
from the conclusory allegation that cessation of Helzberg's
talks with Ritani "coincides" with Aghjayan's meetings with
Helzberg in 2010.  To the contrary, Ritani's first meetings with
Helzberg were in January and Feburary of 2010 (see Dkt. No. 54 ¶
213), and Aghjayan was cut off from Ritani's servers by August
of 2008 and worked at home during September and October of 2009.
Thus, Ritani has failed to adequately plead not only "business
relations" existing between Ritani and Helzberg during the
relevant period, but also that Aghjayan had any alleged
knowledge of such a relationship or intentionally interfered
with it.  See Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis
Council, 857 F.2d 55, 74 (2d Cir. 1988) (plaintiff "must
demonstrate that defendant interfered with business relations
existing between a plaintiff and a third party.").

As to Blue Nile, Ritani similarly fails to adequately
allege that Aghjayan wrongfully interfered with Ritani's
relationship with Blue Nile.  Ritani alleges, solely "[u]pon
information and belief," that Aghjayan used Ritani's
confidential information "to his advantage in his negotiations"
with Blue Nile, and that but for Aghjayan's interference, "Blue
Nile would have placed launching orders in 2010 with Ritani and
would have purchased all of Ritani's Designs from its true owner

68

Ritani, and not Defendant Aghjayan and Defendant Companies."
(Id. ¶¶ 216, 219, 224.)  Ritani, however, offers no facts
supporting the conclusory allegation that any alleged loss of
sales resulted from any wrongful conduct by Aghjayan, or that
Aghjayan even possessed confidential information or used such
information inappropriately.  Instead, Ritani's witness Joseph
Manber admitted under oath at the preliminary injunction hearing
that Aghjayan was first told about Ritani's relationship with
Blue Nile in October 2007, months after H. Ritani Corp. sold its
interest to JKD.  (Tr. At 83-84.)  Further, Ritani fails to show
that Blue Nile ever even placed, and then cancelled, any *actual*
"launching orders" because of Aghjayan or otherwise.  (Dkt. No.
54 ¶ 216.)   Moreover, Blue Nile was not listed as a customer
on Ritani's website, and Ritani expressly agreed that Aghjayan
could sell to customers not on its website after October 14,
2010.  (Tr. at 83-84); (FAC Exh. 9.)  Because Ritani thus fails
to allege that Aghjayan wrongfully interfered with Ritani's
relationship with Blue Nile, Ritani's tortious interference
claim fails.

      In any event, with respect to both Helzberg and Blue Nile,
Plaintiff has not pled, nor could it, that Aghjayan "acted for a
wrongful purpose or used dishonest, unfair, or improper means."
Catskill Dev., L.L.C., 547 F.3d at 132.  First, Ritani has

69

failed to show that if either Helzberg or Blue Nile placed
orders with Aghjayan, they could not also place orders with
Ritani.  In fact, Ritani's witness, Alexan, testified at the
preliminary injunction hearing that Aghjayan had no rings to
sell in 2010.  (Tr. at 229-230.)  Second, "economic
justification" allows a competitor to solicit business even
where a prospective contract exists.  See Guard-Life Corp. v. S.
Parker Hardware Mfg. Corp., 50 N.Y.2d 183 (1980) (status as
competitor may protect interferer from consequences of
interference).  Without more, the speculative "allegations that
[Aghjayan] met with potential customers or that some jewelers
are now selling Harout R rings are not in and of themselves
actionable," but rather show only that Aghjayan appropriately
became a competitor in the business after his non-compete clause
had expired.  (See Dkt. No. 52 at 60.)  Ritani's failure to
adequately plead any wrongful means by Aghjayan is thus fatal to
the tortious interference claim with respect to both Helzberg
and Blue Nile, and the tortious interference claim is dismissed.


The Motion to Dismiss the Misappropriation Claim is Denied


        The July 18 Order granted dismissal of the
misappropriation of trade secrets claim against Defendant
Companies, but held that Ritani had set forth a "more than

70

plausible" misappropriation of trade secret claim against
Aghjayan and Mrs. Aghjayan.  Ritani, 880 F. Supp. 2d at 451.
Defendants, nonetheless, have now moved to dismiss the
misappropriation of trade secrets claim against Aghjayan stating
that they "believe no plausible claim has been stated against
[Aghjayan], because Ritani has failed to plead facts
demonstrating what [Aghjayan] is alleged to have misappropriated
and that such were actually 'trade secrets' and used."  (Def.
Memo at 2 n.3).


