MEYER, SUOZZI, ENGLISH & KLEIN, P.C.
COUNSELORS AT LAW
990 STEWART AVENUE, SUITE 300
P.O. BOX 9194
GARDEN CITY, NEW YORK 11530-9194
516-741-6565
FACSIMILE: 516-741-6706
E-MAIL: meyersuozzi@msek.com
WEBSITE: http://www.msek.com

ONE COMMERCE PLAZA
SUITE 1705
ALBANY, NEW YORK 12260
518-465-5551
FACSIMILE: 518-465-2033

1300 CONNECTICUT AVENUE, N.W.
SUITE 600
WASHINGTON, DC 20036
202-955-6340
FACSIMILE: 202-223-3058

1350 BROADWAY, SUITE 501
P.O. BOX 822
NEW YORK, NEW YORK 10018-0026
212-239-4999
FACSIMILE: 212-239-1311

LYNN M. BROWN
DIRECT DIAL: 516-592-5727
E-MAIL: LBROWN@MSEK.COM

March 17, 2014

**VIA ECF**

The Honorable Gabriel W. Gorenstein
United States Magistrate Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

      Re:    *Ritani, LLC v. Aghjayan, et al.*
               11-CV-8928 (RWS)(GWG)

Dear Magistrate Judge Gorenstein:

      I write on behalf of Defendants in response to the letter of March 7, 2014 (filed at nearly midnight) from Cameron Reuber, Esq., requesting a conference. As discussed further below, Ritani fails to show either the probative value of any of the information that is the subject of its letter, nor that the expense of the recovery of such data is in any way commensurate with its probative value, or that it does not otherwise possess the information it needs to establish its claims. Rather, this letter is simply an eleventh-hour attempt to further extend the Court-ordered discovery schedule and the cost of discovery to Defendants. Tellingly, other than a single line near the beginning of his letter, and a passing reference on page 4, Mr. Reuber never refers to the March 17, 2014 fact discovery deadline established by this Court (Dkt. 158), other than to state such is "nearing" or that on February 18, there were only "30 days remaining," and ignores that Defendants have been seeking to schedule depositions for months, without any substantive response from Plaintiff.

      Initially, we note that although Mr. Reuber's letter purports to seek a conference with the Court on the basis of supposed impasses regarding Defendants' discovery responses and the dramatic but never identified supposed "exponential *increase* in the number of disputes" (emphasis in original), in fact, he wrote the Court only after a meeting and several teleconferences (identified in Mr. Reuber's letter) during which the parties discussed both the matters raised in Mr. Reuber's letter *and* issues raised by Defendants with respect to Plaintiff's discovery responses. During that last teleconference, on March 3, 2014, Defendants suggested that the parties *jointly* call the court regarding scheduling (required because the deadline for the end of fact discovery was fast approaching), and he refused. Further, he <u>never</u> advised that he was seeking court intervention as required by this Court's rules as to any of the matters contained in the letter regarding Defendants' discovery as to which we were supposedly at an impasse, but rather, when I expressly stated that the parties were at an impasse regarding the need to contact the Court in light of the looming fact discovery deadline, Mr. Reuber indicated that he would be writing the Court only to obtain a date for a conference to discuss an extension

of the discovery schedule. He <u>never</u> declared the requisite impasse as to the discovery issues raised in his letter after he was advised that Defendants' ESI vendor, DTI, would not be on the call. Rather, merely in an email sent to me at 11:26 p.m. on March 7, 2013 (admittedly, after he filed his letter with the Court), he contended, "we have reached the point where further discourse on such matters serves no useful purpose," but did not do so in a conference. For this reason alone, his letter should be rejected out of hand.

Nor does the "General Background" section of Mr. Reuber's letter accurately summarize this case.

