```
                    UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK

In re:                              :
                                        Docket #11cv08928
 RITANI, LLC,                       :

                 Plaintiff,         :

   - against -                      :
                                      New York, New York
 AGHJAYAN, et al.,                  : December 18, 2015

                 Defendants.        :

------------------------------------ :

                      PROCEEDINGS BEFORE
               THE HONORABLE GABRIEL W. GORENSTEIN
              UNITED STATES DISTRICT MAGISTRATE JUDGE


APPEARANCES:

For the Plaintiff:        LEASON ELLIS, LLP
                          BY:  CAMERON SEAN REUBER, ESQ.
                          1 Barker Avenue
                          White Plains, New York 10601
                          (904) 821-3075

For Defendants:           ARCHER & GREINER, P.C.
                          BY:  PATRICK PAPALIA, ESQ.
                               MICHAEL LAURICELLA, ESQ.
                          21 Main Street, Suite 353
                          Hackensack, New Jersey  07601
                          (201) 342-6000
```

```
Transcription Service: Carole Ludwig, Transcription Services
                       141 East Third Street #3E
                       New York, New York 10009
                       Phone:  (212) 420-0771
                       Fax:  (212) 420-6007
```

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

<u>INDEX</u>

<u>E X A M I N A T I O N S</u>

| Witness | Direct | Cross | Re-Direct | Re-Cross | Court |
|---------|--------|-------|-----------|----------|-------|
| None | | | | | |

<u>E X H I B I T S</u>

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|-----|-----|-----------|
| None | | | | |

3

1

2          THE CLERK:    The case of Ritani versus Aghjayan,

3    Docket Number 11cv8928.    Counsels, please state your name

4    for the record.

5          MR. CAMERON REUBER:    Good morning, Your Honor,

6    Cameron Reuber for plaintiff Ritani.

7          MR. PATRICK PAPALIA:    Good morning, Your Honor,

8    Patrick Papalia.  Also with me is my colleague Michael

9    Lauricella for the defendants.  I want to just thank the

10   Court for moving the conference earlier in the day for us.

11   Thank you.

12         HONORABLE GABRIEL GORENSTEIN (THE COURT):    So

13   look, we're here based on letters, a document letter of

14   November 20th from defendants and then two letters, Dockets

15   220 -- sorry -- 231 and 232 from the plaintiff.

16         All right.  We've been put in a bad situation

17   because of the 5,000 conferences I've had in the last ten

18   years, we lost one transcript, and it happened to have been

19   yours -- sorry -- one recording that happened to have been

20   yours, so it couldn't be transcribed.  So that's, you know,

21   that's unfortunate.  I'm sorry about that, but we have to

22   deal with that.  I think it's caused some problems.  Not all

23   of the problems, but some of the problems.

24         Your letters are a little bit telegraphic.  They

25   assume that I remember more about what's been going on than

4

1

2 I actually do.  So what I think we need to do is go through

3 what the issues are one by one, whoever's asking.  So I

4 think we'll start with the plaintiff.

5         MR. REUBER:   Your Honor, I think probably the

6 easiest way is to tackle the website issue again.  Since the

7 conference in August, we have issued a subpoena.  I guess

8 the word is escaping me.

9         THE COURT:   Is this protective order from them?

10         MR. REUBER:   This is a stipulation problem.  The

11 -- I'm blanking on what the owner of the website, or the

12 holder of the website, is supposed to be called.  It's

13 101.com hosting company.  That's the word I was looking for.

14         The hosting company would like simply a

15 stipulation before they take the server offline or take the

16 data off the server.  And we've tendered one --

17         THE COURT:   I'm sorry.  Say it again louder.

18         MR. REUBER:   Sure.  The holding company, hosting

19 company of the websites, would like the stipulation from the

20 defendants that they will not have any repercussions by

21 taking the server, continuing the websites offline so they

22 can make copies of the websites to produce pursuant to the

23 subpoena.  They have no objection --

24         THE COURT:   They're the defendants' customer.

25         MR. REUBER:   Yes, they're the defendants'

1

2  customer and they want confirmation that there won't be any

3  repercussions if they do so.

4        THE COURT:    What does that mean -- repercussions?

5  Or how about just getting their permission?  That's all they

6  need is defendants' permission to do it?

7        MR. REUBER:    The attorney that I was dealing with

8  required a stipulation.  I can ask him if he would accept

9  permission but --

10        THE COURT:    Well I'm just trying to think what

11  the right word is.  Anyway, what's the problem, Mr. Papalia?

12        MR. PAPALIA:    Well Judge, the problem is on a few

13  points.  First is, we did not get a copy of the subpoena as

14  required under the Rules.  We asked for it; we still don't

15  have it.  So we don't even know what he's --

16        THE COURT:    Look folks, this is ridiculous.  If I

17  find out there are things the two of you could have worked

18  out that didn't happen, I'm going to go through the roof.

19  So are you telling me that you asked for a copy of the

20  subpoena and they refused to give it to you?

21        MR. PAPALIA:    Yes, Your Honor.

22        THE COURT:    Okay.  And Mr. Reuber, is that really

23  true?

24        MR. REUBER:    That is untrue.  In fact, Your

25  Honor, we worked out the language of the subpoena before it

1   was even served.

2           MR. PAPALIA:   We don't have any transmission of a

3   subpoena.  If they have proof of it --

4           MR. REUBER:   I will have it --

5           MR. PAPALIA:   -- they should submit it to the

6   Court.

7           MR. REUBER:   Your Honor, I will have it to them

8   within one hour of leaving this conference.

9           MR. PAPALIA:   No, we want proof that you gave us

10  the subpoena.  We asked for it.  Mr. Lauricella asked for

11  it.  We don't have it.

12          THE COURT:   No, this is ridiculous.  Someone's

13  going to get in trouble here, and I think it's going to be

14  you.  If I start hearing that there's gamesmanship here --

15  folks, just relax for a second while I calm down.

16          All right.  I don't want to hear about what

17  happened.  Assume you're getting the subpoena.  Now what?

18          MR. PAPALIA:   Your Honor, the hosting company is

19  asking for a hold harmless from us.  Apparently, we suspect

20  there's issues.  They want to take our website offline and

21  there's issues to what I assume would be lost data of what's

22  on our website.  So we can't agree to that.  We can't agree

23  they're going to take our website offline, number one.  And

24  then number two, that if anything goes wrong that when they

7

1

2  do take it off, that we're going to hold them harmless.  We

3  can't jeopardize what we have put up on that website.

4          THE COURT:   Well if this company thinks there's a

5  risk, then what do we do about this?

6          MR. REUBER:   I'm not sure the company believes

7  there's a risk.  They've just never done this before and the

8  risk is adverse.  We would be fine with any precautions that

9  either side, either 101.com or defendants are comfortable

10  with.  We just want the data off the website.

11          THE COURT:   And this is the data that shows the--

12          MR. REUBER:   All of the styles at issue.

13          THE COURT:   The ones that they're selling.

14          MR. REUBER:   Yes.

15          THE COURT:   It has to be taken offline?  Why is

16  that?

17          MR. REUBER:   I don't know the answer to that,

18  Your Honor.  That's what I was informed by 101.com's

19  counsel.

20          THE COURT:   Sounds very fishy.  Well, let's have

21  a hearing on it, we'll have testimony, whatever it is.  You

22  bring your principal.  We're going to have a hearing here,

23  and we're going to figure this whole thing out.  When do you

24  want to have it?  You can tell this company to come too.

