1       UNITED STATES DISTRICT COURT
        SOUTHERN DISTRICT OF NEW YORK
2

3 ---------------------------------------X
               :
4 RITANI, LLC,        : 11-CV-08928 (RWS)
               :
5        Plaintiff,  :
       v.      :
6            : 500 Pearl Street
 AGHJAYAN, et al.,    : New York, New York
7            :
        Defendants. : March 9, 2018
8 ---------------------------------------X

9
     TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE
10    BEFORE THE HONORABLE GABRIEL W. GORENSTEIN
       UNITED STATES MAGISTRATE JUDGE
11

12 APPEARANCES:

13 For the Plaintiff:   CAMERON S. REUBER, ESQ.
            Leason Ellis LLP
14           One Barker Avenue, Fifth Floor
            White Plains, New York  10601
15

16 For the Defendant:   MICHAEL LAUIRCELLA, ESQ.
            Archer & Greiner, PC
17           21 Main Street, Suite 353
            Court Plaza South East
18           Hackensack, New Jersey 07601

19

20 Court Transcriber:   MARY GRECO
            TypeWrite Word Processing Service
21           211 N. Milton Road
            Saratoga Springs, New York 12866
22

23

24

25


 Proceedings recorded by electronic sound recording,
 transcript produced by transcription service

2

1          THE CLERK:  In the matter of Ritani v. Aghjayan,

2    docket number 11-CV-8928.  Counsel, state your name for the

3    record.

4          MR. REUBER:  Good afternoon, Your Honor.  Cameron

5    Reuber for Ritani.

6          MR. LAUIRCELLA:  Good afternoon, Your Honor.  Michael

7    Lauircella from Archer & Greiner for the defendants.

8          THE COURT:  Okay.  Welcome everyone.  You can be

9    seated if you're not speaking.

10          We're here based on a letter dated the 8th from the

11    plaintiff and responsive letter dated January 22nd.  So I guess

12    I'll hear from you, Mr. Reuber.  Go ahead.

13          MR. REUBER:  Your Honor, the last time we were here

14    we indicated that the Edgewater facility contained documents

15    that were relevant to this case that weren't previously

16    produced.  Defendants disputed that in a letter, docket number

17    226, Page 2, bottom paragraph regarding Edgewater facility data

18    storage.

19          THE COURT:  Somehow it's a little hard to hear you

20    maybe because you're looking down or --

21          MR. REUBER:  Sure.  Is that easier?  The

22    representation to the Court is there is no additional

23    information, no additional relevant information for defendants

24    to produce from data storage at the Edgewater facility that has

25    not already been produced.

3

1          Your Honor decided to resolve the dispute between the

2   parties regarding which side was right by allowing us five

3   Boolean searches.  We've conducted four of them and we have

4   discovered that not only were there additional documents that

5   were not produced by any party in this case previously, at

6   least as far as we're concerned, there's still a dispute

7   regarding --

8          THE COURT:  Party as opposed to non-party?

9          MR. REUBER:  As opposed to defendants.  There has

10  been --

11         THE COURT:  No, no, no.  A party as opposed to a non-

12  party.

13

14         MR. REUBER:  As opposed to a non-party, yes, Your

15  Honor.  There is a third party, Alexon [Ph.], who is a form of

16  business party of the defendants who's come forward with

17  information voluntarily and has made a partial production with

18  regard --

19         THE COURT:  So is it the case that the Boolean search

20  didn't recover anything that haven't already been produced by

21  parties and non-parties?  Or is that not the case?

22         MR. REUBER:  Your Honor, there was these two dozen

23  emails that were not previously produced in this case as far as

24  we're concerned.

25         THE COURT:  Two dozen.

4

1          MR. REUBER:  Yes.  To our knowledge, at least two

2    dozen.  There continues to be more.  It's a very large

3    production and we're steadily going through it.

4          THE COURT:  Oh, it's not done?

5          MR. REUBER:  It's not done, which is part of the

6    reason that we're here.  Part of the relief that I'm asking for

7    is the -- because what we're having to do is we're having to

8    compare the current production which has conversation data with

9    prior production which is basically just tiffs.  So there's no

10   way to de-dupe it easily.  We have to effectively when we find

11   a document we think we've never seen before, we have to find

12   words from that document, go back to a different database on a

13   prior production and try to search for it using that

14   methodology and it's very time consuming which is why we've

15   only been able to find a certain small amount just yet.

16         But beyond the individual emails, there was the zero

17   byte file which started this whole thing off which is why we

18   started pursuing it.  Hundreds of those zero byte files were in

19   uncorrupted form at Edgewater and they have been from the

20   start.  We didn't have to go through any of that.  They could

21   have just gone to Edgewater, copied the files, and handed them

22   over to us.  Or better yet, they could have included it in the

23   original production and obviated the whole mess.

24         THE COURT:  Okay.  Let's just try to focus on what

25   your request is right now.  So I mean, you know, if someone

1  could push a button and give you this material it would be

2  easy.  Defendants are claiming a burden.  They don't tell me

3  what it is.  So maybe I should turn to them.  Very vague --

4  I'll come back to you.  Very vague, Mr. Lauircella.  I'm told

5  there's burden and expense but I have no idea what it is.

6       MR. LAUIRCELLA:  Your Honor, what the request for

7  this conversation ID metadata is essentially that all of the

8  prior discovery that occurred in this case over the last four

9  years would need to be reprocessed, re-reviewed, redone --

10      THE COURT:  Whoa, whoa.  Re-reviewed?  We're talking

11  about -- why would it be re-reviewed?

12      MR. LAUIRCELLA:  Because we would -- the discovery

13  would need to be re-collected with this metadata.  It's not as

14  simple as hitting -- if the metadata existed in the documents

15  we had, this one specific field and we could hit a button and

16  produce it, we would.  But the documents would have to be re-

17  collected with this specific metadata field.  The thing that --

18      THE COURT:  Now you're good.  It was the re-review

19  part that made no sense.

20      MR. LAUIRCELLA:  Okay.  So I think with respect to

21  this field, this field, metadata field, was never brought up in

22  the past --

23      THE COURT:  Why don't you answer my question?  I'll

24  accept that it's not a push of a button and I'm not interested

25  in getting to the issue of whether they requested it before

1  because they didn't have a reason before.  They have a reason

2  now based upon the allegation that there's material that's

3  being produced that should have been produced before.  It was

4  destroyed or whatever else happened to it.  So here's the four

5  words, five words I'm wondering about.  Extremely expensive and

6  time consuming.  Based on that I'm supposed to find there's a

7  burden to you.  So I need details.

8          MR. LAUIRCELLA:  Well Judge, everything that was done

9  in the case as far as the discovery of the collection and the

10  review would need to be redone because --

11          THE COURT:  You do it again.  You're about to lose

12  this.  If you do that again, I'm about to order it.  It does

13  not need to be reviewed in the sense that an attorney needs to

14  look at each email to see if it's responsive.  We're only

15  asking you to take the emails you've already produced.  Why do

16  you keep telling me about review?

17          MR. LAUIRCELLA:  Because the emails -- we don't have

18  the emails that were already produced with the metadata that

19  the defendants are looking for attached to it.  So my

20  understanding from talking with our ESI expert or our ESI in-

21  house support is that the documents would all again need to be

22  collected from the original hard drive and processed with the

23  specific metadata field.