     As a general rule, a court should be "'loathe' to
revisit an earlier decision 'in the absence of extraordinary
circumstances.'"  N. River Ins. Co. v. Phil. Reinsurance Corp.,
63 F.3d 160, 165 (2d Cir. 1995) (quoting Christianson v. Colt
Indus. Operating Corp., 486 U.S. 800, 817, 108 S. Ct. 2166,
2178, 100 L. Ed. 2d 811 (1988)).  The law of the case mandates
that "a decision on an issue of law made at one stage of a case
becomes binding precedent to be followed in subsequent stages of
the same litigation."  Westerbeke Corp. v. Daihatsu Moto Co.,
Ltd., 304 F.3d 200, 218 (2d Cir. 2002).  Without any showing of
the existence of an extraordinary circumstance, Plaintiff has
provided no justification to entertain this motion.
Accordingly, this Court declines to revisit its earlier decision
denying Defendants' motion to dismiss the misappropriation of

trade secrets claim against Aghjayan, and the instant motion is denied.  See F.T.C. v. Consumer Health Benefits Ass'n, No. 10 Civ. 3551 (ILG)(RLM), 2012 WL 1890242, at *8 (E.D.N.Y. May 23, 2012) (refusing to revisit previously rejected arguments that the amended complaint failed to state a claim because its earlier ruling was the law of the case.).

### E) **Mrs. Aghjayan's Motion to Dismiss Counts VII and XI is Denied**

Defendants have moved to dismiss Ritani's claims for misappropriation of trade secrets (Count VII) and aiding and abetting breach of a fiduciary duty (Count XI) against Mrs. Aghjayan.  For the reasons set forth below, the Defendants' motion to dismiss these counts is denied.

This Court has already found that Ritani has sufficiently pled its trade secret misappropriation claims against Aghjayan and Mrs. Aghjayan.  See Ritani, 880 F. Supp. 2d at 451.  For the same reasons discussed above in relation to Aghjayan, the Court declines to revisit its earlier decision. See F.T.C., 2012 WL 1890242, at *8.

Plaintiff has also alleged a claim that Mrs. Aghjayan knowingly assisted and abetted her husband's breach of his

fiduciary duty to Ritani.[7]  Courts in New York have held that

where "an employee breached his fiduciary duty by making

improper use of the employer's time, facilities or proprietary

secrets to create a competing business, third parties who have

knowingly participated in the breach may be held accountable."

Berman v. Sugo, LLC, 580 F. Supp. 2d 191, 205 (S.D.N.Y. 2008)

(quoting Schneider Leasing Plus, Inc. v. Stallone, 172 A.D.2d

739, 741 (N.Y. App. Div. 1991)).  For example, in Berman, the

Court found that allegations that the plaintiff "plotted and

conspired" with the counter-defendant to misappropriate the

business opportunities of the defendant and that counter-

defendant "pursued his plan with Plaintiff and formed Rip Road

and proceeded with Plaintiff to misappropriate Defendant's

business and business opportunities through Rip Road" sufficient

to state a claim for aiding and abetting against the counter-

defendant.


        Similar to the allegations against Berman, Ritani

alleges that Mrs. Aghjayan helped her husband "take advantage of

his position to [at Ritani] to access, disclose[] and

subsequently use[] Ritani's trade secrets and other confidential

---

[7] The standard under New York law for stating a claim for aiding and abetting
breach of fiduciary duty is outlined in Section IV(B).

and/or proprietary information" by establishing and operating companies "to directly compete with and solicit customers from Ritani. (Dkt. No. 54 ¶ 11). In addition, Mrs. Aghjayan testified under oath that she was actively involved in husband Aghjayan's competitive business dealings while Aghjayan was still employed by Ritani, including: (1) authorizing Aghjayan to send emails concerning misappropriated Ritani jewelry designs (Dkt. 44 at 376:10-14); (2) asking Aghjayan to work on jewelry designs that competed with Ritani in the U.S. (Dkt. 44 at 373:17-20); and (3) permitting Aghjayan to finalize and transmit completed CAD designs to Khatchadorian. (Dkt. 44 at 379:2-7, 381:7-25 to 382:1-2; see also Dkt. 44 at 371: 2-4, 375:7-9; 376: 12-13). Such allegations that Mrs. Aghjayan aided in setting up Aghjayan's Chinese company and acting "as a subterfuge to send Mr. Khatchadorian Ritani's confidential and trade secret CAD drawings," all of which "aided and abetted Defendant Aghjayan in furtherance of his improper scheme to breach his fiduciary duties" are sufficient to state a claim of aiding and abetting against Mrs. Aghjayan, and her motion to dismiss is denied. (See Dkt. No. 54 ¶ 60).