Plaintiff served its initial complaint on Christmas Eve 2011. The original complaint alleged that Defendant Harout Aghjayan ("Harout"), stole design files belonging to Plaintiff, which he then "tweaked" and began selling through the Defendant companies, either during or after the period of his non-compete covenant (which ended in mid-October 2010). Defendants moved to dismiss, and while that motion was pending, in May 2012, Plaintiff sought to amend the complaint by filing a 300+ paragraph amendment (which also sought to add Shawndria Aghjayan as a Defendant), and simultaneously sought a TRO (denied by the Court) and a preliminary injunction based largely on information and documents provided by Alexan Khatchadorian ("Alexan"), described by Judge Sweet as Harout's "turncoat partner" in a business in China, which materials Plaintiff withheld from Defendants. After hearing evidence over several days, including testimony from Alexan (and Shawndria Aghjayan) and reviewing supposedly incriminating emails between himself and Defendants, the Court denied the preliminary injunction, in part, because Plaintiff could not establish that Harout actually had misappropriated or used any design belonging to Plaintiff. Thereafter, the Court dismissed many of the claims, including for copyright infringement, finding that Plaintiff had not pled that any of its rings were "substantially similar" to any those of Plaintiff, and Plaintiff's claim that that Harout was prohibited from soliciting Plaintiff's customers, *i.e.,* the Court found he was not precluded under New York's *Mohawk* rule, which permanently prevents the seller of a business from soliciting that business' customers, as he was not a "seller."

The Court permitted the amendment, but Plaintiff thereafter filed a *different* amended complaint (for which it had not secured Judge Sweet's permission). Defendants moved to dismiss. The Court dismissed the tortious interference with prospective advantage claim. Harout's wife, Shawndria Aghjayan ("Shawndria"), was added as a Defendant in the amended pleading, wherein Plaintiff alleged that she aided and abetted her husband in breaching the fiduciary duty owed by her husband to Plaintiff in 2008-09, which he was alleged to be the President, CEO and Chief Operating Officer of Plaintiff, apparently by allegedly allowing him to use her e-mail account.

On June 19, 2013, the parties appeared before Your Honor. Defendants sought answers to interrogatories (and the production of ESI, which had yet to be produced) that would: (i) identify what trade secret files belonging to Plaintiff were supposedly taken by Harout and used by a Defendant and (ii) identify which rings of Plaintiff were being copied in which ring of Defendant. At this conference, Plaintiff sought to avoid this discovery on the basis that Plaintiff was pursuing a different claim entirely. According to Mr. Reuber: "[Plaintiff's] contention is that during the time that the contract was enforceable, any design that he conceived that he reduced [to] practice, [Plaintiff] can lay an ownership claim." Plaintiff's counsel further clarified that Harout had not physically taken or copied any designs belonging to Plaintiff." Tr. at 28; *see* Tr. at 31. Plaintiff subsequently provided a list of Defendants' styles it alleges belong to Plaintiff, either because of the date of their creation (supposedly during Harout's employment or during

the non-compete[1]), or because they supposedly were "derivative" of those same styles (*i.e.*, not that Defendant Harout physically stole something that had been previously created).

Thus, the gravamen of the 66-page amended complaint is that Harout, while allegedly the President of Ritani (2008-2009) and during the non-compete (October 2009-October 2010), worked at home on his own computer on designs eventually used by Harout's later-formed companies, which are Defendants. Because *Plaintiff does not contend that any design was stolen from Ritani's computers (and it further admits that Harout and Shawndria had no remote access to Ritani's computers at the relevant time period), which particular design file was attached to that particular email is not material to Ritani's claim.* Rather, under Ritani's own theory of the case, what is relevant is <u>when</u> the email was sent, by <u>whom</u>, and <u>which style</u> ring was attached (identified by the "subject" line and <u>name</u> of an attached file in the email), as it is Ritani's contention that if *Harout* that designed that style, whether during his employment or his non-compete, that style belongs to Ritani and therefore Ritani is entitled to damages for Defendants' use of the design. Each email so identifies the style being discussed or transmitted and, in fact, often identifies the name of the worker <u>in China</u> who created it or worked on the specific style. Every wedding band was created by a designer in China. It should not be forgotten that Plaintiff has each catalog of each Defendant, to the extent they exist, and thus knows what is being marketed and has been provided with extensive records through September 2013 of every sale of ring styles 100-400. <u>No sales</u> were made before the non-compete expired.