25          MR. REUBER:   They're in Pennsylvania, Your Honor.

```
 1                                            8
 2  I'm not sure if they're outside the subpoena power.

 3          THE COURT:   Say that again?

 4          MR. REUBER:   I'm not sure if they're within the

 5  subpoena power of this Court to show up for a hearing.

 6          THE COURT:   The subpoena issued from what Court?

 7          MR. REUBER:   Pursuant to the new Rules, subpoena

 8  from this Court --

 9          MR. PAPALIA:   To Pennsylvania.

10          MR. REUBER:   -- to Pennsylvania.

11          MR. PAPALIA:   Forget knowing the new Rules.  It

12  deals with a dispute on the subpoena.  I don't think we can

13  make them come here.

14          MR. REUBER:   I don't think so either, Your Honor.

15          THE COURT:   Unless they're within a hundred

16  miles.

17          MR. REUBER:   And I think they're just outside of

18  Route 110.

19          THE COURT:   Do you have any ideas about what to

20  do?

21          MR. REUBER:   I think I can go back and find out

22  what the real concerns are and then we can address this

23  issue at some point.  I have to think that these servers

24  can't stay online forever, that they have to come down for

25  routine maintenance at some point.  And when they do, these
```

9

2  copies should be able to be made.

3          THE COURT:    So this doesn't make any sense.    You

4  ask the web company to put up your designs and they can't,

5  neither these people nor the web company can say what they

6  are without jeopardizing the operation?

7          MR. REUBER:    The way the attorney, who is not

8  technically savvy, explained it to me is that they had to

9  take the entire server offline, making a copy of the entire

10 server, all websites hosted thereon.    And then from that

11 copy, they can go in --

12         THE COURT:    That's just their website?

13         MR. REUBER:    Not just their website.

14         THE COURT:    This doesn't make any sense at all.

15         MR. PAPALIA:    Your Honor, if I may add --

16         THE COURT:    Are you going to solve it?

17         MR. PAPALIA:    Well I'm not sure if I'm going to

18 be able to solve it.    I'm trying to put it into some

19 context.    They're just looking for a native copy of the

20 website.    The website's been up since 2011.    They've had

21 access to it throughout the four years.    They want a native

22 copy of it.    I'm not sure that we even, if it's this

23 complicated, that we need to even have --

24         THE COURT:    Is this website selling the product?

25 Is that what it is?

10

1

2          MR. REUBER:   This website is selling product and-

3          THE COURT:   And you want to see what products it

4    is.

5          MR. REUBER:   No, Your Honor, there's actually,

6    the strange thing about this website and the wonderful thing

7    about this website from our perspective, is the photographs

8    that are on the website aren't photographs; they're CAD/CAMs

9    that have been manipulated to look like photographs.  So

10   they're the exact same CAD/CAM files that supposedly gone

11   missing throughout the course of this litigation.  So our

12   belief is --

13         THE COURT:   So how does CAD/CAM transmitted to

14   these people.

15         MR. REUBER:   Yes.

16         THE COURT:   And they say they can't produce the

17   CAD/CAM files transmitted without taking down the whole

18   website, copying the entire website, not just these people's

19   product, but everything else they do?

20         MR. REUBER:   Yes.

21         THE COURT:   Doesn't make any sense.

22         MR. REUBER:   That's what was explained to me,

23   Your Honor.

24         MR. PAPALIA:   Judge, that's not what the

25   subpoena's about.  My understanding is that the subpoena is

1

2 about just getting the native copy of the website. That's

3 all they want. It's not --

4         THE COURT: They just want the CAD/CAM files.

5         MR. REUBER: Which will contain the CAD/CAM

6 files.

7         THE COURT: But you care about anything beyond

8 the CAD/CAM files?

9         MR. REUBER: We do care about some of the

10 marketing materials, yes.

11         THE COURT: Marketing materials.

12         MR. REUBER: Marketing materials.

13         THE COURT: But that's not -- you don't need a

14 native completed copy --

15         MR. REUBER: Yes, Your Honor. What we can see

16 that there are parts of the website that were behind the

17 scenes that were for vendors only.

18         THE COURT: Okay. But you don't need that in

19 native format.

20         MR. REUBER: No, but we haven't --

21         THE COURT: Yeah, but I bet they could do that

22 part by just copying it without taking anything down,

23 because you want the original CAD/CAM files that they're

24 having this issue.

25         MR. REUBER: But we want the original entire

12

1

2 website, yes, but inclusive of the CAD/CAM.

3         THE COURT:   No, but you don't need the original

4 of anything, other than the CAD/CAM files, right?

5         MR. REUBER:   And the advertising material, no,

6 Your Honor.

7         THE COURT:   No, no, no.  Why do you need the

8 advertising material in original format?

9         MR. REUBER:   I'm sorry, original, you're right.

10 We only need the original CAD/CAMs.  We can have updated

11 copies of the --

12         THE COURT:   Okay.  So I suspect the website case

13 is easy once you tell them we don't need that in a native

14 format.  All you need is the -- whatever material they took

15 to create those photographs on the website, those CAD/CAM

16 files which you say they manipulated.

17         MR. REUBER:   Yes, Your Honor.

18         THE COURT:   Do you think they understand that?

19 You don't know, because this lawyer's not very savvy.

20         MR. REUBER:   Yes, Your Honor.

21         THE COURT:   So when you -- you need to somehow

22 get to their actual people.  And if you have a mechanism to

23 do that --

24         MR. REUBER:   Well, I'm hoping I --

25         THE COURT:   I was prepared to have a hearing but

13

1

2   if they're outside my jurisdiction, you might have to go to

3   Philadelphia then.

4           MR. REUBER:   I think I can put my vendor in touch

5   with 101 with counsel's permission.

6           THE COURT:   Okay.  I mean they need to know that

7   that's a possibility if you can't figure this out.

8           MR. REUBER:   We can do that.

9           THE COURT:   Anything else to do on this issue?

10          MR. PAPALIA:   Your Honor, may I please.  This is

11  the first time that I've heard that the purpose of this is

12  for the CAD/CAM files.  This is brought up now for the first

13  time.  I don't --

14          THE COURT:   I'm going to start locking you two in

15  a room before you can have these conferences and not spend

16  15 minutes -- which is what -- that's what you did for all

17  this?  You conferred for 15 minutes?

18          MR. REUBER:   Yes, Your Honor.

19          THE COURT:   I should just send you home now.  The

20  two of you go sit and try to work out all these issues in a

21  room.  I mean, it's outrageous that you're coming to me and

22  saying I didn't get a copy of a subpoena, as if that's -- I

23  mean, I can't tell you how angry I am and I still haven't

24  become unangry yet.  So you're telling me it's the first

25  time I've heard this.  I'm sorry, I don't -- we have a 15-

14

minute phone conference.  I'm not surprised that all of this

is the first time you've heard it.  Why you couldn't have a

conversation just like I have now, to try to figure out what

he wanted and how to get it done makes no sense to me.

You're really wasting my time.

          MR. PAPALIA:   Your Honor, counsel has put this

position in various papers and submissions and --

          THE COURT:   Yeah, because you don't talk to each

other.  That's the problem.  All right.  I'm going to try

going through this.  And if this happens again, I'm just

leaving you in the jury room for a few hours, and then we'll

come back in the afternoon.  What's the next issue?

          MR. REUBER:   Discovery from Alexan Khatchadorian,

Your Honor.

          THE COURT:   It didn't sound like you actually

wanted me -- you had an issue on this.