24          THE COURT:  Okay.

25          MR. LAUIRCELLA:  And when that document -- when all

7

1  that information is collected with that specific metadata

2  field, it's going to be everything, not what was just produced

3  but everything that's on those devices that was previously

4  produced.  So then we're going to have, I don't know --

5          THE COURT:  So what's the cost?

6          MR. LAUIRCELLA:  It's --

7          THE COURT:  If you don't know, tell me that.  Don't -

8  -

9          MR. LAUIRCELLA:  I don't --

10          THE COURT:  You haven't appeared in front of me

11  before, have you?

12          MR. LAUIRCELLA:  I've been here with Mr. Papalia.

13          THE COURT:  Right.  Okay.

14          MR. LAUIRCELLA:  And I've fortunately read all the

15  transcripts.

16          THE COURT:  Okay.  Don't say anything unless you know

17  it to be true.  If you don't know, you've got to say I don't

18  know.  Do you understand that?

19          MR. LAUIRCELLA:  I do understand.

20          THE COURT:  What's the cost going to be?

21          MR. LAUIRCELLA:  I cannot give a specific cost.  I

22  know it will be hundreds of man hours.

23          THE COURT:  Hundreds of man hours of this vendor?

24          MR. LAUIRCELLA:  Or of an attorney going through

25  documents and figuring out --

8

1          THE COURT:  Why is an attorney going through

2    documents?

3          MR. LAUIRCELLA:  Because we have to figure out what

4    was previously produced and reproduce it in the same way.

5    There's been tons of issues in this case with the prior

6    production and whether there were Boolean searches or whether

7    they were the attorney reviewing them.  It's not as simple as

8    saying these were the 42,500 pages that were previously

9    produced and here they are again with this single metadata

10   field.

11         THE COURT:  I'm telling you that makes -- I know you

12   said it three times now.  It still makes no sense to me.  It

13   makes no sense to me that an attorney would do this task.  Do

14   you know exactly what documents you produced?  Maybe it's hard

15   to -- it's a time consuming effort to go back and find them in

16   the original documents but that's not an attorney task.  I mean

17   it's ridiculous.  I mean I'm not going to -- you know, if it

18   costs $100,000, I'm not going to make them do it, Mr. Reuber.

19   If it costs 5,000 I probably would.  How do we figure this out?

20         MR. LAUIRCELLA:  Can I clarify one point?

21         THE COURT:  Sure.

22         MR. LAUIRCELLA:  It is the defendant's position that

23   all of the -- there are no documents that haven't been produced

24   by either a party or non-party.

25         THE COURT:  He denies that.

1          MR. LAUIRCELLA:  And if you look at counsel's letter

2   that was submitted to the Court on January 8 on Page 4 it said,

3   "Indeed, the primary point of contention between the parties

4   regarding Edgewater data source is and remains the defendant's

5   unsupported claim that Edgewater is duplicative of prior

6   production by defendants.  However, upon reviewing the result

7   of only four of the five allotted Boolean searches, defense

8   counsel is now pivoting from that prior contention.  Now

9   defense counsel contends that the Edgewater is duplicative of

10  prior production made by defendants Ritani and/or Alexon."  So

11  counsel and I had at least two separate meet and confers on

12  this in person.  I went to his office in August and with an

13  initial set of exemplars, and at that time I brought with me

14  printed out documents with the defendant's Bates stamp on it

15  and the Alexon or the non-party Bates stamp on it and

16  plaintiff's Bates stamp on it.  After that, another

17  correspondence was sent in October with what counsel believed

18  was unproduced documents.  It's my recollection, it's not in

19  any of the letters so unfortunately I can't be prepared today,

20  but it's my recollection that we agreed on the phone and in

21  correspondence that all those new exemplars in October had been

22  previously produced by defendant Alexon on the plaintiff.  And

23  that's why in my letter, our letter on Page 2 --

24          THE COURT:  Okay.  So you thought he submitted it

25  before but now he's not.  Maybe he can come up with them.

1    Maybe you want to give him a list?  Probably don't have it now.

2    Mr. Reuber, you want to give him a list of things you say were

3    found and not produced?

4            MR. REUBER:  Your Honor, I already have given him a

5    partial list as of October.  I gave him 20 exemplars.  The

6    August meeting was to provide information to the effect of

7    these documents that were never produced to us by defendants

8    that were sitting at Edgewater.  That was the discussion.

9            THE COURT:  By defendants?

10           MR. REUBER:  By defendants that were sitting at

11   Edgewater.

12           THE COURT:  Okay.  Which is a separate problem.  I

13   understand that.

14           MR. REUBER:  So at that point the argument turned to

15   well you've already got these same documents from Alexon so we

16   don't have to produce them again from Edgewater.  At that point

17   I went back and I searched for documents that were not part of

18   the defendant's production.  I provided them 20 exemplars and

19   that's in addition to the zero byte files.  So there are

20   hundreds of documents that were sitting at Edgewater the entire

21   time that were not produced and weren't subject to discovery

22   originally.

23           THE COURT:  Okay.  Right now we're just talking about

24   email so, this request.

25           MR. REUBER:  Sure.  Sure.  There's at least 20.

1      THE COURT:  So that's not the zero byte files.

2      MR. REUBER:  No, no.  Most of the zero byte were

3  attachments to emails but yes.

4      THE COURT:  Okay.  So I don't know what just happened

5  here but I think we're exactly where we were before which is

6  you say there are emails that were not produced by a party or a

7  non-party and the defendants say no.  So --

8      MR. REUBER:  We have produced with the current Bates

9  --

10     THE COURT:  How am I supposed to justify that?

11     MR. REUBER:  We have produced with Bates numbers, I

12 think it's just as simple as counsel giving us Bates numbers

13 from the prior production and then we either concede the point

14 --

15     THE COURT:  Okay.  Maybe you have to come back.  I

16 don't know.  But you also have to come back on this other

17 issue, right?

18     MR. REUBER:  Yes.

19     THE COURT:  Which is what is the expense of this

20 thing?  Is it 5,000 or 100,000?

21     MR. REUBER:  My ESI expert who doesn't have the

22 information available to the defendants seems to think it would

23 be a relatively simple matter because you only have two small

24 data stores, a laptop hard drive and a desktop hard drive to

25 identify the data thereon that might be responsive based on

1   what's previously been produced and then just find where the

2   duplication is.

3              THE COURT:  But how do you do that?  How do you do

4   that?

5              MR. REUBER:  Well, it's -- I don't claim to be an ESI

6   expert or understand entirely --

7              THE COURT:  Maybe we should do a sample.  Maybe you

8   should pick out 50 of them, make them give you the data for

9   that.  Is that going to solve anything?

10             MR. REUBER:  The problem, Your Honor, is their

11  argument is that it's the entire production is duplicative and

12  I can't litigate that issue unless I have all the data

13  available to me.  And right now it's going to cost hundreds of

14  man hours on our part to compare the two without the

15  conversation ID.  If I have that conversation ID data, it's

16  the work of a few days.  If I don't, it's the work of a few

17  months.

18             THE COURT:  Right.  But if costs them -- again, I'm

19  not going to impose an unreasonable cost on them for this

20  purpose because it's a little bit collateral to a substitute

21  issue of document production.