**F) Amazing Settings and Harout R's Motion for Dismiss Count VII is Denied**

New York courts define trade secrets as "any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it." Softel, Inc. v. Dragon Med. & Scientific Commc'ns., Inc., 118 F.3d 955, 968 (2d Cir. 1997) (citations omitted). "[I]t is not simply information as to single or ephemeral events in the conduct of the business; rather it is a process or device for continuous use in the operation of the business." Id. (internal quotation marks and citation omitted). To recover under New York law, a plaintiff must show that it possessed a trade secret and that defendants used the trade secret in breach of an agreement, confidential relationship or duty or by improper means of discovery. N. Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 44 (2d Cir.1999) (finding that a list containing identities and preferences of plaintiff's clients was a protectable trade secret).

The July 18 Opinion dismissed the misappropriation of trade secrets claim against the Defendant Companies but not against Aghjayan and Mrs. Aghjayan.  Specifically, the claims were dismissed against Amazing Settings and Harout R because the allegations, as pled in the PAC, did not allege "use of the alleged trade secrets" by the Defendant Companies so that the

75

wrongdoing of each Defendant was delineated.  Ritani, 880 F.
Supp. 2d at 450.  Plaintiff contends that the FAC has rectified
this defect by adding approximately 10 paragraphs of factual
allegations to specifically set forth what Amazing Settings and
Harout R did in the misappropriation of Ritani's trade secrets
and confidential information.  (See Dkt. 54, ¶¶ 72-73, 75, 80,
183, 196-202).  Defendants, on the other hand, maintain that the
FAC continues to rely on Aghjayan's mere control of the
Defendant Companies, which this Court already deemed
insufficient in the July 18 Opinion.[8]

Plaintiff has already provided "sufficient details
including specific categories of trade secrets for which the
Plaintiff is entitled to protection and the extensive measures
undertaken by Ritani to maintain the secrecy of this
information."  Ritani, 880 F. Supp. 2d at 450-51.  Thus, the
only remaining question is whether the FAC alleges facts to
support the contention that Amazing Settings and Harout R
improperly used Ritani's trade secrets.

The FAC alleges that Amazing Settings and Harout R
were formed to commercialize these misappropriated trade secrets

---

[8] For the reasons previously discussed, contrary to Defendants' arguments, the
July 18 Opinion does not preclude Plaintiff from repleading the specific
causes of action dismissed from the PAC.

and confidential information and improperly used such information to create and sell a number of jewelry designs to compete with Ritani in the United States market.[9]  (Dkt. No. 54 ¶¶ 75, 80).  In support of these factual allegations, the FAC alleges that Ritani's trade secrets were "improperly disclosed by Defendant Aghjayan and used by Amazing Settings and Harout R to make rings that were offered for sale in the United States. Amazing Settings and Harout R sold these misappropriated designs."  (Id. ¶ 73).  Ritani also added the new paragraphs describing Amazing Settings and Harout R's use of Ritani's alleged trade secrets to delineate the wrongdoing of each defendant.  (See generally id. ¶ 199-202).

    A review of the amended allegations against Amazing Settings and Harout R supports a denial of Defendants' motion to dismiss at this stage of the pleadings.  As the July 18 Opinion stated, "the precise details as to the specific information" misappropriate and what exactly was done with this information is not necessary now, but rather will be "uncovered during the discovery process."  Ritani, 880 F. Supp. 2d at 451.  As set

---

[9] For example, the FAC specifically allege that Harout R and Amazing Settings misappropriated and used particular Ritani trade secrets and confidential CAD drawings, enumerated in the pleading, to create the following specific jewelry designs sold to customers through their catalogs and websites: Style Nos. 1r123, 1r162, 1r188, 1r294, 1r310, 1r411, 1r413, 1r414, 1r452, 1r478, 1r496, 1r515, 1r530 and 1r532. (Dkt. No. 54, ¶¶ 64-65, 72-73; 54:34, 54:46-51).

forth above, the wrongdoing of each defendant has been delineated and therefore Amazing Settings and Harout R's motion to dismiss the misappropriation of the trade secret claim is denied.