Plaintiff's recently articulated theory is completely without basis:

- Plaintiff contends that all these design files belong to Ritani *even though the employment agreement with Harout does not so provide* (listing several prohibited activities, but not "designing"); *and even though all designs were created by Shawndria or workers in China – not Harout; and even though many of the designs were created after he left the employ of Ritani.*[2]

- Plaintiff contends that these design files are <u>Ritani's</u> trade secrets – *even though Ritani cannot establish under New York law that these files are its trade secrets because:*

    o *it made no investment in them*

    o *it did nothing to maintain their confidentiality while these files were created and maintained on non-Ritani computers or in China by Chinese workers*

    o *Ritani itself uses out-side designers in foreign countries and did not have non-disclosure agreements with them, just as it did not have confidentiality agreements with its employees, including Shawndria*

    o *Ritani cannot disprove Defendants' position (which is fact) that Shawndria and Chinese workers created the designs – not Harout.* The Court previously found

---

[1] The non-compete does not prohibit Harout from designing during its period.
[2] Ritani's contention that Harout designed styles 100-400 while in the employ of Ritani (including as its President) is not true. Shawndria designed the first 84 styles; Chinese workers designed the remainder. Shawndria is a trained designer and Cad-Cam operator (as Judge Sweet found on the record).

  that Shawndria was a designer in her own right. Not only was she employed by Ritani in that role, but she was trained as a designer by one of the "deans" of Cad-Cam software

  o Most of Harout's communications with Alexan were, as Alexan testified, working as "translator" to explain to Alexan (as he and Harout speak Armenian) what changes were needed to create wax models, etc. "Parev" is Armenian and is used as a greeting – much like "Shalom" is used. Many of Harout's communications were late at night, on the weekends, or otherwise on days off.

- Ritani contends that Harout was a "faithless servant" (but does not have an express claim for such in its amended complaint). Damages for such claim would be a disgorgement of salary for the period of disloyalty *and would not be dependent upon the proximate causation of any other damages, which are not recoverable as relief for this tort.* However, Ritani never complained to Harout about any dereliction of duties while in its employ; Ritani cannot show that Harout used any of Ritani's resources to further the Defendant companies. Further, anything done by Harout during the period of the non-compete (*i.e.*, when he was no longer an employee) would have no bearing on this claim.

  o while in Ritani's employ, and working from home, Harout created and delivered to Ritani some 24 wax models of rings made for Ritani, which wax models were presented to Joe Manber, the CFO of Ritani (and which Mr. Manber brought to the preliminary injunction hearing). Ritani was aware that Harout owned a 3-D printer and used such to create these wax rings in 2009. Harout employed (without cost to Ritani) Alexan to assist in the delivery of these designs, and each email that involves such rings shows that the rings was for Ritani, and not for any other entity and was never used by any entity. There is nothing "illegal" or nefarious about owning a 3-D printer. None of the "Ritani" rings were used by any Defendant.

- Ritani contends that Harout breached his fiduciary duties owed to Plaintiff as an officer of Ritani. *Ritani is being disingenuous, to say the least, as by August 2008 it had stripped him of all of his "powers" and titles and left him solely with the duties of attending to customers and trade shows and supervising the design team – and stripped him of access to Ritani's servers when not in the office.* Documents produced by Ritani establish that Harout was no longer president, CEO or COO of Ritani by August 2008, and by that time was no longer "in the loop" on any of Ritani's business plans or efforts. He was never told, for example, that Ritani was planning to sell rings to internet giant Blue Nile (and in fact, the business was done under a fictitious name to hide the fact that such sales were being made); nor was he told that Ritani was planning to change its business model and enter into a joint venture with Cantor Fitzgerald to mimic Blue Nile by selling directly to consumers on the internet, rather than through independent retail jewelers.