          MR. REUBER:   I don't, Your Honor.

          THE COURT:   So only bring up your issues.

          MR. REUBER:   Only my issues.

          THE COURT:   If he has issues, you can bring it

up.

          MR. PAPALIA:   Defendants' sales information, Your

Honor.  At the hearing, when we left, my understanding is

that they were going to get all of our sales information; we

15

1  were going to get all of theirs.  We --

2          THE COURT:  Okay.  Well, this is a big

3  complicated one.  So this is the one that Mr. Papalia feels

4  you waited a long time before you asked for what I told you,

5  you could ask for it, right?

6          MR. REUBER:  I think so, Your Honor.

7          THE COURT:  Okay.  So what took you so long?

8          MR. REUBER:  With regard to the defendants' sales

9  information?  I was working --

10         THE COURT:  Let's go back.

11         MR. REUBER:  Sure.

12         THE COURT:  What is it I told you, you could do,

13 in your view?

14         MR. REUBER:  That I could do with regard to their

15 sales information?

16         THE COURT:  Yeah, what was supposed to happen

17 next in you review, after the August hearing?  What did I

18 order?  This was all raised at the August hearing, right?

19         MR. REUBER:  Yes, Your Honor, they were supposed

20 to collect all of the sales information for all of the

21 styles on a spreadsheet that they've given us and update it

22 with all of those sales.

23         THE COURT:  A little slower.

24         MR. REUBER:  Sorry.  They were supposed to update

16

1

2  a spreadsheet they had previously given to incorporate all

3  styles that they had been selling since the case was -- or

4  since the dispute started.

5           THE COURT:   And was the spreadsheet showing the

6  name of the style --

7           MR. REUBER:   Style and the quantity and the

8  revenues generated thereby.

9           THE COURT:   And at a certain time period --

10          MR. REUBER:   Certain time period.

11          THE COURT:   Hold on.  Was it a total number or

12 was it broken up by time periods?

13          MR. REUBER:   I honestly don't think it was broken

14 down by time periods; it was just totaled.

15          THE COURT:   So I said they should update it?

16          MR. REUBER:   Yes, Your Honor.

17          THE COURT:   And you were accepting that

18 spreadsheet.

19          MR. REUBER:   And I was accepting that spreadsheet

20 and 20 of those customers they've identified of the, I think

21 around 200, they were going to give us invoices for all

22 sales to those customers, that we could reconcile against

23 the spreadsheet as well as understand --

24          THE COURT:   All right.  And I did that because

25 you said, I need some basis to know a spreadsheet is

accurate?

MR. REUBER:   And to understand the accounting

mechanics behind it.

THE COURT:   Okay.  So I said pick 20 or I said we

have to settle?

MR. REUBER:   You said pick 20.

THE COURT:   I said pick 20 and they should give

you the information to back up the spreadsheet.

MR. REUBER:   Yes.

THE COURT:   Okay.  So why didn't you pick out the

20?

MR. REUBER:   I did take my 20, Your Honor.

THE COURT:   Why did it take you so long?

MR. REUBER:   Two reasons, well actually more or

less three.  I was working on getting the discovery for them

that they asked for regarding our sales information.  That

took -- I agreed here that we were going to exchange, and I

didn't understand that there was going to take a lot of time

to do that.  Because we have multiple -- across multiple

business units from our client, it took a lot of time, a lot

of man-hours.

I also lost my associate Ms. Polidoro right after

our hearing to maternity leave, and I was effectively the

only one working on this case.  And I also had a two-week

18

jury trial in a different district, scheduled for the first
two weeks of October.  That's the long and the short of it,
Your Honor.

             THE COURT:   What else, other than -- so what do
you need now?  You say you need to have an update and the
backup on the 20 customers?

          MR. REUBER:   Yes, the update for all sales and
the backup for the 20 customers also.

          THE COURT:   And is there anything else on this
that you're asking?

          MR. REUBER:   No, Your Honor, we've already --
well, unless there's any question regarding the four-hour
deposition that was granted previously.

          THE COURT:   A question from me?

          MR. REUBER:   I haven't seen any objection to
that, but I'm curious as to --

          THE COURT:   Don't assume there's any problems.

          MR. REUBER:   Okay.

          THE COURT:   Okay.  Mr. Papalia, you can be heard
on this request.

          MR. PAPALIA:   Your Honor, the issue that was
decided by Your Honor on August 28th was that out of the
sales data that we provided to the plaintiff, that they
would identify 20 entries.  And the reason for that, what

1

2  Your Honor said was, the 20 entries -- not 20 clients -- was

3  so they can do a spot check to make sure the data that we

4  gave them was accurate.

5          THE COURT:   Does anyone have the spreadsheet so I

6  can see what an issue looks like or is it -- I have the

7  August materials.  Is it in there, or?

8          MR. PAPALIA:   Your Honor, I have the August 18th

9  letter that was submitted by Mr. Reuber for that August 28th

10 hearing.

11         THE COURT:   I'm asking for the spreadsheet.

12         MR. PAPALIA:   That's not in the record anyway.

13 And the reason is, Your Honor, because it was never really

14 an issue.  It wasn't even an issue in his August 18th

15 letter.  The point was is that at the time of the hearing

16 what was discussed was he wanted the backup.  He was asking

17 for the backup -- invoices, receipts --

18         THE COURT:   Backup to what?

19         MR. PAPALIA:   To the sales data.

20         THE COURT:   Which is on the spreadsheet.

21         MR. PAPALIA:   No, this backup would be everything

22 that's at the company for the sales that were generated.

23 We're talking about the styles that they claim are at issue

24 here, the 84 styles.

25         So the sales data was provided to them.  He then

20

said, well I have a spreadsheet.  How do I know that what's

put in that spreadsheet --

          THE COURT:  Stop right there.  You finally

answered my question.  You gave the sales data and

spreadsheet.

          MR. PAPALIA:  To the plaintiff, Your Honor.

          THE COURT:  Good.  Does anyone have a copy of

that spreadsheet?

          MR. PAPALIA:  I don't have a copy of it, Your

Honor.  I don't think we have it here.

          THE COURT:  That's all I'm asking.

          MR. REUBER:  Your Honor, I'm sorry, I don't.

          MR. PAPALIA:  We don't have it, Your Honor.

          THE COURT:  Okay.  So describe to me what's in

the left-hand column?

          MR. REUBER:  I'm sorry, Your Honor, I --

          THE COURT:  Is it by style?

          MR. REUBER:  It's broken down, if memory serves,

it is broken down by style, yes.

          THE COURT:  Styles 1 through 400 or whatever the

numbers are?

          MR. REUBER:  1 through 400, yes, and that's what

we --

          THE COURT:  Okay.  And is there like a column for

21

1    each style?

2         MR. REUBER:   There is a -- I believe there's a

3    line for each style and then the columns represent most of

4    the financial data.

5         THE COURT:   That's what I mean.

6         MR. REUBER:   Yes.

7         THE COURT:   The line, the line for each style.

8         MR. REUBER:   Yes, yes, yes, I believe that's how

9    it's broken down, Your Honor.

10        MR. PAPALIA:   And there's a client next to --

11   there's a client column also that list the client name.

12        THE COURT:   This is 1, 2, 3, 4, 20, 50, 100

13   clients, or what?

14        MR. PAPALIA:   Well, but based on the sales of

15   each style, it shows who it was sold to, and that's where

16   the client column comes in.