22             MR. REUBER:  The problem, Your Honor, is it goes

23  right to the heart of our trade secrets case.  Our trade

24  secrets case, and this is straight from Judge Sweet's

25  preliminary injunction hearing where he indicates that the

1  disconnect with plaintiff's case at that point was identifying

2  CAD/CAMS for ring designs that were being sold by the

3  defendants that we claim are our trade secrets because they

4  were created during the course of employment by Harout

5  Aghjayan.  Now, the easy way to determine whether or not those

6  ring designs belong to Ritani because they were made during his

7  employment period or after the employment period is to identify

8  the date the CAD/CAM was created.  We have at least emails

9  flying back and forth, including amount the 20 that I just

10  indicated before were not previously produced to us from the

11  2008 2000 time frame when Harout Aghjayan was employed by

12  Ritani.  The problem is is that we believe and our theory is

13  that Harout Aghjayan deleted all of the original CAD/CAMS with

14  those original dates of creation that would establish that he

15  was employed by Ritani at the time they were created.  At some

16  point in the future he then uploaded them back to either the

17  Edgewater facility or some other computer after that, after he

18  deleted them and prior to giving us the hard drives that we've

19  been using in this case.  And those new CAD/CAMS have new

20  dates.  The problem with those new dates is that there's been

21  an interceding catalog that --

22          THE COURT:  There's been...?

23          MR. REUBER:  An interceding catalog.  There's a

24  catalog that came out between him leaving --

25          THE COURT:  A catalog, of sales catalog?

1          MR. REUBER:  A sales catalog with all these designs

2    in them, with all the designs that were being used by Ritani.

3    I'm sorry, used by the defendants prior to the lawsuit being

4    filed but after Harout leaving his employment.  We have not

5    been able to establish for each of those designs in that

6    catalog a corresponding CAD/CAM prior to that catalog.

7          THE COURT:  You can't do that because you're missing

8    this metadata?

9          MR. REUBER:  We're missing I think the entire

10   documents.  But also we're missing a lot of the emails that

11   would establish that the CAD/CAMS were part of the emails, were

12   part of that production.

13         THE COURT:  You know, I think I need to think about

14   the big picture on this.  Why is it -- tell me what this

15   metadata is going to give you.  Let me ask you that again.  I

16   know I've read your letter but now I want to think about it

17   again.  What's this metadata going to give you?

18         MR. REUBER:  The metadata is going to give us all of

19   the background information regarding the prior 125,000 emails.

20   Well not emails, but 125 -- most of the emails in that 125,000

21   --

22         THE COURT:  It's going to tell you when they were

23   originally created?  That's what you're interested in?

24         MR. REUBER:  When they were originally created, yes,

25   and who created them, who they were sent by, who they were sent

15

1  to.

2          THE COURT:  Okay.  But the way you phrase it in your

3  letter, it's as if you want to match it to something.

4          MR. REUBER:  We want to match it to the production

5  from Edgewater.

6          THE COURT:  And what's that going to get you?

7          MR. REUBER:  We're going to -- I understand at that

8  point which documents will have been produced previously and

9  which documents won't have been produced previously so we don't

10  have to one, cover the same ground we previously have.  We can

11  identify easily the new matter because it's not easy to

12  identify right now.  If we're going through and we find a

13  document that we currently believe is new, we have to leave the

14  database that's easily searchable for the new documents, the

15  Edgewater documents, go back to the prior production which are

16  only in tiff form, and then search for the prior document to

17  see if we already have it.  And sometimes we do and sometimes

18  we don't.  And if we do, we have to see if it's a zero byte

19  file and if it's not, then we have to go back to the Edgewater

20  file and then find it.  It's like a jigsaw puzzle trying to

21  find out what we have, what we didn't have before.  And we're

22  finding new information but it's extremely hard.  For every ten

23  emails that we already have, there's one email that we didn't.

24  And it's a large labor intensive process that shouldn't have

25  been occurring in the first place.  We shouldn't have had to do

1   it because it shouldn't have been withheld from production.

2            THE COURT:  I'm sympathetic to that but I have to

3   also think about the cost benefit here and I have zero

4   information on cost and maybe that'll get rectified.  Now I'm

5   just trying to understand the benefits side.  So the benefit to

6   you is that with the metadata you'll be able to instantly match

7   up to what you already have and find out what is new and you

8   would presumably only need to look at the new material?  Is

9   that the theory?

10           MR. REUBER:  Yes, Your Honor.  And I think we could

11  establish either it would assist us in our spoliation case as

12  well as --

13           THE COURT:  See, that's the part I don't know it's

14  worth -- I don't know if it was just for spoliation that I

15  would have them undergo a huge expense.  And you've got plenty

16  of other information on spoliation and you wouldn't need it for

17  every single email.  For that you could to sampling.  For that

18  you could pick out 20 emails from what you already have and say

19  give us the data from the Edgewater facility as to those

20  emails.  That would solve the spoliation problem, wouldn't it?

21           MR. REUBER:  Probably, Your Honor.

22           THE COURT:  Yes.  So that's out of the picture.  We

23  can solve spoliation very easily with a sample.

24           The other problem I'm sympathetic to relieving your

25  burden given that it's the defendant's inability to do a proper

1  production that have landed us in this situation.  But I do

2  have to balance that against the cost.  I'm trying to figure

3  out if there's some other way to do it.  Have you thought about

4  another way to do this so that they don't have to -- in other

5  words, I guess your contention is there's zero emails new in

6  this new production, right?  That's your contention.

7          MR. LAUIRCELLA:  Yeah.  And I think --

8          THE COURT:  And for him it's one out of ten.  There's

9  a disconnect.

10          MR. LAUIRCELLA:  But even more than that, I think 20

11  -- if those 20 were identified and weren't previously produced,

12  which I don't think is the case, I think there is about 24,000

13  files or something produced, so it's one out of ten, it's --

14          MR. REUBER:  That's what we've been able to go

15  through to date.

16          MR. LAUIRCELLA:  And Your Honor, these documents were

17  produced June 5, 2017.

18          THE COURT:  Well, let's look at it from their point

19  of view.  So you get a production of 10,000 emails, whatever

20  the number is, and then the other side says to you -- and then

21  you go through them.  And then the other side says to you oh,

22  you know what, we have other emails and there's a few more we

23  didn't produce to you before.  Here's 11,000 emails.  Thank

24  you.  There's 1,000 new ones in there.  Good luck.  Isn't that

25  what you're saying has happened?

1        MR. REUBER:  Yes, Your Honor.  There's also another

2   small caveat.  We only had four Boolean searches so it's not

3   like we were given free reign to look at the entirety of the

4   Edgewater facility.

5        THE COURT:  You only got -- you're getting a piece of

6   it.

7        MR. REUBER:  Very small shrunken -- we've got a

8   decent chunk out of that very small --

9        THE COURT:  Okay.  But I mean it's the same point

10  which is you need to know what's new in that chunk.  That's all

11  you really want this for.

12       MR. REUBER:  Yes.  Well, we need to know what was

13  withheld from us.

14       THE COURT:  Well, again, put the spoliation piece

15  aside.  You want to know what's new in this group so you don't

16  have to go through the entire group again.

17       MR. REUBER:  Yes, Your Honor.

18       THE COURT:  So that seems reasonable.  Except your

19  position is there's nothing new, right?

20       MR. LAUIRCELLA:  Correct.  And Your Honor, when we

21  were initially discussing this in the summer of 2015, we both

22  had our ESI experts here and all of our ESI experts were

23  involved in a protocol to collect the data at the Edgewater

24  facility and how it was going to be produced and what metadata

25  was going to be produced with it.  And at that time both sides

1   knew that the purpose of the collection and production of the

2   Edgewater facility was to determine if it was duplicative.  And

3   at no point up until October of 2017 was there any discussion

4   of this new metadata field that had never previously been

5   produced, collected, or discussed.  And you know, I think the

6   plaintiffs thought that they were going to get this treasure

7   trove of new documents that had been withheld.  And after

8   several months of review, there are no new documents that

9   they've been able to locate.  And then this metadata issue came

10  up.  So if this was something that was a concern and necessary

11  to determine whether or not Edgewater was duplicative of prior

12  productions, it would have come up in the summer of 2015.