## G) Defendants' Motion for Attorneys Fees is Denied

Defendants have moved for attorney's fees and costs under Section 505 of the Copyright Act of 1976, which permits a court to "award a reasonable attorney's fee to the prevailing party." 17 U.S.C. § 505.  The Supreme Court has expressly held that a party does not qualify as a "prevailing party" for purposes of fee-shifting statutes until and unless it has secured "a judgment on the merits or a court-ordered consent decree." Buckhannon Bd. and Home Care v. W. Va. Dept. of Health and Human Serv., 532 U.S. 598, 605, 121 S. Ct. 1835, 149 L.Ed.2d 855 (2001).[10]  To be considered a prevailing party, there must be a "judicially sanctioned change in the legal relationship of the parties." Id.

---

[10] Although Buckhannon concerned the fee-shifting provisions of the Fair Housing Amendments Act of 1988 and the Americans with Disability Act of 1990, this District has expressly found that "it is clear that Buckhannon applies with equal force to the fee-shifting provision of the Copyright Act." See Chambers v. Time Warner, Inc., 279 F. Supp. 2d 362, 365 n.4 (S.D.N.Y. 2003).

The first issue is whether Defendants can be considered "prevailing part[ies]" under 17 U.S.C. § 505.  If the Defendants are not "prevailing parties" within the meaning of the statute, the instant motion must be denied without further analysis as this requirement is a statutory prerequisite to the requested relief.  See 17 U.S.C. § 505.

"In the context of fee-shifting statutes, the Supreme Court has held that, for a party to be 'prevailing,' there must be a 'judicially sanctioned change in the legal relationship of the parties.'"  Dattner v. Conagra Foods, Inc., 458 F.3d 98, 101 (2d Cir. 2006) (quoting Buckhannon, 532 U.S. at 605).  The Second Circuit has reasoned that where a plaintiff remains "free to pursue his claims against defendants . . . because it remains to be seen which party will, in fact, prevail on the merits, defendants have not yet achieved a judicially sanctioned change in the legal relationship of the parties so as to be considered "prevailing" under Rule 54(d).  Dattner, 458 F.3d at 103.  Thus, claims that are dismissed because of a jurisdictional point, or dismissed without prejudice do not meet the Rule 54(d) test. See id. (citing cases)

As discussed in this opinion, the parties had different interpretations of the July 18 Opinion.  Based on

79

their respective interpretations, Defendants contended that they are the prevailing party and Plaintiff averred that it voluntarily withdrew its copyright claim.  Whether or not Plaintiff voluntarily dismissed its copyright claim by leaving it out of the FAC or by failing to file a notice of voluntary dismissal is not dispositive.  Instead, applying the reasoning of Dattner, the question is whether Defendants were "immunize[d] . . . from the risk of further litigation on the merits of" Ritani's claims to be considered the "prevailing party."  As discussed above in Section IV(D), the July 18 Opinion allowed Plaintiff to file its PAC, subject to that opinion, or replead within 20 days.  Ritani, 880 F. Supp. 2d at 456.  Thus, while Defendants successfully obtained a dismissal on the grounds set forth in the July 18 Opinion, they remained at risk and therefore cannot be a "prevailing party" entitled to costs under Rule 54(d).  See e.g., Dattner, 458 F.3d at 103 (citing Szabo Food Serv. Inc. v. Canteen Corp., 823 F.2d 1073, 1076-77 (7th Cir. 1987)) (holding that the defendant was not a "prevailing party" where the complaint was dismissed without prejudice because "dismissal without prejudice [. . . ] does not decide the case on the merits.").

Even assuming that Plaintiff was the prevailing party, there is no per se entitled to attorney's fees.  See CK Co. v.