  o *As evidenced by documents produced by Ritani, in 2007, it* stripped Harout of his powers, and took away his titles, reducing his salary

  o therefore, as a result, there is a lack of consideration for the non-competition provision *and* Ritani materially breached the agreement; the agreement required

        all changes to be in writing and there were never any writings to modify the agreement, including to reduce Harout's salary, and thus, the non-compete is unenforceable

- o   Because Harout was no longer the CEO, COO or President of Ritani, Harout's fiduciary duties owed to Ritani were not that of an officer

- o   Any fiduciary duties Harout had no longer existed after he advised Ritani, in the late summer of 2008 that he planned to join his wife in her venture, and further, included as an attachment to his emails with Ritani on that subject a document entitled "Shawndria Harout Company," and, with this knowledge, Ritani allowed Harout to remain in its employ and work at home in a diminished role

- o   Ritani's interests that needed protection during the non-compete period, if the non-compete is otherwise enforceable, are lacking, inasmuch as Ritani was beginning to change its business model to a direct-to-consumer company, and, thus, the Defendant companies, who sell to retailers, and not competitors of Ritani, and Harout was not using any resources of Ritani and was working on a non-Ritani computer (with no expectation of privacy).

- Ritani's contention that Defendants are liable for an infringement of a Ritani trademark will also fail, including because

  - o   The marks and name never were used by Defendants in connection with the sale of jewelry (other than in Harout's biography); the shank of the rings bear the name of the seller and none of Defendants' rings says "Ritani"

  - o   Ritani no longer owns the trademarks in question as it contributed such to another company *and thus it has no standing to pursue the infringement claims*

  - o   Ritani no longer uses the trademarks in question – *and such lack of use makes injunctive relief unavailable, especially since Plaintiff apparently abandoned such trademarks*

  - o   Ritani admittedly knew of and permitted Defendant to continue using the "Ritani" name for certain purposes and so the mere continued existence of H. Ritani Corp. and H. Ritani LLC is not an infringement; Ritani's complaint that Harout's biography mentions the "true fact" that he was a founder of Ritani, is not actionable and Ritani has not acted to prevent other employees from including in their work history the fact that they were employed by Ritani.

      Ritani falsely states that all of the affirmative relief sought by any Defendant was dismissed. In fact, however, Ritani never moved to dismiss the counterclaims for declaratory relief regarding the use of the name "Ritani" and, although Defendants' counsel raised this issue with Ritani's counsel, Ritani has never answered these counterclaims, which are still in the case, and, accordingly, Ritani is in default. (This also begs the question of why Plaintiff will not "admit or deny" the allegations raised in the counterclaims.)

The Honorable Gabriel W. Gorenstein
March 17, 2014
Page 6

**Status of Discovery**

This case is a classic example of what discovery should not be. Plaintiff, backed by one of the largest diamond purveyors in the world, Julius Klein Diamonds, and Cantor Fitzgerald, have used their far greater financial might, not for any legitimate purpose, but to force Defendants to divert their entire attention (and pocketbook) to discovery. To date, Plaintiff has served a series of abusive, duplicative, repetitive demands, as follows:

- Serving 235 Requests to Produce, 16 Interrogatories and 190 Requests to Admit on Harout

- Serving 236 Requests to Produce, 15 Interrogatories and 190 Requests to Admit on Shawndria

- Serving 211 Requests to Produce and 15 Interrogatories on Harout R, LLC

- Serving 190 Requests to produce and 14 Interrogatories on H. Ritani, LLC

- Serving 190 Requests to produce and 14 Interrogatories on H. Ritani Corp

- Serving 211 Requests to Produce and 15 Interrogatories on Amazing Settings

Defendants responded to each of the above, and, until January 7, 2014, Plaintiff failed to identify a single issue as to their responses. Indeed, I advised Mr. Reuber that we were still looking into certain of the issues raised in the letter of March 7, 2014, and thus, Mr. Reuber did not and could not have stated that an impasse had been reached, as required by this Court's rules. (While he attempts to make "hay" out of our ESI consultant's failure to participate in our March 3 phone call, in fact, the consultant did not participate because their investigation was still on-going.)