17        MR. REUBER:   Yes.

18        THE COURT:   Okay.  I mean, how many different

19   clients -- I'm having a really hard time to visualize this.

20   How many lines are there in the spreadsheet, 400 or 4,000?

21        MR. PAPALIA:   Thousands.

22        THE COURT:   Thousands.

23        MR. PAPALIA:   Thousands and thousands.  And Your

24   Honor, at the time of hearing, again, it's in his -- in Mr.

22

Reuber's August 18th letter, he's talking about backup.  We brought the whole issue before Your Honor.  It's unfortunate we don't have the transcript.

And Your Honor said -- and I've wrote it down as a quote.  I've got it here written from my notes and my memory's very vivid.  Pick -- using Your Honor's words -- pick 20 entries and give them the backup.  That's what Your Honor ruled.

THE COURT:  I understand that.  I mean, Mr. Reuber, let me tell you what's going through my mind and you tell me what I've got wrong.  What was going through my mind is that you've got a spreadsheet with a certain number of entries, several thousand.  And you said how do I know this is correct.  So I said let's do this, randomly pick 20 entries from that spreadsheet.  And then if it turns out that there -- like any of them are wrong, then you can come back to me and say, you know what?  I can't trust this spreadsheet.  But if all 20 were right, then we could lay it to rest.  So I don't see why they need to pick more than 20 of those thousands of lines.

MR. REUBER:  Because we were also asking for some support so we could look at the accounting background behind all of these.  And that on a -- what's the word I'm looking for -- on a client-per-client basis we can identify how much

1

2 monies were attributable to that particular client, because

3 we have a separate part of the spreadsheet that identifies

4 revenues for that individual client.  And then we can

5 reconcile all of the entries against that total that was

6 supposedly attributable to that client.

7        It makes it a hell of a lot harder to hide entries

8 if we have a total attributable to a client, and we can go

9 back and look at each individual entry, and we can look at

10 the actual invoices submitted to that client for those

11 transactions.

12        THE COURT:   And this is just a check against the

13 spreadsheet, right?

14        MR. REUBER:   And it's also to understand that the

15 mechanics involved and how it's accounted for.  We have an

16 invoice and then we can attribute where monies went once it

17 came in.

18        THE COURT:   I mean, it seems like if you picked

19 out one client that might be enough to get a grip of what's

20 going on here, no?

21        MR. REUBER:   Well, Your Honor, I think the reason

22 it was up to 20 is because of the difference and that the

23 proportionality of what was discussed at the last

24 conference.  The last conference I walked out of here

25 believing I was going to get all of their sales data and

1

2  they were going to get all of our sales data.

3          THE COURT:   But you have -- I thought you had the

4  data in the form of spreadsheets.  It's the proof that it's

5  accurate you're looking for.

6          MR. REUBER:   We had data for styles 100 through

7  400 only, not for anything above 400.  The spreadsheet that

8  we were given stopped at 400.  It did not incorporate --

9          THE COURT:   So now I feel like -- I have no idea.

10  It's very hard to do this without these documents in front

11  of me.  I thought we were talking about, all we were talking

12  about, was a spreadsheet of styles 1 through 400.

13          MR. REUBER:   No, Your Honor.

14          THE COURT:   Okay.

15          MR. REUBER:   That was what we discussed last time

16  as well, and I read from our pleadings where Mr. Papalia

17  continues to represent that we've only discussed 84 styles.

18  We have gone well beyond 84 styles and I --

19          THE COURT:   I don't even know what's going on.

20  When you got this spreadsheet, was the complaint that it

21  didn't have all the styles or was the complaint that you

22  wanted backup for it?

23          MR. REUBER:   Both.

24          THE COURT:   Okay.  And I'm not saying you're

25  limited to 1 through 400 at all.  I've have no memory right

now.  I can only do one thing at a time so let's -- and you

started with the 20 whatever.  So I thought that was an

effort to verify the accuracy of a spreadsheet that was

already in existence.  And that it was a thing itself that

we were trying to verify.  Is that wrong?

          MR. REUBER:   No, Your Honor.  Well, no, Your

Honor, it's correct, but we expanded it to include -- we

wanted all sales and we also --

          THE COURT:   When you say we expanded it, you mean

you --

          MR. REUBER:   We had to --

          THE COURT:   Hold on.  Stop.

          MR. REUBER:   Sorry.

          THE COURT:   You mean you asked to have an

additional spreadsheet with other styles?

          MR. REUBER:   I asked for the spreadsheet to be

updated to incorporate all styles.

          THE COURT:   Okay.

          MR. REUBER:   And I believe that that request was

granted at the last hearing.

          THE COURT:   Okay.

          MR. REUBER:   And I believe it was granted not --

          THE COURT:   So there's two pieces to this.  One

is you want a spreadsheet with all styles.

1

2          MR. REUBER:   Yes.

3          THE COURT:   Go ahead.

4          MR. REUBER:   And we want invoices for 20

5  customers that we've selected and have already provided.

6          THE COURT:   Okay.  And that's entirety of your

7  request.

8          MR. REUBER:   That's the entirety of our request.

9          THE COURT:   Okay.  Let's now, before I hear from

10  the other side, try to understand what this 20-customer

11  thing is.  Okay.  So then I said to you if all we're trying

12  to do is verify the accuracy of the spreadsheet by requiring

13  20 customers, and give you an understanding, I guess of what

14  the documents look like, or something.  Why do you need more

15  than one?

16          MR. REUBER:   Spot entries will identify accuracy

17  but it won't help us understand the accounting mechanics

18  behind it.  If we believe that the invoices, combined with

19  the spreadsheet, will allow us to understand the mechanics

20  that are going on behind the scenes when it comes to

21  accounting.

22          THE COURT:   And why 20 and not 1?

23          MR. REUBER:   Your Honor picked 20.  I accepted

24  that and I think they accepted that --

25          THE COURT:   No, but the theory -- I'm trying to

1
2  understand, I'm trying to understand the two different

3  purposes.  It's one thing if you just want to just check the

4  accuracy of the numbers on the spreadsheet.  And I feel that

5  even if there's 4,000 entries, 20 random selections, if

6  they're a hundred percent correct, that's enough for me to

7  have confidence in it.  Would you agree with that?

8          MR. REUBER:   Yes, Your Honor.

9          MR. PAPALIA:   Yes.

10          THE COURT:   And if they weren't accurate, that's

11  when you would come back and say, you know what, now we need

12  to figure something else out.  So you need -- you still

13  haven't -- and, you know, due to the lack of perhaps

14  documents in front of us.  But I still don't understand what

15  the customer thinks with the 20.  To try it again.

16          MR. REUBER:   Your Honor, we believe that if we

17  have 20 customers that we picked effectively at random to

18  identify, well, reconcile the invoices that were provided

19  along with the customers and against the spreadsheet --

20          THE COURT:   You already have the invoices.

21          MR. REUBER:   We do not have the invoices.  We

22  don't have one invoice.

23          THE COURT:   So you're going to get an invoice for

24  a customer.  What is it you think you're going to get for

25  each customer?

28

1

2          MR. REUBER:   The invoices for the 20 customers

3    that we've identified.

4          THE COURT:   Okay.

5          MR. REUBER:   All of the invoices.

6          THE COURT:   And just to be really obvious, that's

7    saying we sold you this style, you paid us $5,000 on this

8    date, whatever.

9          MR. REUBER:   Yes, these styles on these dates for

10   these monies, yes.