13          THE COURT:  All right.  Well, this is an interesting

14  point [indiscernible] their letter which is it would have been

15  a lot easier to collect this data at the time and that you

16  didn't request this

17          MR. REUBER:  Your Honor, we didn't have reason to

18  request it at that time because we didn't know what we were

19  going to get.  We were trying to maintain a minimal footprint

20  in terms of additional outlays to get this information.  The

21  Court was not willing just to give it to us.  We had to

22  effectively prove that there had been spoliation or at least

23  some lack of diligence with regard to the Edgewater facility in

24  the first place.  We met that burden.  And even then, you only

25  gave us a limited number of Boolean searches.  You gave us

1  five.  We only used four.  We still managed to hit on documents

2  that should have been produced before.  And while we might

3  argue about whether or not certain emails had been produced in

4  the past, there is no dispute, or at least there can be no

5  dispute in my mind regarding the zero byte files.

6          THE COURT:  But that's not what you're -- your

7  request is not about the zero byte files, is it?

8          MR. REUBER:  It would capture the zero byte files as

9  well.  It would allow us to very easily, because we've already

10 got a list of the zero byte files.  We can easily match those -

11 -

12         THE COURT:  But now I'm totally confused.  I thought

13 we -- again, take spoliation out of this.  I thought we were on

14 a path where you were telling me I was produced certain set of

15 documents, I don't want to have to go over them again.  I want

16 to know what's new.  The zero byte files you've never been able

17 to review because there's nothing in them, right?

18         MR. REUBER:  Yes, Your Honor.

19         THE COURT:  So that's not an issue, is it?  You're

20 getting -- that's easy.  If you're getting the actual files,

21 then that's all new.

22         MR. REUBER:  We've only --

23         THE COURT:  And you know that, right?

24         MR. REUBER:  We've only got some of the zero byte

25 files because the Boolean searches were only able to capture

21

1  some of the zero byte files.  All of the zero byte files we do

2  not have.

3          THE COURT:  Okay.  Well whatever you've gotten, the

4  metadata isn't going to add anything to it.

5          MR. REUBER:  No, Your Honor.  The metadata will allow

6  us to identify -- I'll back up.  There are certain zero byte

7  files that have filenames that are subject to multiple emails.

8          THE COURT:  Subject to?

9          MR. REUBER:  To multiple emails.

10          THE COURT:  What do you mean subject to?

11          MR. REUBER:  An email would go from Alexon to the

12  defendants.  It would have the same file.  It would come back,

13  it would be modified going back and forth.  The same file --

14          THE COURT:  An attachment?

15          MR. REUBER:  An attachment.

16          THE COURT:  Right.

17          MR. REUBER:  Most of the zero byte files are

18  attachments.

19          THE COURT:  Okay.

20          MR. REUBER:  So the zero byte file will appear on

21  multiple emails.

22          THE COURT:  Okay.

23          MR. REUBER:  If we have the conversation ID data, we

24  can identify which emails are associated with that file much

25  easier than if we didn't have the conversation ID data.

22

1          THE COURT:  But at least for those you can -- that's

2  a limited set.

3          MR. REUBER:  It's a limited set.  Yes, Your Honor.

4          THE COURT:  You could just say for the following 20

5  emails, or 50, or whatever it is, give me this data, right?

6          MR. REUBER:  But it's still a substantial utility and

7  it --

8          THE COURT:  It's still...?

9          MR. REUBER:  Substantial utility and it cuts down on

10  the time it takes to actually acquire the --

11          THE COURT:  I'm sorry, it's still --

12          MR. REUBER:  Substantial utility.

13          THE COURT:  I don't know what you mean by substantial

14  utility.

15          MR. REUBER:  It's a lot easier to do the searching

16  and it's a lot faster to do the searching on the current

17  methodology that we have to use with only the tiffs to guide us

18  because the tiffs don't have any of the user functions that we

19  would need to do a simple de-dupe.

20          THE COURT:  I wasn't talking about de-duping.

21          MR. REUBER:  I'm sorry.

22          THE COURT:  I'm now completely confused.

23          MR. REUBER:  I'm sorry, Your Honor.

24          THE COURT:  I was talking about the emails and trying

25  to work on this and then you said you know what, don't just

1   think about the emails, think about the zero byte files.  So

2   now I'm thinking about the zero byte files and I've forgotten

3   the emails.  I thought the zero byte files are attached to the

4   emails and I thought the issue with the zero byte files was

5   that you literally had no file before.

6           MR. REUBER:  That was the issue, Your Honor.  You're

7   correct.

8           THE COURT:  But now you're getting the file.  So

9   that, unlike the other documents where you didn't know what was

10  new, you know every zero byte file is new, do you not?  What am

11  I missing?

12          MR. REUBER:  Yes, Your Honor, we know that there are

13  zero byte files at Edgewater.

14          THE COURT:  Okay.  So getting this metadata zero byte

15  files doesn't seem that important.

16          MR. REUBER:  No, Your Honor, it's not but the point I

17  was trying to speak to with regard to the zero byte is the

18  duplication aspect, the duplication element of counsel's

19  argument where he's saying there's nothing new at Edgewater

20  that hasn't been produced before.  The zero byte file stands as

21  the exception to that.

22          THE COURT:  Right, right, right.  And you've gotten

23  them and those are easily identifiable to you and you don't

24  need the metadata for the those.

25          MR. REUBER:  Correct.  We have some of them, some

24

1  zero byte files based on the --

2          THE COURT:  You don't need any -- and you're not

3  asking for any relief with respect to the zero byte files in

4  your letter, are you?

5          MR. REUBER:  No, Your Honor.  We haven't gotten to

6  that point yet.  The entire purpose of this exercise wasn't to

7  get us everything that we need to go to trial, it was to prove

8  that there is information at Edgewater that we could use to go

9  to trial.  That was the entire purpose of this exercise.

10         THE COURT:  Okay.  But let's go back.

11         MR. REUBER:  Sure.

12         THE COURT:  I'm still working on your first point.

13         MR. REUBER:  I'll do better, Your Honor.  I'm sorry.

14         THE COURT:  That's okay.  It could be me.  I'm going

15 to have to keep going through it again and again because we

16 keep getting distracted or I'm not understanding.  I can't tell

17 which.  Let's try it again.  You have -- and again, this is

18 about emails.  You were produced a number of emails from the

19 defendants and from this third party.  They were in tiff form

20 those were?

21         MR. REUBER:  Yes, Your Honor.

22         THE COURT:  Okay.  And you have reviewed them and you

23 have certain information about them.  Again, tell me if I'm

24 getting the problem wrong.  I keep trying this.  The problem

25 now is that they go to Edgewater, they do these searches.  They

1  produce a number of emails.  And you can't tell whether in this

2  production there's something new that you haven't already

3  reviewed.

4          MR. REUBER:  Can't tell easily, Your Honor.

5          THE COURT:  Can't tell easily.

6          MR. REUBER:  Yes.

7          THE COURT:  Right.  And you want that to -- it would

8  be fine with you if they said here's 1,000 emails, numbers one

9  through 900 you already have, 901 to 1,000 are new.  Would that

10 solve your problem if they could do that?