80

Burger King Corp., No. 92 Civ. 1488(CSH), 1995 WL 29488, at *1
(S.D.N.Y. Jan. 26, 1995) ("To hold otherwise would establish a
per se entitlement to attorney's fees whenever [issues
pertaining to judgment] are resolved against a copyright
plaintiff."). Attorneys' fees should not be awarded to the
prevailing party "as a matter of course," but as a matter of the
court's discretion. Fogerty v. Fantasy, Inc., 510 U.S. 517,
533-34, 534 n. 19, 114 S. Ct. 1023, 127 L. Ed, 2d 455 (1994)
(citing several non exclusive factors a court should consider
when exercising this discretion including "frivolousness,
motivation, objective unreasonableness (both in the factual and
in the legal components of the case) and the need in particular
circumstances to advance considerations of compensation and
deterrence.").

In evaluating a motion for attorneys' fees, the Second
Circuit has directed that "objective reasonableness is a factor
that should be given substantial weight in determining whether
an award of attorneys' fees is warranted." Matthew Bender &
Co., Inc. v. West Pub. Co., 240 F.3d 116, 122 (2nd Cir. 2001).
"[N]ot all unsuccessful litigated claims are objectively
unreasonable." CK Co., 1995 WL 29488, at *1. "Rather, the
courts of this Circuit have generally concluded that only those
claims that are clearly without merit or otherwise patently

devoid of legal or factual basis ought to be deemed objectively unreasonable."  See Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd., No. 96-4126(RWS), 2004 WL 728878, at *3 (S.D.N.Y. Apr. 6, 2004).  Such a case does not exist in the instant case, in which Defendants conceded that Plaintiff sufficiently plead the first three elements of the claim and the Court noted that the "the pleadings in the Amended Complaint are more detailed and therefore a closer call."  See Ritani, 880 F. Supp. 2d at 441.

     Moreover, even assuming that Defendants are the "prevailing party" on the copyright claim, Defendants seek relief pursuant to 17 U.S.C. 505, which provides, in pertinent part, that: "[i]n any civil action under this title […] the court may also award a reasonable attorney's fee to the prevailing party as part of the costs."  Attorneys' fees, as a specifically defined subset of "costs," are governed by Fed. R. Civ. P. 54(d)(2), which provides that: "[u]nless a statute or a court order provides otherwise, the motion [for attorneys' fees] must be filed no later than 14 days after the entry of judgment […]."  (Emphasis added).  Section 505 does not "provide otherwise" as to the timing of a motion for attorneys' fees, nor is there any "court order" concerning the same.

Defendants' allege an entitlement "to an award of attorneys' fees incurred in connection with their successful effort to dismiss [Plaintiff's] copyright claims." (Def. Memo in Support, Dkt. No. 138 at 15). As such, Defendants necessarily predicate their stated entitlement on July 18 Opinion, a judgment as defined by Rule 54. See Rinieri v. News Syndicate Co., 385 F.2d 818, 821 (2d Cir. 1967) (quoting Zadig v. Aetna Ins. Co., 42 F.2d 142 (2d Cir. 1930) ("[a]lthough a dismissal without prejudice permits a new action [. . .], the order of dismissal, nevertheless, is a final order from which an appeal lies.").

Accordingly, Defendants' motion for attorneys' fees must have been brought no later than August 3, 2102, or 14 days after entry of July 18 order dismissing the copyright claim upon which Defendants base their fee application.  Defendants' motion was filed on March 29, 2013, eight months after the timeliness deadline. See, e.g., Mattel, Inc. v. Radio City Entm't, 210 F.R.D. 504 (S.D.N.Y. 2002) (denying motion for fees under 17 U.S.C. § 505 as untimely Fed. R. Civ. P. 54(d)(2)(B) when filed seven weeks late); see also Canfield v. Van Atta Buick/GMC Truck, Inc., 127 F.3d 248, 250-51 (2d Cir. 1997).

83

**V. <u>Conclusion</u>**

Based upon the conclusions set forth above, (1)
Plaintiff and Counter-Defendants' motions to dismiss the
counterclaims of HR Corp., Mrs. Aghjayan and Amazing Settings
and Harout R are granted; (2) individual Defendants' motions to
dismiss certain claims in the FAC are denied in part and granted
in part; and (3) Defendants' motion for attorney's fees is
denied.


It is so ordered.

**New York, NY**
**August 3/ , 2013**

_____
ROBERT W. SWEET
U.S.D.J.

84