Plaintiff produced hard-copy materials, including some emails from Alexan in November 2012, for purposes of the mediation only. (Defendants had been seeking them since the preliminary injunction had been sought, but Plaintiff refused to produce them.) Defendants produced their catalogues in 2012. Defendants made an ESI production in April 2013, and made subsequent productions in October and November 2013 (in response to a second set of demands for production). Despite this Court's Order, ECF #158, requiring the parties to discuss a deposition schedule with Defendants' counsel by December 31, 2013, Plaintiff failed and refused to do so, and despite having the ESI production for many months, Plaintiff delayed asking any questions or indicating that it had a problem with anything until the early morning hours of January 7, 2014. At the January 7, 2014 in-person meet and confer, Plaintiff again refused to discuss when it would make its witnesses available for deposition. (Defendants had asked to have dates in March 2014 and indicated that it would make its witnesses available in February 2014.) The first time Plaintiff proposed actual dates that its witnesses were available for deposition was on March 3, 2014 (despite Defendants many requests for such), the dates finally provided were *after the cut-off of fact discovery established in this Court's schedule*. Although Defendants had been raising various issues with Plaintiff for weeks, including regarding Plaintiff's failure to provide a privilege log, Plaintiff's refusal to provide a password or unencrypted versions of produced documents, and its continued inappropriate designation of "attorneys eyes only" documents, Defendants' counsel finally produced on March 7 (admittedly after his letter to the Court), re-designated documents, a privilege log and Shawndria's

The Honorable Gabriel W. Gorenstein
March 17, 2014
Page 7

employment file, and pronounced all issues Defendants had with Plaintiffs' production "resolved" (this, at the very same time he refused to produce documents produced by Plaintiffs in unencrypted form so that Defendants could access those files).[3]

Shawndria's notebooks and designs and those emails exchanged between Defendants and Alexan have been produced by Defendants and are in Ritani's possession. Each email from or to Alexan specifically shows on its face what style was being sent to or from China (stating such in the "subject" line or body of the email); if a design was worked on or created by a Chinese designer, the text of the emails states such.

Defendants also produced to Ritani all sales data for each design (in chronological order, identifying which Defendant sold that design) through September 2013 (when such data was produced), which Defendants agree to update the sales data periodically. Ritani also has possession of the tax returns of the Defendant companies, for the years the tax returns exist. Defendants already produced to Ritani the "profit margin" analysis for each Defendant company, so Ritani can establish the lost profits, through the last tax return.

What is clear to Defendants is that Plaintiff does not want this case to be ready for trial (because, as set forth above, it cannot prevail), but rather, wants to prolong discovery, and increase Defendants' costs and legal fees, and prevent the start-up Defendants from competing against Ritani. Indeed, they might not even be competitors, as, since the start of this case:

- Plaintiff has transferred all of its Intellectual Property at issue in this case to another entity (that is not a party hereto) *so that it may not have standing to its trademark claims.*

- Plaintiff has changed its business model, so that now it is (as a limited partner) selling by internet directly to consumers (and not to jewelry stores), *so that – at the very least – its damages have been capped.*

- The trademarks at issue are not being used, and thus may be abandoned.

Plaintiff has steadfastly ignored Defendants' request that it produce witnesses for deposition, and allowed the date for all fact discovery to pass without making witnesses available, despite repeated requests for deposition dates in person, on the phone, and in writing. Instead, Plaintiff has created issues that have no probative value, in an effort to make this case too expensive for Defendants to defend.