11         THE COURT:   Okay.  Invoices, yes, what else?

12         MR. REUBER:   And that's it.  Twenty invoices --

13   invoices for twenty customers to reconcile against the

14   spreadsheet that's updated for all styles.

15         THE COURT:   All you want is the invoices.

16         MR. REUBER:   Yes, Your Honor, we want the

17   invoices for the customers only.

18         THE COURT:   And how many -- and so if they do an

19   invoice for 20 customers, is that a hundred invoices or what

20   is it?  I mean, how is it?  How many is it?

21         MR. REUBER:   I don't have the answer to that,

22   Your Honor.

23         THE COURT:   How can you not have the answer to

24   that?

25         MR. REUBER:   Because we don't have copies of the

29

1    invoices.

2         THE COURT:    The spreadsheet doesn't tell you --

3         MR. REUBER:    Spreadsheet does not identify --

4         THE COURT:    -- how many invoices they represent.

5         MR. REUBER:    No, Your Honor, it identified purely

6    numbers -- 200,000, 10,000, $4,000; that's it.  We have no

7    idea which styles go into those numbers, anything like that.

8         THE COURT:    Okay.  Go ahead.  Tell me what the

9    problems with the request.

10        MR. PAPALIA:    Judge, these -- back in May of

11   2015, earlier this year where there is a transcript, Mr.

12   Reuber was trying to allude to why he should get more than

13   the 84 styles and --

14        THE COURT:    Let's do one piece at a time.  Are

15   you now going to talk about all styles versus 1 versus 400?

16   Are you going to talk about the 20 customers?

17        MR. PAPALIA:    I'm talking about the entire

18   request that's being made here shouldn't be considered by

19   the Court, based on this history that I'm about to explain.

20        So at the May hearing, and I share Your Honor's

21   frustration with all of these case management conferences on

22   a case that's now going on five years of discovery --

23        THE COURT:    Okay, sir, don't use my problem to

24   try to bolster your case.  That's really going to hurt you

                                                                30

1
2  so don't go there. Go ahead.

3          MR. PAPALIA:   Okay, Your Honor, I won't.  I

4  apologize.

5          THE COURT:   I'll give you the reason if you want,

6  but you might not want to hear it.  I think you're part of

7  the problem as is opposing counsel.  So it doesn't help when

8  you try to say, oh, Your Honor's frustrated and we're

9  frustrated too, and it's the same frustration.  It's not.

10 Go ahead.

11         MR. PAPALIA:   Your Honor, again, my apologies.

12 I'm not trying to in any way do anything to alter what would

13 be appropriate discovery in the case.  On page 29 Your Honor

14 says to Mr. Reuber, line 5, "I think you need to explain,

15 what you know.  We're down a five-year road here -- four-

16 year road.  We're at the end, and I need to know in writing

17 the justification for this expansion, how it relates to your

18 claims."  This is in May.

19         We then had the August hearing before Your Honor

20 where there's an August 18th letter of Mr. Reuber.  And we

21 had that hearing on the 28th.  Everything that's being

22 raised now was never explained as Your Honor indicated he

23 should do if he wants to do this expansion.

24         We then proceeded on the 28th to discuss the sales

25 data that was given to him and provided to him.  And his

issue was I need backup to support it.  And Your Honor heard

the discussion on that and ordered the 20.

What we have now here is, is it looks like

reverting back to what was discussed back in May where he

was asking for trying to expand it.  And Your Honor gave him

an opportunity to explain it in writing, and he never did,

and we hadn't finished.  At the time that we left that

August conference, we were expecting that discovery was

going to be on a short timeline and be closed, and the exact

opposite has happened.

Not only has it not been closed, there's now an

expansion being done.  What's being requested here isn't

tailored to any real, meaningful discovery issue in the

case.  They have the sales data from the sales, not only

from my client, but they have it from an independent source,

IVD, who was a vendor that was doing the sales data that was

subpoenaed, produced thousands and thousands of pages of

document sales data of what was sold, and they had a

deposition of that representative.

So what's being asked for here, Your Honor,

doesn't relate to anything that needs to be done to finish

the remaining discovery.  These 20 clients that they're

asking for, we're talking thousands and thousands of pages

of documents with no connection to anything.  We've given

32

1

2    them the sales data and just I point out, Your Honor, they

3    gave us their sales data the same exact way we gave it to

4    them.

5            So the issue was spot check.  Now they're trying

6    to increase it to beyond what we've been doing in this case.

7    And frankly, Your Honor, at this rate I'm not sure that

8    there's going to be an end.  Because every time we seem to

9    address a discovery issue there's an expansion of it,

10   there's more information.

11           MR. REUBER:   Your Honor, I don't want to

12   interrupt --

13           THE COURT:   What?  Are you finished or not?  I

14   don't know.

15           MR. PAPALIA:   Your Honor, these customers that

16   they've listed, that they've listed here, if we were to go

17   and try and figure out what exactly it is they're looking

18   for, it's going to -- I'm not sure that it shows them

19   anything.  If the issue is --

20           THE COURT:   Do you know?  How do you keep

21   customer invoices?  Do you know the answer to this question?

22           MR. PAPALIA:   How we keep them on the computer

23   system, Your Honor?

24           THE COURT:   This may be the easiest thing in the

25   world.

1

2          MR. PAPALIA:   I'd have to ask my client that

3   question, Your Honor.   I don't know how they do that.   I

4   know that they have a very primitive system that they have.

5   I don't know -- I can talk to my client about that, on how

6   they keep them.   But again, Your Honor, we're talking

7   thousands and thousands of pages of documents --

8          THE COURT:   Maybe retrievable with the push of a

9   few buttons?   Who knows?

10          MR. PAPALIA:   That, I can represent to Your

11   Honor, that based on discussions that we've had throughout

12   the course of the case, there's very few things that are

13   done with the push of a button.

14          THE COURT:   I mean there may be a file of these

15   customers' invoices sitting in a stack and run through a

16   copier.   You have no idea.   Okay.   That's it on the

17   invoices.   What about the additional styles?

18          MR. PAPALIA:   On the additional styles that

19   they're asking for?   Your Honor --

20          THE COURT:   I thought you were objecting to that,

21   too.

22          MR. PAPALIA:   -- that issue, again, there's --

23          THE COURT:   And when you say this is of course

24   adding to the existing spreadsheet with some other style

25   numbers, right?

1

2          MR. PAPALIA:   We've gone through this issue

3   repeatedly before the Court and Your Honor has, each time

4   said, I'm not letting you expand beyond what's been done on

5   this four-year discovery track.  They're trying to do it

6   again.  That issue has been raised repeatedly, including at

7   this May hearing before Your Honor, May 21st.

8          But I think what's interesting is, is in their

9   papers that was submitted to the Court, they're saying that

10  we've made this allegation in our amended pleading which was

11  filed in 2012.  In their transcript in May when they were

12  trying to get the information and expand what they've done

13  for the prior four years, I'm going to call Mr. Reuber's

14  statement to Your Honor where he attributed the need to

15  expand to the deposition of Mr. Khatchadorian.  That's that

16  ex parte deposition that took place in the Netherlands.

17          On page 24 -- page 24, line 24, "But we recently

18  spoke to Mr. Khatchadorian.  In his deposition he indicated

19  there were upwards of 600 styles that were created using the

20  84.  And that Harout Aghjayan was instrumental in every

21  single design being created, manufactured and put in the

22  product line."