11         MR. REUBER:  Yes, Your Honor.

12         THE COURT:  Okay.  And that seems reasonable to me

13 that you should get that again given their past production.  I

14 just need to figure out what it's going -- and part of the

15 problem is I could just say to them you know what, identify the

16 new ones and if they had a good methodology for doing that you

17 could have it.  They're totally denying there are any new ones,

18 so ordering them to tell you the new ones is not going to solve

19 anything because they'll just say there are none I guess.  Hold

20 on.  I'll give you a chance.  Your solution to this is to say

21 provide these metadata fields on emails one through 1,000 and

22 then we can use a computer program that will match them up and

23 will tell us exactly which of the 1,000 are new, right?

24         MR. REUBER:  Yes, Your Honor.

25         THE COURT:  Isn't that what's going on?

1          MR. REUBER:  That is it.

2          THE COURT:  Okay.  And their answer to that is it's

3     going to cost some number that they don't know but they think

4     is big.  And your answer is no, our guy says it's really easy

5     to do this.  Right?

6          MR. REUBER:  Yes, Your Honor.

7          THE COURT:  That's where we are right now.  And I'll

8     hear from them.  But the only solution I can think to this

9     because I think they do have an obligation to tell you what's

10    new if anybody can do it without undue burden, is to get a lot

11    more information about what it would take and it may require

12    your IT person talking to their IT person and me getting

13    affidavits and explaining what the expense is.  And it may be

14    that if you say you know it's really cheap, then I'll say okay,

15    well then they can pay for it and I'll have your guy do it.  I

16    mean I have many options here.  But then of course your guy

17    would have to do it.  So he shouldn't start saying it's cheap

18    unless he can really do it for that because I'm going to expect

19    it to be done.  And if he can't do it for the price he said,

20    I'm going to expect you people to pay for it.  Can't just stop.

21    So that's sort of where I'm going right now.  But let me hear

22    from defendants because they haven't had a chance to talk.

23          MR. LAUIRCELLA:  Judge, there's three things with

24    respect to this issue that I think you need to consider.  First

25    is the product -- we're talking about the prior production, not

1  the new Edgewater facility,

2          THE COURT:  Right.

3          MR. LAUIRCELLA:  The metadata that they're looking

4  for is for the prior production, not Edgewater.

5          THE COURT:  Okay.  That's the original production.

6  Yes, go ahead.

7          MR. LAUIRCELLA:  Yes.  And the conversation ID

8  metadata is not going to solve the duplication issue with

9  respect to the documents that were produced by Ritani or third

10  party Alexon.

11          THE COURT:  Oh.

12          MR. LAUIRCELLA:  Because we are not going to be able

13  to give them metadata for documents that we did not produce.

14  So we would only be able to reproduce --

15          THE COURT:  Whoa, whoa, whoa, whoa.  They only want -

16  - they're asking for metadata for the files you produced.

17  They're asking for metadata for the new production from

18  Edgewater, right?

19          MR. LAUIRCELLA:  No.

20          THE COURT:  That's what you're asking for the

21  metadata on, isn't it?

22          MR. REUBER:  No, Your Honor.  We're asking for the --

23  we have conversation ID for the current --

24          THE COURT:  For the new.

25          MR. REUBER:  For the new.

1          THE COURT:  You want them to use it for --

2          MR. REUBER:  The old --

3          THE COURT:  Okay.  For the stuff that's now tiff.

4          MR. REUBER:  Yes.

5          THE COURT:  Okay.

6          MR. REUBER:  For the old stuff that's tiff.

7          THE COURT:  All right.  I had it backwards but it

8  doesn't change anything I said.  Go ahead.  A right.  So your

9  point is you could only do it for your production, not for the

10  third party's production.

11          MR. LAUIRCELLA:  Correct.  And that's not going to

12  help them.  It may provide some assistance but it's not going

13  to provide this global assistance where you hit one button and

14  all of a sudden all the new documents come up because there's

15  going to be, you know, tens of thousands of documents that

16  Ritani produced and documents that Alexon produced that are

17  these emails that we say were already in their production that

18  are now coming from the Edgewater facility.  So it's not going

19  to solve that problem.

20          And second, we -- counsel and I negotiated

21  extensively the protocol for this Edgewater facility.

22          THE COURT:  Okay.  Which is what threw me off because

23  I think -- are you about to tell me that if he wanted the

24  metadata he could have asked for it?

25          MR. LAUIRCELLA:  Well --

1        THE COURT:  But I thought you got it for the

2    Edgewater stuff you told me.  It's now the original stuff that

3    he needs it for.  So the demand is not with respect to the

4    Edgewater production, it is with respect to the original

5    production, right?

6        MR. LAUIRCELLA:  Well, I think the protocol that we

7    discussed was for the issue that was a duplication of Edgewater

8    in the prior production of what was going to occur.  And at no

9    point have we ever discussed having to redo everything.

10        THE COURT:  No, no, no, but it had already been done

11    at that point.  You had already done it.  It's not like you

12    could have proceeded differently at that point, right?  You had

13    already produced that original tiff data.

14        MR. LAUIRCELLA:  Correct.

15        THE COURT:  So even if they had raised it at this

16    meeting it wouldn't have made any difference.

17        MR. LAUIRCELLA:  Well, I think the difference that it

18    could have made is (A), that was two and a half years ago, that

19    now we're two and a half years further along in the 2011

20    litigation.  And also, I'm not sure how it would have affected

21    the initial decision and burden on searching the Edgewater

22    facility if at that same time the plaintiff said okay, we're

23    not only going to have to search the Edgewater facility but,

24    you know, the entire production is going to need to be -- the

25    original production is going to need to be reproduced with this

1  new metadata.

2          THE COURT:  Okay.  But again, the labor would be the

3  same, it's the delay you're complaining about.  So what about

4  the non-party production problem?

5          MR. REUBER:  Your Honor, it would be helpful to know

6  exactly who produced what.  And if the defendants have a set

7  data set and Alexon has a set data set and we can compare the

8  two, that would still be useful.  We have the --

9          THE COURT:  I'm not following.  Try it again.

10         MR. REUBER:  Sure.  A large part of --

11         THE COURT:  Let me try to frame the problem for you.

12         MR. REUBER:  Okay.

13         THE COURT:  What I think I heard them say was okay,

14 even if we gave you -- we took back all those tiff stuff and

15 gave it back to you with metadata, we could only do it for our

16 stuff, not Alexon stuff.  So you would have a match but it

17 would only give you information with respect to our production.

18         MR. REUBER:  And that's accurate and that would be

19 sufficient for our purposes going to trial because for one

20 problem we have with Alexon is if Alexon doesn't come to trial,

21 we have an issue in terms of admissibility as to what he has

22 submitted with us, or to us.  And if it comes from defendant's

23 files, we don't have that same issue.

24         THE COURT:  Have you tried asking them to admit that

25 all the emails from them to Alexon and back and forth are

31

1   authentic?

2           MR. REUBER:  Yes, Your Honor.

3           THE COURT:  And have they admitted it?

4           MR. REUBER:  No, Your Honor.

5           THE COURT:  Why haven't you admitted it?  That may

6   affect what I do here.

7           MR. LAUIRCELLA:  I'm not aware -- are we talking

8   about a request for admission?

9           THE COURT:  Yes.

10          MR. LAUIRCELLA:  I'm not aware of any request for

11  admission since I've been involved in the case.