---

[3] At the June 19, 2013 conference, Defendants raised the issue of the attorneys-eyes only documents with the Court. The Court found (Tr. at 46-52), that Defendants need not tell Plaintiff which particular documents it wanted re-designated, but rather placed the burden on Plaintiff to designate documents attorneys-eyes only in good faith. Notwithstanding this ruling by the Court, Plaintiff not only continued to illegitimately so designate documents – including documents publicly available – Mr. Reuber attempted to place the same burden on Defendants with respect to password protected and encrypted documents, and which he refused to produce in a format which could be reviewed – by anyone – unless Defendants made a showing of why that particular document (produced by Plaintiff) was relevant. That issue was not resolved, but rather, remains pending, given Mr. Reuber's most recent statement in an email sent on March 7 that Ritani was "confirming" its position.

The Honorable Gabriel W. Gorenstein
March 17, 2014
Page 8

### Zero Byte and Corrupt File Issue and Email Account Issue

Defendants made their initial document production in April 2013, nearly a year ago. Included in that production were emails that were produced in response to a document demand served in late 2012 by former counsel to Plaintiff. Many of those demands asked for all emails from certain specified email addresses, which Alexan had advised Ritani were supposedly used by him and Defendants. Defendants produced emails from those accounts. (To date, Defendants have produced 123,146 pages of documents.)

Until we received Mr. Reuber's letter of January 7, 2014 (sent at 5:43 a.m.), Plaintiff never made Defendants aware of any issue concerning attachments to emails nor did Plaintiff make Defendants aware that Plaintiff believed that there were further email accounts of Defendants containing responsive documents that were not reviewed. Thus, we were quite surprised that nearly <u>a year after the production</u>, Plaintiff not only suddenly raised these issues, apparently using this as an excuse to put off depositions until such were resolved.

Upon receipt of the January 7th letter, we asked for more information at our January 7th in-person conference. Mr. Reuber agreed to provide such information. We did not receive such information for weeks – until January 23, 2014. In the weeks since then, the parties have engaged in several conferences to understand the issue and Defendants' counsel is working diligently with its computer forensic consultants to determine (a) what is recoverable; (b) what efforts were done previously to harvest (and this item is made a bit more difficult as our firm changed ESI vendors after the April 2013 production to Plaintiff and because the paralegal who oversaw the production left our firm). We have had our current ESI consultant, DTI, speak with our former ESI consultant, BIA, a very well-known and reputable ESI firm, and know that BIA performed a collection of Defendants' computers using an industry standard tool, FTK. In addition, BIA did a data recovery for the jewel cad files, and several thousand deleted files were identified and attempts to recover them were made. Both DTI and BIA confirmed the existence of zero-byte and corrupt files. Every recovered email was reviewed (as Plaintiff did not provide search terms), and all responsive emails were produced.

While Plaintiff complains about corrupt and "zero-byte" attachments, we were able to confirm that Plaintiff's <u>own</u> production (*i.e.*, emails Ritani received from Alexan) contains some of the same emails <u>with the attachments intact</u>, and we provided a list of those emails to Plaintiff's counsel. Although we originally believed that there were 24 such emails, that number has risen to 56. Thus, as to these files, this is a complete non-issue. With respect to the remainder of the corrupt and zero-byte attachments, it should be noted that Plaintiff is in possession of these emails from Alexan, a non-party (which production it delayed making to us for over a year), thus raising the question of why it needs to obtain these same emails from Defendants. Indeed, while Mr. Reuber contends that there must be more emails in existence because Alexan only made a "*partial* production" (Reuber March 7, 2014 letter at 4; emphasis in original), Alexan testified that he produced all of the emails between himself and Harout regarding their business venture during the relevant period, and there is no reason to believe that he withheld any emails helpful to Ritani, on whose behalf he appeared at the preliminary injunction hearing.

Nor has Plaintiff shown that any efforts in recovering the "zero byte" attachments is worth the effort entailed, as, contrary to Plaintiff's conclusory assertion in that regard, Plaintiff has not shown that this is probative. As noted above:

- each email lists the name of the cad-cam file by a ring's style number in the email itself

- each email shows the date it and the attachment was transmitted, and the author and recipient (all of which Plaintiff has)

- many RFAs were served by Plaintiff and answered by Defendants as to the emails and their attached files

- certain of the emails, with the attachments intact, are already in Plaintiff's possession from Alexan.