23          So they tried that back in May.  They were not

24  permitted to do that.  Now in their papers submitted for

25  this hearing they put -- well, we've always alleged this

 1
 2   since August.  Well, was it -- in May of this year, you said
 3   to the Court that you now need to expand it because of what
 4   Mr. Khatchadorian said.  But now you're telling the Court
 5   that, wait a minute.  We always intended this from 2012.
 6   And if that's the case, then why wasn't it pursued since
 7   2012 for three years?  Why is it being raised now?

 8           And the explanation that we provided to Your Honor
 9   is that there's been exhaustive discovery on the 84 designs
10   and the designs that run up to 400.  And what has come out
11   of discovery is that the designs did not sell well.  They
12   were at a loss.  Realizing that, that makes their case not
13   viable.  Now they're trying to come up with some other
14   theory that every design that this company's ever done.

15           Mr. Aghjayan stopped working for Ritani in 2009.
16   In 2010, after the one-year non-compete period ended, he
17   proceeded to have his own business formed, and he proceeded
18   to conduct his business, and he's been doing so since then.
19   They want to expand what they've learned through discovery
20   this past year, when all the depositions were finally done,
21   to now try to go into all the other styles because they
22   don't have a claim, whether it be approximate cause or
23   damages, to say that even if he took the styles -- which Mr.
24   Aghjayan denies that he had anything to do with those
25   designs; he's already said repeatedly that it was his wife's

1

2  designs -- that they can't establish that.

3          So bottom line is, Your Honor, and it's been said

4  repeatedly.  It was said at the last conference.  That on

5  this -- and to use the points we were advancing then using

6  them again now, which is they shouldn't be allowed to expand

7  the styles on this case when they've never been an issue.

8  They've tried to explain it now two different ways.

9          One is, oh, Mr. Khatchadorian said that this year

10  when we took that ex parte deposition in the Netherlands

11  and, two, now they're saying, oh, well, by the way, we

12  always alleged it in our complaint of 2012.  But they have

13  no explanation why they never pursued it.  So there

14  shouldn't be an expansion.

15          My client, Your Honor, they want to move on to the

16  next phase of this case, which is the dispositive motion

17  case.  We've been trying to do that for quite some time.

18  And I, you know, I -- respectfully, Your Honor, there's no

19  gamesmanship on this side.  All we're trying to do it close

20  the discovery and not keep it from continuing to mushroom

21  and expand every time something comes up.

22          That's all we're trying to do, Your Honor, and we

23  wouldn't engage in anything other than that.  So they should

24  not be permitted to expand on the styles, Your Honor.

25          MR. REUBER:  Your Honor, can I just address the

37

1

2   expansion aspect.  Your Honor, might not remember, but in

3   May of 2013 and June of (inaudible), prior counsel to Mr.

4   Papalia and I were in the same courtroom --

5          THE COURT:   May of what year?

6          MR. REUBER:   2013.

7          THE COURT:   Okay.

8          MR. REUBER:   -- concerning Erica Garay and Lynn

9   Brown, they were concerned that they didn't have an

10  understanding of what styles we were seeking.  So we went

11  back and we crafted a spreadsheet which we filed pursuant to

12  this case.  It's 232-1, and I'm going to refer to the fourth

13  column in that spreadsheet.

14         THE COURT:   Your letter you just filed.

15         MR. REUBER:   That's the letter I just filed. But

16  these are responses that were served in 2013 in response to

17  a discovery order --

18         THE COURT:   I don't have 232-1.  Maybe you didn't

19  send me a courtesy copy.

20         MR. REUBER:   If we didn't I apologize, Your

21  Honor.  We can get you that.

22         THE COURT:   Thank you.

23         MR. REUBER:   The first column and I'm on page 8.

24  No, I'm sorry.  Technically it's page 7 and 8 but docket

25  entry page 8.

```
 1                                                           38
 2              THE COURT:    Yes.
 3              MR. REUBER:    We have a spreadsheet here.  It's
 4   got four columns.  The first column is style 100 and then
 5   there's a jCad file name that we've been able to identify
 6   from documents produced from Alexan Khatchadorian.  The date
 7   he sent them pursuant to the e-mail --
 8              THE COURT:    Is this a question to which is the
 9   files or trade secrets?
10              MR. REUBER:    Yes, and if you look at the fourth
11   column, which is relevant to whether or not we're expanding
12   discovery here, it's called derivative styles, including
13   200. 403, 407, 430, 467, 484, and that's just for style 100
14   alone.  So we've identified years ago the aspects and the
15   styles that we were looking for in terms of discovery well
16   before damages ever became an issue.
17              And what I was referring to in the Alexan
18   Khatchadorian deposition is that Alexan Khatchadorian --
19   we're effectively having to piece together a puzzle.  He
20   corrected us.  We believe that there is 84 designs that were
21   then heads swaps, or had various heads and shanks swapped,
22   then it would create the other 200 to 400.
23              He informed us that that is accurate, but there
24   was additional swapping going on from 600 and above.  Our
25   understanding prior to that was that the 600 and above were
```

individual styles that he knew nothing about, that were created after he left the company.  That turned out not to be the case.

So when I say there's an expansion aspect, I don't mean styles above 400.  I mean styles above 400, how they were created in terms of whether or not it was attributable to Harout while he was employed by Ritani, or whether or not it was attributable to Harout Aghjayan after he left the company.

We believe when we finally have all of the data we can identify when these styles were created, and then we can solidify our claims as to each individual style.  It could very well be that Mr. Aghjayan created styles after he left his employment.  And if that's true and we can't make our case, we can't claim those as damages for us because that's outside the scope of our claims.  But we don't have discovery to make that determination yet.

THE COURT:   Now I'm completely lost.  I thought all you were looking for was sales data with respect to certain style numbers.

MR. REUBER:   At this point, Your Honor, we are.

THE COURT:   But now you sound -- acting like we now have -- may have redo the whole case with respect to this.

40

1

2          MR. REUBER:   We don't have to review the whole

3    case, Your Honor.  We don't know if it's even worth that

4    effort.  We don't know that.  We don't know what the damage

5    amount would be for those and whether or not it's worth

6    pursuing.

7          THE COURT:   But why wouldn't this have been

8    something -- you showed me this document.  When was this

9    document you showed me from?

10         MR. LAURICELLA:   This is from 2013.

11         THE COURT:   So why is this coming up now, two

12    years later?

13         MR. REUBER:   Because we didn't get to the damages

14    aspect of the case.  We didn't --

15         THE COURT:   Okay.  Well good.  So at least you're

16    telling me you're looking for numbers.  You're not looking

17    for substantive discovery on this.

18         MR. REUBER:   We're not looking for substantive

19    discovery, Your Honor.  We've never looked for substantive

20    discovery.

21         THE COURT:   Okay.  So you just want the sales

22    data for the numbers that are the very ones listed in this

23    fourth column or are there more?

24         MR. REUBER:   We want -- effectively, now, now we

25    want proportionality.  As of the last conference my

1

2  understanding as I walked out of here was they're going to

3  get every shred of financial date that we have and we were

4  going to get every shred --

5          THE COURT:   No, no, no, I don't do things that

6  way.  Let's talk about your request and then we'll talk

7  about their request.  So don't tell me about the

8  portionality of this, and that's the wrong word, especially

9  these days.  So I think I tried to ask you a question and I

10 don't know that I've gotten the answer.  Do you remember it

11 or should I give it to you again?

12         MR. REUBER:   Please give it to me again, Your

13 Honor.

14         THE COURT:   I mean just look at your sales data,

15 items in that fourth column, the document you just showed

16 me?