12          THE COURT:  I mean standing here now, and I won't

13  hold you to it, do you have any reason to doubt that they're

14  authentic?

15          MR. LAUIRCELLA:  No.  And I told counsel that when we

16  spoke about this issue.

17          THE COURT:  Let's assume it's going to get admitted

18  then.  I was literally asking if you had done a request for

19  admission.

20          MR. REUBER:  Yes, Your Honor.

21          THE COURT:  You think you did it and they refused?

22          MR. REUBER:  I am confident that we submitted

23  requests for admission regarding this, yes.  With prior

24  counsel.  It wasn't with current counsel.

25          THE COURT:  Okay.  Well why don't you guys after talk

1  this out because this could affect what I did here if they're

2  refusing to admit it.

3          MR. LAUIRCELLA:  I don't think there's any -- I don't

4  think there's going to be any issue with the authenticity of an

5  email that says, you know, HaroutAghjayan@gmail.com, or

6  whatever the email address is, or Shawndria and Alexon, I don't

7  think that's ever, to my knowledge, and don't hold me to this,

8  Your Honor, but I don't understand that to be an issue in the

9  case.

10          THE COURT:  But let's settle this because if the

11  answer is something different, there could be a lot more burden

12  placed on you.  So let's assume for the moment that they're

13  going to admit that.  So back to you.  Tell me why how having

14  the metadata for the defendant's production is going to be

15  materially advantageous to you.

16          MR. REUBER:  Even if we are only going to be informed

17  as to the production of the defendants as separate and apart

18  from the production of Alexon, it's going to tell us the extent

19  of the lost data associated with defendant's production because

20  right now that is a large part --

21          THE COURT:  We're now back to spoliation.

22          MR. REUBER:  We are --

23          THE COURT:  And I'm solving your spoliation issue.

24  I'm going to let you pick 20 emails and get this information at

25  a minimum.  So take spoliation out.

1          MR. REUBER:  If spoliation is out of it, Your Honor,

2     the utility associated with purely the defendant's documents is

3     going to be limited to not reviewing the same documents twice

4     and knowing what was produced from Edgewater as opposed to the

5     previous production and what was not.

6          THE COURT:  Okay.  So it would at least let you not

7     have to review things twice to understand what's new from the

8     defendants.  How about this?  What if I just order -- tell me

9     why this would be unreasonable.  What if I just ordered you to

10     identify for him which in your recent production from you have

11     not already been produced by you?  Why would that be -- would

12     there be anything unreasonable about that or --

13          MR. LAUIRCELLA:  Anything in our new production that

14     wasn't previously produced, I don't --

15          THE COURT:  Okay.  And your answer is going to be

16     nothing.  And then if it turns out you're wrong on that, then

17     you're going to be in trouble.

18          MR. LAUIRCELLA:  That wasn't previously produced by

19     us or previously produced by --

20          THE COURT:  No, by you.  What is being produced by

21     you --

22          MR. LAUIRCELLA:  By defendants.

23          THE COURT:  -- in the Edgewater production that was

24     not previously produced by you.  And I guess you would identify

25     all the Alexon documents because you would have to plus some

34

1   documents that were in your possession.

2        MR. LAUIRCELLA:  There would be -- I think we'd have

3   to go through all of them and compare them to what was

4   produced.

5        THE COURT:  Right.  That's what he doesn't want to

6   have to do.  Why should he have to do it?

7        MR. LAUIRCELLA:  They've been doing it for months.

8        THE COURT:  Doing what?

9        MR. LAUIRCELLA:  Reviewing the documents that were

10  already produced.  I don't know how many they've gone through

11  already.  And you know, the contention was that these are --

12  that there's a whole set of new documents and we wouldn't be

13  able to tell the Court this wasn't produced without reviewing

14  them all.  And the defendant said -- plaintiffs and we want to

15  an opportunity to check and we've given them that opportunity.

16  And now it seems like the burden is shifting back to the

17  defendants to go through everything.

18        MR. REUBER:  Your Honor, if I may?

19        THE COURT:  Yes, go ahead.

20        MR. REUBER:  I think that's a wonderfully elegant

21  solution to this problem considering that the defendants are

22  the ones who have been saying that Edgewater is duplicative for

23  the last two years.

24        THE COURT:  But what if they come back and they just

25  say no, nothing new?

1    MR. REUBER:  If the Court wants to hold a hearing at

2  that point, if we prove them wrong, I'm more than happy to do

3  that.

4    THE COURT:  I mean you say you can prove them wrong

5  already.

6    MR. REUBER:  Yes, Your Honor.

7    THE COURT:  So I think we have to do this in two

8  parts.  First, you need to supply to them the documents you say

9  were not produced by anybody before.  Give them the Bates

10  numbers.  Right?  You can do that.

11    MR. REUBER:  I've already given them an exemplar.

12  Are we obligated to give them everything that we found to date

13  in terms of that we know hasn't been produced?  Because we're

14  still going through the production.  Like I said, it's a very -

15  - we've already identified -- we've already given them all of

16  the zero byte files previously and we gave them --

17    THE COURT:  Well again, we're not talking about zero

18  byte.  I thought we were talking about emails.

19    MR. REUBER:  Emails?  I've given the 20 exemplars in

20  October with Edgewater production numbers.  They have not

21  identified any production numbers in prior production that they

22  gave us.

23    THE COURT:  Okay.

24    MR. REUBER:  In other words, non-Edgewater.

25    THE COURT:  So you've done that already.

1        MR. REUBER:  Yes.

2        THE COURT:  Do you know what he's talking about?

3        MR. LAUIRCELLA:  Yeah.  We have a different

4   understanding about what happened.  I know counsel sent me the

5   email in October with the 20 exemplars.  My understanding was

6   those are 20 exemplars that were not produced by defendants.

7   And I believe that those were produced.  But I know what he's

8   talking about and I could check that very easily whether or not

9   those were produced.

10       THE COURT:  Well it's the very thing that you keep

11  denying exists.  So is it right or is it wrong?  I keep saying

12  to you was there any production in the new production from

13  Edgewater that hadn't previously been produced by you or

14  Alexon.  You said no.  And now it sounds like you're admitting

15  there's 20 of them.

16       MR. LAUIRCELLA:  No.  I know counsel sent me that

17  letter with 20 and I thought we had multiple conversations

18  after that where we both agreed that these were produced by

19  Alexon or Ritani.

20       THE COURT:  Oh, I'm sorry.  I didn't hear you

21  correctly.  So you need to then supply him with the Bates

22  numbers of the prior production.

23       MR. LAUIRCELLA:  No problem doing that.  I think I

24  went through the first five or ten with him on the phone, with

25  Mr. Reuber on the phone.  And then I said do you want me to

1   still go through or are you satisfied that these were

2   previously produced?  But I have no problem and that's an easy

3   task.

4           THE COURT:  All right.  So supply the whole thing

5   because that's a little bit of a predicate for this whole

6   thing, Mr. Reuber, is that there is some set of a significant

7   number of documents that isn't in the group.  If you literally

8   can't find any, then there's a problem with the premise of your

9   argument.

10          MR. REUBER:  Yes, Your Honor.

11          THE COURT:  Okay.

12          MR. REUBER:  And I believe that we already satisfied

13  that.  But again, the zero byte file issue still exists and

14  that there are zero byte files in Edgewater that were not

15  produced to us previously that have now been produced to us.