Thus, all the information needed by Plaintiff to make its "faithless servant" claim or to identify what files were being transmitted is in its possession, as well as sales and profit data. Moreover, it should be realized – from a proportionality point of view – that Harout's salary was not more than $160,000 per annum, and as a start-up, the profit margins are "thin" to say the least.

Indeed, when I questioned Mr. Reuber regarding the probative value of these attachments, given that he had the accompanying emails, he had no good reply (which explains why he never recounts in his letter his side of the conversation). In fact, he contended that at deposition, Defendants might argue that the attachment annexed to the email provided by Alexan to Ritani was not the same one originally annexed to that email but something else. This argument made no sense then, and makes no sense now, because, as noted above, and as explained to this Court at our June 2013 discovery conference, Plaintiff's latest theory of its case (but not actually pled in the "second" amended complaint of August 2012), is that:

- In and after 2008, Harout Aghjayan, while President of Plaintiff (which he was not)

- worked on design files for rings (which are or were sold by a Defendant)

- and because he was employed by Ritani at the time, the designs belong to Plaintiff (although there is no such provision in Harout's employment agreement with Plaintiff)

- and somehow these design files (that were actually originated by either defendant Shawndria Aghjayan or a Cad-Cam operator in China (and Plaintiff has received the "pencil sketches" and emails that indicate when a ring originated in China) "magically" became trade secrets of Plaintiff that were misappropriated by Defendants (even though Plaintiff cannot in any way establish the multi-part test for these design files (that *never* resided on a Ritani computer much less were created by or for Ritani) to be protected as a trade secret

- and they disbelieve that defendant Shawndria Aghjayan created any of the rings and they disbelieve that Shawndria was capable of designing any of the rings although Judge Sweet previously found (after Ms. Aghjayan testified at trial) that she was "a skilled, competent, ... designer of (sic) her own" and had been employed for several years by Ritani as a Cad-Cam operator and designer, and had prior experience and training as a designer.

The Honorable Gabriel W. Gorenstein
March 17, 2014
Page 10

Thus, Plaintiff actually has all the information it needs to make its arguments as to trade secret and other contentions concerning these rings and damages. The content of the attachment is simply not material to Plaintiff's theory of this case: no "verification" of a third-party's business records (Reuber March 7, 2014 letter at 4) is required. While, in fact, no "refusal" to produce these documents ever was made, this is a "manufactured issue," having no bearing on Plaintiff's ability to prove its case.

To the extent Mr. Reuber argues that Defendants failed to produce documents from all 9 email accounts supposedly used to communicate with Alexan, that representation is blatantly false. With respect to the 4 remaining internet email accounts, Defendants have advised that these email accounts were not searched (and, admittedly we were in error when we initially advised that they were not used to communicate with Alexan). But even as to these, Plaintiff has received emails from these accounts from Alexan. Defendants have not produced such emails after the accounts were brought to our attention on January 23, 2013, because, unfortunately, we are advised that these email accounts require a password, which our clients do not remember and cannot be obtained from the internet provider.[4] Our current ESI vendor has attempted to gain access to each of them using possible passwords, including passwords identified in emails between Defendants and Alexan, but these passwords have not worked, possibly because, having gotten possession of passwords, <u>Alexan changed them</u>. If Plaintiff has a possible solution for recovering these other emails, we welcome their suggestion. It bears noting however, that (i) we never refused to provide these emails; and (ii) Mr. Reuber never declared we were at an impasse regarding such. If he had, I would have told him that our inquiry was still on-going and there was no impasse. Indeed, he contends that we refused to answer the questions set forth on page 6 of his letter, but, in fact, no such refusal to answer these questions ever was made. A litigation hold was implemented in February 2012. Defendants imaged their computers long before Ritani, as its prior counsel conceded.