17         MR. REUBER:   No, Your Honor, we're looking for

18 all sales data for all styles.

19         THE COURT:   Okay.  On the --

20         MR. REUBER:   Since the dispute began.  We want to

21 know every single style that has been sold.

22         THE COURT:   Okay.  On the theory that you can

23 show that the ones above 400 were also trade secret

24 material?

25         MR. REUBER:   Yes, Your Honor.

1

2          THE COURT:   All right.   And is this something --

3   this just keeps being brought up.   I mean people tell me

4   about things that have happened and I don't get any record

5   of them.   And I'm not just talking about August 28th.   I'm

6   talking about a clearer history.   Is this something you'd

7   asked for previously?

8          MR. REUBER:   Yes, Your Honor.

9          THE COURT:   Okay.   And when did you get the sales

10  chart?

11         MR. REUBER:   June.

12         THE COURT:   And then at what point did you say,

13  you know what, this is only 1 through 400, we need more?

14         MR. REUBER:   June.

15         THE COURT:   And you sent it to whom?

16         MR. REUBER:   (Inaudible) and we had a conference

17  about it in August.

18         THE COURT:   And that's the -- one of the

19  conferences you had in August.   And you feel I said give

20  them all the stuff.   Give them the information on all the

21  stuff.

22         MR. REUBER:   Yes, Your Honor.

23         THE COURT:   What do you think I said?

24         MR. PAPALIA:   Your Honor didn't -- all Your Honor

25  said was they're entitled to pick 20 items on that sales

43

1  list.

2          THE COURT:   That was for the, you know, back-up

3  proof verification issue.  And I addressed the issue of

4  whether he gets a spreadsheet, not back-up data, but an

5  actual spreadsheet showing the sales data for the styles

6  above 400.

7          MR. PAPALIA:   It wasn't even an issue.  That's

8  what I'm --

9          THE COURT:   So you're saying I never -- it was

10  never addressed.

11          MR. PAPALIA:   It was never addressed and not only

12  wasn't it addressed, because we don't have the transcript,

13  we have to look at the submission, his letter.

14          THE COURT:   You have his letter and you say it's

15  not his letter.

16          MR. PAPALIA:   Didn't even ask for it and it

17  wasn't even addressed, Your Honor.

18          THE COURT:   Do you have any explanation for that,

19  or?

20          MR. REUBER:   Your Honor, I did.  I distinctly

21  remember you asking me the one question.  The question was

22  did the spreadsheet cover styles 100 -- over 400.

23          THE COURT:   No, no, that's not the issue.  Did

24  you come to that conference saying defendants won't give me

44

1    styles 400 and above?

2         MR. REUBER:   Your Honor, I believe that was an

3    issue that we intended to bring up and I believe it might be

4    in our letter, if you give me chance to look for it.

5         THE COURT:   Well this is the very thing he says

6    is not in your letter.

7         MR. REUBER:   I will go and look through the

8    letter.  Maybe it wasn't specifically identified.

9         THE COURT:   Take your time.  If you want your

10   letter I have copies.

11        MR. PAPALIA:   I can give it to you.  It's

12   actually got a heading, defendants' sales information, and

13   it's one paragraph.  It's at the top of page 2.  And I can

14   also -- there's another letter, too.  There was two letters

15   he submitted.  There was also one on October 28th -- August

16   28th, the day of the conference.  And if you look at that

17   column of defendants' sales data, it's not even raised

18   there.  So he had -- it wasn't raised in two submissions to

19   the Court and it wasn't raised at the argument hearing

20   either.

21        MR. REUBER:   Your Honor, we have addressed that.

22   It might not be in the letter, but we have addressed that.

23        THE COURT:   I can't believe that this would've

24   been brought up in a hearing and not being brought up in the

letter.  The letter's just about the spreadsheet and the back-up.

MR. REUBER:  I don't have an explanation for that, Your Honor, but I do know that we did, we absolutely discussed it at that conference.

THE COURT:  Out of nowhere, you brought it up.  I mean here's the thing, Mr. Papalia.  I'm trying to understand what the burden is of providing these additional styles.  This truly seems computerized.  This seems like an hour worth of programming would generate this.  Tell me why it's not.

MR. PAPALIA:  It's not, Your Honor, and again, we could -- it's not an hour.  Unfortunately, it's a lot of work and --

THE COURT:  Because?

MR. PAPALIA:  It's thousands of pages of data on top of the tens of thousands of data that's already been produced in the case.

THE COURT:  How do you produce those spreadsheets?

MR. PAPALIA:  And those spreadsheets were produced, by the way, they were produced before June of this year.  In June of this year is when the customer column was added.  They had that data way before that.

1

2          But the point is, is Your Honor, is we've complied

3  and produced thousands of pages of discovery.  And every

4  time that they ask for something they say, well --

5          THE COURT:   Let's focus on one issue and not what

6  they've done every time.  So let's just go back to this.

7  Let me ask again, when was the spreadsheet first produced,

8  with or without the customer column?

9          MR. PAPALIA:   We believe, Your Honor, without

10 having it, it was some time in 2014.

11         THE COURT:   What's your answer on that?

12         MR. REUBER:   Your Honor, I don't recall when the

13 original spreadsheet without the customer column was.  I do

14 know it was of little use without the customer column, which

15 is why we needed it -- the customer column.

16         THE COURT:   No, but my problem is that you have a

17 spreadsheet of 1 through 400 in 2014 and then you don't,

18 regardless of the customer column, you don't come and

19 complain about it until either now, in his view, or August,

20 in your view.  It doesn't make sense.  That's the problem.

21         All right.  I'm not going to add on the additional

22 styles, regardless of what people's memories are for August.

23 It's just, I mean I have a rule and I have an order that

24 says you've got to raise things with me, you know, when they

25 happen.  And if there was a problem in 2014 because it

1  wasn't all the styles. that's when it should've been raised.

2       Now, the invoices, I can't -- I'm accepting that

3  there's a reason to examine the invoices for the 20

4  customers.  If you can come and make a credible burdens

5  (phonetic) in this argument in the next -- well, the holiday

6  -- but by the first week in January, then come back to me.

7  Otherwise, try to work it out with Mr. Reuber.  What's the

8  next issue, Mr. Reuber?

9       MR. REUBER:   There's a $320,000 sale from which

10  the defendants have identified in an affidavit which there

11  doesn't appear to be any documentation.  It indicated that

12  it was included -- it was not included in the previous

13  spreadsheet they provided and the Court ordered them to

14  disclose this at the August hearing, but they haven't done

15  so.

16       THE COURT:   Disclose what?

17       MR. REUBER:   Disclose the information underlying

18  the 32 -- $320,000 sale.

19       MR. PAPALIA:   Your Honor, I understand what he's

20  asking for is he wants the invoice that includes the

21  $320,000 in sample sales.  This is not jewelry.  This is

22  just samples that were given to IDD.  That's what he's

23  asking for.

24       THE COURT:   I assume this took up 42 seconds of

1

2  your 15-minute phone call that you could've asked him these

3  questions.  Is it time to lock you in the jury room or what?

4          MR. PAPALIA:   Your Honor, we'll get the invoice.

5  And it's not an invoice for 320.  I think it's included with

6  other samples that were sold.  But we'll get it and we'll

7  send the document to them.

8          THE COURT:   By the first week in January.  What's

9  next, Mr. Reuber?