16          THE COURT:  But it seemed like those were very easily

17  identifiable because you already know --

18          MR. REUBER:  Yes, Your Honor.

19          THE COURT:  -- what the zero byte files are.  So it's

20  not like -- and you never reviewed them before anyway.  My

21  point is they're easily identifiable so you know you have to

22  look at those.

23          MR. REUBER:  Sure, Your Honor.  Absolutely.

24          THE COURT:  So that doesn't fit into this category.

25  Okay.  So step one is defendant needs to supply you with Bates

1   numbers of all of those.  If in fact can't -- if he can, then

2   we need to revisit this because unless someone can show me that

3   there's something new in this new production, then I don't know

4   that I'm going to put them to any burden to help on this de-

5   duping effort.  Do you understand what I'm saying?

6         MR. REUBER:  Yes, Your Honor.

7         THE COURT:  So that's step one.  So someone needs to

8   report back on step one.  And then I'll give you a hint on step

9   two.  If in fact there are documents that are being produced

10  from Edgewater that were not previously produced, and of course

11  they'd have to have some importance, then we need to talk about

12  who's going to bear this burden of figuring out what's new.  In

13  the IT people will need to talk and they'll need to figure out

14  what it is you think defendant should be doing, what they think

15  they need to do to solve this problem and how much it's going

16  to cost because I can't do this in a vacuum.  Okay?  So that's

17  where we are in this first request.  Any questions, Mr. Reuber?

18        MR. REUBER:  No, Your Honor.

19        THE COURT:  Any questions, Mr. Lauircella?

20        MR. LAUIRCELLA:  No, Your Honor.

21        THE COURT:  Okay.  Now I've completely forgotten your

22  second request.  Give me a second to review it.

23              [Pause in proceedings.]

24        THE COURT:  Frankly, Mr. Reuber, I didn't really

25  understand your request, so try it again.

 1            MR. REUBER:  The long and the short of it, Your

 2     Honor, is that in the 60 days immediately following being

 3     served with lawsuits we have emails that were attached to my

 4     letter indicating that Mr. Aghjayan deleted information off of

 5     the Edgewater facility data stores.  This is consistent with

 6     also --

 7            THE COURT:  That who deleted it?

 8            MR. REUBER:  We believe it to be Mr. Aghjayan who's

 9     referred to in the email as Mr. Happy.  At least that is to the

10     best of Gevik [Ph.] Cajadorian [Ph.] who is the IT consultant

11     for the defendants, his understanding.

12            THE COURT:  All right.

13            MR. REUBER:  And this is consistent also with data

14     that was devised by our ESI expert who looked at the laptop and

15     the desktop and determined that file destruction software was

16     run during that same time period by Mr. Aghjayan.  And this is

17     consistent with Mr. Aghjayan saying that he went to Gevik

18     indicating that he --

19            THE COURT:  That he...?

20            MR. REUBER:  He went To Gevik indicating that he had

21     a virus problem but asked Gevik not to work on it, he was going

22     to take care of it himself in which case he went and he asked

23     Gevik what software can I buy that will effectively erase

24     everything permanently from my desktop?  And Mr. Cajadorian

25     instructed him as to where to go to get that program, and he

1  did.  And these two emails -- well, there's four emails, but

2  there's one from January 30th from Mr. Aghjayan's wife and

3  business partner  Shawndria to Gevik indicating at least two

4  deletions and requests to be restored based on those.  our

5  theory is that he got served with the lawsuits, decided to get

6  rid of the evidence, and he got rid of something that was

7  necessary for the business to run.  And it was restored.  And

8  we would like copies of everything that was destroyed in the

9  aftermath, immediate aftermath of being sued.

10        THE COURT:  Okay.  So let's talk about your request.

11  You want -- what is it you're asking for exactly?

12        MR. REUBER:  We want production of what was destroyed

13  during that time, what was destroyed or what was recovered.

14  The requests were done here and it looks like at least one of

15  them was successful.  We don't have verification that the

16  second one was.  But the subject matter of the email indicating

17  --

18        THE COURT:  So you want production of what was

19  destroyed?

20        MR. REUBER:  Yes, Your Honor.

21        THE COURT:  How do they produce what's destroyed?

22  I'm sorry.

23        MR. REUBER:  Well, it was -- I'm sorry.  What was

24  restored or --

25        THE COURT:  So you want production of the files that

41

1  were restored?

2          MR. REUBER:  Yes.

3          THE COURT:  And how do they do that?

4          MR. REUBER:  They have at least done it once.  I

5  believe they just go and look at the history for the backup

6  server, identify the folder that was restored based on that

7  history and produce that.  But we didn't do this work --

8          THE COURT:  I mean if you read you guy's letters it's

9  like you're talking about totally different things.  They're

10  talking about style numbers of 400.  I can't even tell what's

11  going on here.  Try this again, Mr. Reuber.

12          MR. REUBER:  Sure.

13          THE COURT:  I thought you were asking to personally

14  go and do this yourself.  What is the request?

15          MR. REUBER:  We would like our IT expert to go and

16  search and try to recover this information.

17          THE COURT:  This information being to figure out what

18  --

19          MR. REUBER:  The document -- the data that was --

20          THE COURT:  Hold on.  Let me finish.

21          MR. REUBER:  I'm sorry, Your Honor.

22          THE COURT:  What files were destroyed and restored?

23  What files were restored which --

24          MR. REUBER:  Any discovery we can get regarding the

25  deletion and/or restoration of files in the 60 days or 60 to 90

42

1    days immediately following service.

2           THE COURT:  Well, I think you have to say what

3    discovery you want so we can have this in a concrete form.

4    What is it you're asking for?

5           MR. REUBER:  We're asking for our IT expert to search

6    the Edgewater facility or the current data store that has

7    already been preserved for information concerning data that was

8    destroyed in the 90 days immediately following service of the

9    lawsuit.  Destroyed and/or restored.

10           THE COURT:  Destroyed or restored.

11           MR. REUBER:  Yes.

12           THE COURT:  Okay.  So what's your response to that?

13           MR. LAUIRCELLA:  Your Honor, this comes out of the

14    protocol that we had negotiated and specifically it's Number 3

15    in our protocol for the Edgewater facility.  And what had

16    occurred, or what was said to occur in the protocol, is counsel

17    identified a specific email that was there were 26, 2012 where

18    Gevik Cajadorian restored a folder to the defendant's computer

19    and --

20           THE COURT:  Which is one of these four emails you

21    attached.

22           MR. LAUIRCELLA:  Yes.  And our protocol was for that

23    specific email of February 26, 2012.

24           THE COURT:  Okay.

25           MR. LAUIRCELLA:  And in our protocol, our IT expert

1   would attempt to recover that folder and if possible would

2   produce it to my office for review.  And if it was within

3   styles 100 through 400 it would be produced to Ritani.  The

4   folder and the specific path was identified for plaintiff's

5   counsel.  It is for a style --

6           THE COURT:  So you found out what was destroyed or

7   what was restored?

8           MR. LAUIRCELLA:  It was what was -- I guess it was

9   deleted and then restored.

10          THE COURT:  So you only found out this restored file

11  that had previously been deleted?

12          MR. LAUIRCELLA:  Correct.  That's all we were looking

13  for.  That's all we were supposed to look for.

14          THE COURT:  All right.  Go ahead.  And you didn't

15  produce it because it was 400?

16          MR. LAUIRCELLA:  It was over 400.  And that's exactly

17  what we had agreed to in our protocol.