### Cloned Hard Drive

Plaintiff has offered to bear the expense of data recovery of emails from an unidentified hard drive of Defendant (which Plaintiff acknowledges was imaged in 2012). Plaintiff's prior counsel was made aware in 2012 that certain files had been lost by virtue of a computer virus, and because the infamous Alexan has been given Harout's email account passwords, which he used to delete files (and, apparently changed). (Emails showing that Harout's passwords were given to Alexan have previously been produced.)

This letter is the first time that Plaintiff has offered to bear the expense of harvesting and recovering materials from the drive. We are prepared to discuss this with the Plaintiff and the Court, as well as parameters to protect non-relevant information contained on the drive, including having an independent ESI company do such work.

### Third Set of Document Demands

Plaintiff incorrectly states that "Defendants' production does not include any financial or business data for 2013 or 2014". Letter at 7. In October and November 2013, Defendants produced a substantial quantity of information about sales of rings for the designs that are at

---

[4] We were able to reset the password for the ShawndriaRitani@yahoo.com account and are processing Plaintiff's request for information.

issue, including approximately 377 pages of spread sheets and tax returns (D0118810-187; D019188-9314), pursuant to the document requests served and the agreed-upon schedule.

The sales information was quite specific: it listed each sale of each ring by date and by ring design (style) number, through September 2013. This date was used because Defendants were responding to the "second document demand" and that was the most current information. Defendants will, of course, meet their responsibilities of continuing discovery and propose that in April they make the sales information available through the end of March 2014. Tax returns were produced for the years that such returns exist. When a tax return for 2013 is available for production, it will be produced. Obviously, Defendants cannot produce what they don't have. However, it appears that Plaintiff has not reviewed what was produced.

Plaintiff also complains that no "customer list" was produced. This is true. The identity of the customers is not relevant to any claim that is in the case; the copyright, tortious interference and non-solicitation claims were dismissed by orders of Judge Sweet. Indeed, Plaintiff has refused to answer discovery we served regarding customers on this basis. (Such requests were served before these claims were dismissed.) The only purpose in inquiring about a "customer list" is to harass Defendants' customers. The identity of the customers to whom the styles at issue were sold has no bearing on Plaintiff's alleged damages.

Instead of producing invoices, Defendants produced computer-generated sales summaries, which should be sufficient and is economical. Defendants produced financial statements to the extent that they have such. Defendants also have produced summary cost/expense data (including from tax returns and an analysis of profit margins per the request made by interrogatory), but to produce the expense back-up for each purchase, including of platinum, silver and gold (the price of which constantly fluctuates), is overly burdensome and the summary information should suffice.

Although Defendants raised objections to the latest round of document demands, that does not mean that Defendants had not already produced voluminous documents pursuant to the previously served demands – and, as stated in the objections, Plaintiff's *Third* document demand overlapped and duplicated to a considerable extent the demands that were previously served. And nowhere in Plaintiff's submission is there any indication of why the sought-after data is probative of any claim remaining in the case.

As shown above, the sheer number of demands makes it self-evident that Plaintiff's sole purpose is to out-spend, out-last and to exhaust Defendants, who are individuals and start-up companies. Plaintiff's "good faith" is illusory. Plaintiff claims that our raising the issue of social security numbers is "retaliatory," when the failure to redact such is not only improper, but demonstrates that Plaintiff gave little or no review to what it produced, being more intent on producing more documents for counsel to review (like hundreds of resumes submitted to Ritani from job seekers) than actually relevant documents. Even on March 7, 2014, after being advised that it had improperly produced documents bearing social security numbers, Ritani produced Shawndria's employment file with numerous documents bearing her social security number, including a copy of her social security card. Plaintiff's attempt needlessly to draw out discovery and its attendant expense to Defendants should be seen for what it is, and on that basis, rejected.

The Honorable Gabriel W. Gorenstein
March 17, 2014
Page 12

                                                  Respectfully,

                                                  /s/ *Lynn M. Brown*
                                                  Lynn M. Brown

LMB:mr

cc:    Cameron Reuber, Esq. (Via ECF)
        Peter Sloane, Esq. (Via ECF)
        Erica B. Garay, Esq.(Via ECF)

984676