10          MR. REUBER:   The Edgewater (inaudible) Facility's

11  the last thing, Your Honor.  We still don't have any idea

12  regarding how many computers are there, who the custodians

13  of said computers are, whether or not there's an e-mail

14  service separate and apart from any others.  We don't have

15  any understanding as to the Edgewater facility.  And there

16  was, I don't believe, any issue or question regarding the

17  production that we are going to get out of it.

18          When I walked out of here on the August -- when I

19  walked out of the August 28th hearing, my understanding was

20  they were going to collect all the data and then we were

21  going to provide five Boolean searches.  They were going to

22  search the data, and our vendor was going to be part of that

23  process.

24          MR. PAPALIA:   Your Honor, that was another issue

25  that came up at the last hearing as to, you know, why is it

49

1

2    being brought up now.  They've known about the Edgewater

3    facility for --

4              THE COURT:  This I recall ordering them.

5              MR. PAPALIA:  And Your Honor ordered that they

6    would give us the five Boolean searches, whatever, if they

7    want to search style 127, and they never did that.  In fact,

8    as of today --

9              THE COURT:  Well he's saying that you didn't give

10   information in which he listed in his letter.

11             MR. PAPALIA:  That was never part of it.  When we

12   left here on August 28th, he was -- Mr. Reuber was supposed

13   to send me five Boolean searches that we were then supposed

14   to proceed with and run.  We've never gotten it.  We haven't

15   gotten it to date and now there's an expansion of it.

16             But I want to add, Your Honor, since -- when we

17   left, we had -- Mr. Lauricella in my office -- had

18   communications with one of our in-house ESI people.  And

19   apparently, to do what Mr. Reuber is asking -- which he

20   hasn't done anyway -- if they were to give us the five

21   Boolean searches to run, the cost of that is $102,000 or

22   more to do that, because it involves going through all --

23   remember now, this business was started at the end of 2010

24   and 2011.

25             The first computer, I think got into operation at

50

the end of 2010, okay.  All the stuff that they allege, the
wrongdoing, et cetera, that was ongoing was before that.  So
we're talking about a four-year time period for this company
that it's been operating, conducting business.

         For us to run these searches, we'd have to go
through an entire process which involves imaging all the
data, running the Boolean searches.  So it's actually --
there's two reasons why he shouldn't have it.

         One is, he didn't give us the five Boolean
searches like Your Honor said, do that, with the
understanding we were going to close discovery and move on
to the next phase of the case.  Number two, Your Honor, is
since we've gone back and checked from our ESI person, the
cost of that is substantial to get what it is they're asking
for us to find out.

         MR. REUBER:   Your Honor, two points.  I'll
address the cost issue first.  That number is substantially
less than what we've already spent providing them with the
discovery they asked for.  We had to go through dozens of
custodians, dozens of computers, dozens of facilities
pursuant to their discovery requests from us.  We did so.
We never complained about cost.

         The second issue is that we never agreed to give
them Boolean searches before they did the searches, under

51

1    any circumstances.  One, that's never been done.  We only

2    asked for what's previously been done in this case, which is

3    everybody provides or obtains a data source, that that

4    becomes a copy, and then you work off of that copy.  That's

5    what was done with us and that was done previously with --

6            THE COURT:    What's your point?  I'm sorry.

7            MR. REUBER:    I'm sorry.  The issue is for us,

8    security.  As soon as the defendants received a copy of the

9    complaint he suddenly had a virus and started destroying

10   things on his two computers.  And those are the computers,

11   the only computers, that we've been provided to date.

12           If we give the Boolean searches before the data is

13   secure, we have very little faith that the data we're asking

14   for will be on those computers.

15           THE COURT:    Okay.  So you want to wait to do

16   that.

17           MR. REUBER:    Yes, Your Honor.

18           THE COURT:    Okay.  And when you say data secured,

19   what does that mean?  Copied?

20           MR. REUBER:    Yes, copied, yes, Your Honor.  For

21   what we've done in this case previously, both sides, data

22   sources were cloned --

23           THE COURT:    So are you --

24           MR. REUBER:    -- and then searched.

1

2          THE COURT:   Okay.  What is it you're waiting for

3    in the Edgewater facilities?

4          MR. REUBER:   We would like --

5          THE COURT:   I thought you were trying to get the

6    certification that I ordered actually, I think in May, not

7    August.  Did that not happen -- about what's there and

8    what's going on there?

9          MR. REUBER:   They provided us certification but

10   it was only in general terms.  In August, we believed that

11   we were going to get a data map, and then we were going to

12   identify -- once we got the data map, we were going to

13   identify a place where our vendor can participate in the

14   cloning of the documents or the -- not documents -- the data

15   storage at the Edgewater facilities and then we would run

16   the Boolean searches.

17         THE COURT:   So I mean Mr. Papalia, I've already

18   ordered the search, so I think we're beyond that.  If you

19   can think of a way to make it less costly, that's fine.  I'm

20   sympathetic to the notion that we should have a cloning of

21   the thing being run, unless you have a good reason not to.

22   But this I ordered already and in his answers he didn't give

23   us the Boolean searches.  I'm overruling that objection.

24         So now we have to deal with it.  How do you want

25   to deal with it?

53

                MR. PAPALIA:   Your Honor, he's going to give us

five Boolean searches.  It'll be style 127, style 300,

whatever words he gives us to search.  That's what Your

Honor ordered so if he gives us that --

                THE COURT:   He's saying you need to copy the

source before you do the search.

                MR. PAPALIA:   These are computers that existed

after Mr. --

                THE COURT:   I already ordered the search so don't

-- let's not go backwards.  Why would you not want to make a

copy before you did the search?

                MR. PAPALIA:   And turn over a copy of our entire

computer system?

                THE COURT:   No, no, I don't -- you don't --

you're not looking at that.  He just wants you to copy

before you do the search.

                MR. PAPALIA:   Your Honor, if they're seeking that

type of costly discovery I --

                THE COURT:   Is it more costly to copy it than to

not?

                MR. PAPALIA:   It's an entire process.  According

to my ESI person --

                THE COURT:   You know what, (inaudible) assign

people to figure out the cheapest way to do this.  I mean, I

1

2 don't want to increase the expense on the theory that -- Mr.

3 Reuber, I'm not sympathetic to the notion that if we tell

4 them what the search is, they're suddenly going to destroy

5 documents.  We can't -- if that's going to increase the cost

6 of this thing, it's not worth it.  So if somehow copying

7 this thing is going to jack up the costs, we need to do this

8 cheaply on the theory that people are going to act in good

9 faith.  As much as you don't trust the other side, that's

10 the way we're going to do it, because I believe cost is more

11 important.

12        Have your two people talk to each other, figure

13 out the cheapest way to do this, give them the searches.

14 Let's have this done by the first week in January again if

15 possible.  If there's a problem, come back.  What's next,

16 Mr. Reuber?

17        MR. REUBER:   That's it, Your Honor.

18        THE COURT:   Anything from you Mr. Papalia?

19        MR. PAPALIA:   No, Your Honor.

20        THE COURT:   All right.  Thank you everyone.  Let

21 me -- get me a report by January 15th, a jointly composed

22 letter following a telephone conference between of great

23 length if there's any disputes left.

24            (Whereupon the matter is adjourned.)

25

55

C E R T I F I C A T E

I, Carole Ludwig, certify that the foregoing

transcript of proceedings in the United States District

Court, Southern District of New York, Vassilev v. DOE,

Docket #11cv8928, was prepared using PC-based transcription

software and is a true and accurate record of the

proceedings.

Signature_____

Date:  January 11, 2016