18          THE COURT:  So would it be enough for you if I told

19  them to give you the one that they found?  It sounds like

20  that's what you are asking for.  What am I missing?

21          MR. REUBER:  For the second email.  There's two

22  emails indicating two destructions, two separate destructions.

23  There's the January and the February.  It looks like the

24  restoration took place only in February according to Gevik.

25  But there's -- if you look at the four emails, there's two

1  different -- there's two separate chains.  And I didn't

2  initially appreciate this, but through conversation with

3  counsel I've now determined that there is Monday, January 30,

4  2012 at 6:39 p.m. which is Shawndria asking Gevik --

5            THE COURT:  Yes, I see it, I see it.  So that's a

6  restoration.

7            MR. REUBER:  That's a restoration.

8            THE COURT:  So you're interested in that restoration.

9            MR. REUBER:  Yes.

10            THE COURT:  And his answer we already had an

11  agreement on this.  He didn't ask for it.

12            MR. REUBER:  But I disagree that we didn't ask for

13  it.  I'm pretty sure I can establish that I asked for it

14  because I sent him these exact emails indicating this is what I

15  was looking for.

16            THE COURT:  All right.  So go ahead.

17            MR. LAUIRCELLA:  Judge --

18            MR. REUBER:  And in the protocol --

19            MR. LAUIRCELLA:  -- our protocol explicitly says that

20  the defendant's ESI expert will make all reasonable effort to

21  locate the folder restored by Gevik Cajadorian in February

22  2012.  And then in brackets it said the folder appears to be

23  identified in the February 26, 2012 email.

24            THE COURT:  He's quoting from his letter, by the way,

25  Mr. Reuber.

45

1          MR. REUBER:  Yes, Your Honor.  I'm looking it up.

2          THE COURT:  So --

3          MR. LAUIRCELLA:  And that's what was done.  And it

4     falls outside of 100 through 400.  Your Honor has already ruled

5     that --

6          THE COURT:  And then there's also an agreement not to

7     do styles above 400.

8          MR. REUBER:  Pending judicial determination.  They've

9     indicated that styles above 400 are out of this case.

10          THE COURT:  No, no, no.  Forget what's out of the

11     case.

12          MR. REUBER:  Sure.

13          THE COURT:  They say that you have some written

14     agreement that you were going to ask just for the 26th date and

15     if it came up with a file above 400 they didn't have to give it

16     to you.

17          MR. REUBER:  Well, on Point 6 of their email they

18     also put in, "But we'll segregate or tag them so they can be

19     produced --"

20          THE COURT:  Hold on.  This is Point 6 of the protocol

21     which I don't have.

22          MR. REUBER:  Of the protocol, yes.

23          THE COURT:  Okay.  It says what?

24          MR. REUBER:  "But we'll segregate or tag them so they

25     can be produced to plaintiff pending judicial resolution of the

46

1    outstanding dispute."  And that is the dispute that --

2              THE COURT:  For the ones above 400?

3              MR. REUBER:  Yes.

4              THE COURT:  Okay.  But as to the -- what about the

5    fact that you didn't ask for this January one and it's not part

6    of your agreed-upon protocol?

7              MR. REUBER:  Defendants -- if we go back to Paragraph

8    3, defendant's ESI expert will make all reasonable efforts to

9    look at the folder restored by Gevik Cajadorian in January

10   2012.

11             THE COURT:  But my quote says February 2012.  That's

12   what it says in the letter.

13             MR. REUBER:  Well, I have a hole punch unfortunately

14   that's going through there but --

15             THE COURT:  You have what?

16             MR. REUBER:  A hole punch, Your Honor.  It's taken

17   out the -- I read that as January 2012.  If it says February --

18             THE COURT:  And it's in his letter.  I assume you

19   read his letter.

20             MR. REUBER:  Yes, Your Honor, I read his letter but

21   the letter I'm reading now has a hole punch through --

22             THE COURT:  Okay.  So now you know.

23             MR. REUBER:  Now I know.

24             THE COURT:  I mean I don't like to disturb parties'

25   prior agreements.  I understand the over 400 thing but --

1        MR. REUBER:  Your Honor, my understanding, and I can

2   go back to the emails, is that when I'm talking about the

3   restoration of what was here, I didn't segregate the email that

4   specifically says 215 and 215 done.

5        THE COURT:  February 2012 was a mistake on your part.

6   You meant to include January?  Is that your point?

7        MR. REUBER:  Yes, Your Honor.

8        THE COURT:  This is no burden to you, is it?  That's

9   for you.

10        MR. LAUIRCELLA:  I mean minimal burden.  It's our ESI

11   expert will have to go back and find it if they can find it.  I

12   don't --

13        THE COURT:  Okay.

14        MR. LAUIRCELLA:  They didn't look for that one.

15        THE COURT:  I don't blame you for relying on the

16   agreement but on the other hand, this is not worth wasting time

17   on.  So go ahead.  I'm going to direct that you find out what

18   file was referred to by that and produce it to them.  And also

19   produce the other one even though it's above 400.  This is not

20   to be taken as a ruling as to relevance or anything else.  But

21   at this point there's been enough problems with the defendant's

22   production that I'm not going to start putting a very minor

23   limitation like this.  Any questions about my ruling?

24        MR. LAUIRCELLA:  Your Honor, can I just clarify?

25        THE COURT:  Yes.

48

1          MR. LAUIRCELLA:  Counsel's letter was very broad.

2     Your ruling is only related to this document that's identified

3     in Exhibit 24?

4          THE COURT:  That's Exhibit 24.  Yes, exactly.

5          MR. LAUIRCELLA:  Okay.  So we'll make the efforts to

6     locate that.

7          THE COURT:  Locate that and produce it, and produce

8     the one that you found as a result of Exhibits 25 through 27

9     notwithstanding the fact that it's over 400 and without

10    prejudice to any future argument on your part that it lacks

11    relevance.

12          Okay.  What else do we need to do today, Mr. Reuber?

13          MR. REUBER:  If I could ask that the efforts made to

14    locate that be cataloged so that my expert can review?

15          THE COURT:  What do you mean?

16          MR. REUBER:  There was some issue -- I'm not 100

17    percent clear on the issue between the ESI experts working

18    before, but there was some issue before regarding the

19    methodology used by their current ESI expert that --

20          THE COURT:  To figure out what they were referring to

21    in that email?

22          MR. REUBER:  No, Your Honor, in terms of the data

23    restoration process.  There was some dispute --

24          THE COURT:  You mean once they find it whether

25    they're restoring the right file?

49

1          MR. REUBER:  Yes, Your Honor.

2          THE COURT:  Okay.  Well, you should make your ESI

3  expert available to explain that to their expert.  Okay?  I

4  mean there has to be transparency about all this process.

5          Anything else, Mr. Reuber?

6          MR. REUBER:  No, Your Honor.  Thank you.

7          THE COURT:  From defendant's side?

8          MR. LAUIRCELLA:  We don't have anything, Your Honor.

9          THE COURT:  Okay.  Thank you, everyone.

10          MR. LAUIRCELLA:  Thank you, Judge.

11          MR. REUBER:  Thank you, Judge.

12                    * * * * * *

13

14

15

16

17

18

19

20

21

22

23

24

25

50

1    I certify that the foregoing is a court transcript from an

2 electronic sound recording of the proceedings in the above-

3 entitled matter.

4

5                                        *Mary Greco*
     _____

6                                        Mary Greco

7 Dated:  March 24, 2018

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25